[NOT YET SCHEDULED FOR ORAL ARGUMENT]

No. 25-5165

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

SUSAN TSUI GRUNDMANN,

Plaintiff-Appellee,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the District of Columbia

_____

## MOTION FOR A STAY PENDING APPEAL AND AN
## ADMINISTRATIVE STAY

_____

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
LAURA E. MYRON
DANIEL AGUILAR
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Plaintiff-appellee is Susan Tsui Grundmann. Defendants-appellants are Donald J. Trump, in his official capacity as President of the United States of America, and Colleen Duffy Kiko, in her official capacity as Chairman of the Federal Labor Relations Authority.

No amici curiae or intervenors participated before the district court.

### B.    Ruling Under Review

On March 12, 2025, the district court (Judge Sparkle L. Sooknanan), granted summary judgment to the plaintiff and ordered that plaintiff "shall continue to serve as a Member of the Federal Labor Relations Authority." Order at 2, Dkt. No. 21, *Grundmann v. Trump*, No. 25-425 (D.D.C. Mar. 12, 2025). The district court's opinion will be published in F. Supp. 3d, and is currently available at 2025 WL 782665. Defendants seek review of the district court's opinion and order.

### C.    Related Cases

This case has not previously been before this Court.

*Wilcox v. Trump*, No. 25-5057 (D.C. Cir.), similarly involves a challenge to the President's removal of a principal officer from a

multimember agency (the National Labor Relations Board) with statutory removal restrictions, 29 U.S.C. § 153(a).

*Harris v. Bessant*, No. 25-5055 (D.C. Cir.), similarly involves a challenge to the President's removal of a principal officer from a multimember agency (the Merit Systems Protection Board) with statutory removal restrictions, 5 U.S.C. § 1202(d).

*Slaughter, et al. v. Trump*, No. 1:25-cv-909 (D.D.C. filed Mar. 27, 2025), involves a challenge to the President's removal of a principal officer from a multimember agency (the Federal Trade Commission) with statutory removal restrictions, 15 U.S.C. § 41.

/s/Daniel Aguilar
Daniel Aguilar
*Attorney, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................... 1

STATEMENT .................................................................................................... 5

    A.    Statutory Background ................................................................ 5

    B.    This Litigation ........................................................................... 7

ARGUMENT .................................................................................................... 8

    A.    The Government Is Likely To Prevail On The Merits ............... 9

        1.    At-will removal is the general rule, and the FLRA does not fit within any exceptions ..................................... 9

        2.    Grundmann cannot show entitlement to reinstatement ................................................................... 17

    B.    The Remaining Factors Favor A Stay ...................................... 23

CONCLUSION ................................................................................................ 25

CERTIFICATE OF COMPLIANCE

ATTACHMENT A: District Court Summary Judgment Order

ATTACHMENT B: District Court Summary Judgment Opinion

ATTACHMENT C: District Court Order Denying Stay Pending Appeal

ATTACHMENT D: District Court Stay Opinion

**INTRODUCTION**

This appeal arises from the district court's order reinstating a member of the Federal Labor Relations Authority (FLRA or Authority) whom the President has lawfully fired. The Supreme Court recently stayed similar orders for Members of the Merits Systems Protections Board (MSPB) and the National Labor Relations Board (NLRB), recognizing that "the Government is likely to show that both" agencies "exercise considerable executive power," such that the President "may remove without cause" those agencies' principal officers. Order at 1, *Trump v. Wilcox*, No. 24A966 (U.S. May 22, 2025) (hereinafter *Wilcox* Order). The Court additionally explained that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." *Id*. Thus, a stay was warranted "to avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation." *Id*. at 2.

That logic applies here. The district court's reinstatement of plaintiff Susan Tsui Grundmann to a principal office of the United States works a grave harm to the separation of powers and undermines the President's ability to exercise his authority under the Constitution. The government

seeks a stay of the district court's order pending appeal, and an administrative stay while this Court considers the motion.

The Constitution vests the entirety of the "executive Power" in the President, who is given the sole responsibility to "take Care that the Laws be faithfully executed." Art. II, § 1, cl. 1; *id*. § 3. As the Supreme Court has long held, that executive power encompasses the authority to remove those who aid the President in carrying out his duties.

On February 10, 2025, the President exercised his Article II authority to remove plaintiff from her position as a Member of the FLRA, an Executive Branch agency that performs quintessentially executive functions. Grundmann filed suit to challenge that removal, and, on March 12, 2025, the district court granted summary judgment and issued an injunction reinstating her to office. That extraordinary relief significantly and unjustifiably intrudes on the President's constitutional authority to oversee the Executive Branch and the principal officers he must trust to carry out his responsibilities. Consistent with the Supreme Court's stay order in *Wilcox,* the district court's order should be stayed.

First, the district court erred in holding that the President lacks authority to remove Grundmann from the FLRA other than "for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 7104(b).

That statutory restriction on the President's removal power is unconstitutional. The President "as a general matter" has "authority to remove those who assist him in carrying out his duties." *Free Enterprise Fund v. Public Accounting Oversight Board*, 561 U.S. 477, 513-14 (2010). The Supreme Court in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), recognized a limited exception to that rule of at-will Presidential removal for "a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Seila Law LLC v. CFPB*, 591 U.S. 197, 216 (2020). This exception, however, does not encompass the FLRA, which plainly exercises executive power in "carrying out the purpose" of the Federal Service Labor-Management Relations Statute. 5 U.S.C. § 7105(a)(1). The FLRA determines the appropriateness of bargaining units for labor organization representation; prescribes criteria and resolves issues related to granting of national consultation rights and determining compelling need for agency rules or regulations; conducts hearings and resolves complaints of unfair labor practices; and resolves exceptions to arbitral awards issued under the statute. *Id.* § 7105(a)(2)(A)-(H). Accordingly, because the FLRA does not fit within the narrow *Humphrey's*

*Executor* exception, Congress cannot restrict the President's removal authority.

Second, Grundmann will not suffer irreparable harm in the absence of immediate reinstatement—indeed, it is "the Government [that] faces greater risk of harm" by her reinstatement. *Wilcox* Order at 1. The district court wrongly concluded that this is the sort of "genuinely extraordinary situation," *Sampson v. Murray*, 415 U.S. 61, 92 & n.68 (1974), in which loss of government employment may constitute irreparable harm. Likewise, the court's conclusion that Grundmann was irreparably harmed by being deprived of a presidentially appointed and congressionally confirmed position that served as the "capstone of her long career in public service," Dkt. 22 at 33, also fails because public officials have no individual right to the powers of their offices. *See Raines v. Byrd*, 521 U.S. 811, 820 (1997) ("loss of political power" not irreparable harm).

Third, the balance of the equities and the public interest favor a stay. The relief Grundmann obtained—an order requiring the President to reinstate a person he has chosen to remove from office—is extraordinary and virtually unheard of. Such an order would greatly impede the President's authority to exercise "all of" "the 'executive Power'" of the United States. *Seila Law*, 590 U.S. at 203. Allowing Grundmann to exercise

4

executive power over the President's objection unquestionably inflicts irreparable harm on both the Executive and the separation of powers.

A stay pending appeal and an administrative stay are warranted.

## STATEMENT

### A.     Statutory Background

The Federal Labor Relations Authority is an executive branch agency that oversees relations between certain non-postal federal employees, their federal employers, and public-sector unions under the Federal Service Labor-Management Relations Statute (FSLMRS), 5 U.S.C. § 7101, *et seq*. The FLRA comprises three Members, appointed by the President with the advice and consent of the Senate, who serve fixed five-year terms. *Id*. § 7104. A statute provides that FLRA Members may be removed "only for inefficiency, neglect of duty, or malfeasance in office." *Id*. § 7104(b).

The FSLMRS defines and lists the rights of certain federal employees, labor organizations, and government agencies, and tasks the FLRA with realizing the statute's directives. Among other things, the FLRA is directed to: determine the appropriateness of units for labor organization representation; prescribe criteria and resolve issues related to granting of national consultation rights and determining compelling need for agency rules or regulations; conduct hearings and resolve complaints of unfair

labor practices; and resolve exceptions to arbitral awards issued under the FSLMRS. 5 U.S.C. § 7105(a)(2)(A)-(H).

The FSLMRS grants the FLRA a broad array of means to carry out these functions, including the authority to: "(1) hold hearings; (2) administer oaths, take the testimony or deposition of any person under oath, and issue subpoenas as provided in [5 U.S.C. § 7132]; and (3) * * * require an agency or labor organization to cease and desist from violations of this chapter and require it to take any remedial action it considers appropriate to carry out the policies of this chapter." 5 U.S.C. § 7105(g); *see also id.* § 7105(a)(2)(I) (authorizing the FLRA to take "actions as are necessary and appropriate to effectively administer the provisions of" the FSLMRS). When resolving complaints of unfair labor practices, for example, the FLRA may issue an order requiring an agency or labor organization to "cease and desist from such unfair labor practice;" "requiring the parties to renegotiate a collective bargaining agreement;" "requiring reinstatement of an employee with backpay;" and "including * * * such other action as will carry out the purpose of this chapter." *Id.* § 7118(a)(7)(A)-(D).

The FLRA possesses other significant powers. It is authorized to "prescribe rules and regulations to carry out the provisions of this chapter."

5 U.S.C. § 7134. With the exception of litigation before the Supreme Court as provided in 28 U.S.C. § 518, the FLRA may also send its own attorneys to "represent the Authority in any civil action brought in connection with any function carried out by the Authority pursuant to this title or as otherwise authorized by law." 5 U.S.C. § 7105(h).

### B.    This Litigation

**1.** Plaintiff Grundmann was confirmed by the U.S. Senate to a five-year term as Member of the FLRA on May 12, 2022. Compl. ¶ 3. On January 3, 2023, then-President Biden designated Plaintiff as the FLRA Chair. *See* FLRA News, "Susan Tsui Grundmann designated FLRA Chairman," (Jan. 3, 2023), *available at* https://perma.cc/Q3Q9-LBRT.

On February 10, 2025, the Deputy Director of the White House Presidential Personnel Office informed Grundmann that she was being removed from the FLRA. Compl. ¶ 16. The next day, the President named Colleen Kiko Duffy as Chairman of the FLRA. Compl. ¶¶5, 19.

Grundmann sued and moved for summary judgment, which the district court granted on March 12, 2025, entering a permanent injunction and a declaratory judgment. The court concluded that the FLRA "satisfies the *Humphrey's Executor* exception, making the removal provision a valid exercise of Congress's constitutional authority." Dkt. 22 at 18. The court

declared Grundmann's removal "unlawful," Dkt. No. 21 at 1, and ordered that she "shall continue to serve as a Member of the" FLRA "until her term expires * * * unless she is earlier removed 'upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office,'" *id.* at 2. The court further enjoined defendant Colleen Duffy Kiko, and her subordinates and agents, from "removing [Grundmann] from her office without cause," treating her as having been removed, denying her access to the "benefits and resources of the office," or obstructing her authority. *Id.*

**2.** At the time of the district court's order, this Court was considering whether the government was entitled to stays pending appeal of similar orders reinstating principal executive officers. *See Wilcox v. Trump*, No. 25-5057 (D.C. Cir.). On March 28, 2025, a divided panel granted the government a stay in that litigation, but the en banc court soon thereafter reversed and denied those stays on April 7, 2025. The Supreme Court granted an administrative stay on April 9, and ultimately granted a stay pending appeal in a May 22, 2025 opinion and order. *See Wilcox* Order. Following the Supreme Court's decision, the government moved the district court for a stay pending appeal in this case on May 27, 2025, which the district court denied on June 13, 2025, Dkt. 29.

## ARGUMENT

In considering a stay pending appeal, this Court considers four factors: the likelihood of success on the merits, the movant's irreparable injury, the balance of harms, and the public interest. *Nken v. Holder*, 556 U.S. 418, 426 (2009).

The Supreme Court has recently concluded that the government is likely to show it will succeed on the merits and that there is a greater risk of harm to the government from an order allowing a removed officer to continue exercising executive power in two similar cases and stayed district orders that reinstated Members of the MSPB and NLRB. *See Wilcox* Order, No. 24A966 (U.S.). A stay is similarly warranted here.

### A.  The Government Is Likely To Prevail On The Merits

The government is likely to prevail because the Constitution empowers the President to remove, at will, principal officers leading a freestanding component within the Executive Branch, such as FLRA Members, and because the district court's remedy exceeds its powers.

### 1.  At-will removal is the general rule, and the FLRA does not fit within any exceptions

Article II of the Constitution provides that "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law*, 591 U.S. at 203 (quoting U.S. Const. art. II,

9

§ 1, cl. 1; *id.* § 3). To discharge those responsibilities, the President "as a general matter" has "authority to remove those who assist him in carrying out his duties." *Free Enterprise Fund*, 561 U.S. at 513-14. "Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Id.* at 514.

The Supreme Court has "recognized only two exceptions to the President's unrestricted removal power." *Seila Law*, 591 U.S. at 203. First, the Court has held that "Congress could provide tenure protections to certain *inferior* officers with narrowly defined duties." *Id.* at 204. Second, *Humphrey's Executor*, 295 U.S. 602, held that Congress could "give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Seila Law*, 591 U.S. at 216. Those exceptions represent the "outermost constitutional limits of permissible restrictions on the President's removal power" under current precedent. *Id.*

There is no question that FLRA Members are principal rather than inferior officers: they are appointed by the President with Senate confirmation, *see* U.S. Const. art. II, § 2, cl. 2; 5 U.S.C. § 7104(b), oversee their own department, and are not subservient to any other principal

officer. Thus, the relevant question is whether the FLRA can be said to perform only "legislative and judicial functions" and therefore falls within the exception identified in *Humphrey's Executor*. *Seila Law*, 591 U.S. at 216. It does not. As the Supreme Court made clear in *Seila Law*, that exception is limited to "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions" that exercise no executive power. 591 U.S. at 216-17 (quoting *Humphrey's Executor*, 295 U.S. at 632).

But the FLRA is no "mere legislative or judicial aid," *Seila Law*, 591 U.S. at 199. It is an independent agency that performs significant executive functions. For instance, the FLRA "conduct[s] hearings and resolve[s] complaints of unfair labor practices," 5 U.S.C. § 7105(a)(2)(G), in which it "unilaterally issue[s] final decisions awarding legal and equitable relief," *Seila Law*, 591 U.S. at 219 (explaining that issuing unilateral decisions in administrative adjudications is exercising executive power). It can "require [an agency or labor organization] to take any remedial action it considers appropriate to carry out the polices" of the FSLMRS, 5 U.S.C. § 7105(g)(3), and petition to enforce such an order in federal court, 5 U.S.C. § 7123(b); *see Seila Law*, 591 U.S. at 219 (describing authority to enforce in federal court as "quintessentially executive power not considered in *Humphrey's Executor*"). And the FLRA has the authority to send its own attorneys (not

11

Department of Justice attorneys) to litigate civil actions outside the Supreme Court in connection with any of its functions. *Id*. § 7105(h); *see also Buckley v. Valeo*, 424 U.S. 1, 138–40 (1976) (recognizing interpreting and enforcing law through litigation as executive function).

The FLRA also possesses the power to "prescribe rules and regulations to carry out the provisions of [FSLMRS] applicable to [it]." 5 U.S.C. § 7134; *see also* 5 U.S.C. § 7105(a)(2)(C) (authorizing FLRA to "prescribe criteria * * * relating to the granting of national consultation rights under section 7113"); 5 U.S.C. § 7105(a)(2)(D) (authorizing FLRA to "prescribe criteria * * * relating to determining compelling need for agency rules or regulations"). *See Collins v. Yellen*, 594 U.S. 220, 254 (2021) (Because "interpreting a law enacted by Congress to implement the legislative mandate is the very essence of execution of the law," an agency "empowered to issue a 'regulation or order' * * * clearly exercises executive power." (cleaned up)).

The Supreme Court has recently recognized that the government is likely to show that Members of the NLRB and MSPB "exercise considerable executive power." *Wilcox* Order at 1. Similarly, the FLRA "wield[s] executive power" and therefore must be accountable to the President by at-will removal. *See Seila Law*, 591 U.S. at 204 ("The President's power to

remove—and thus supervise—those who wield executive power on his behalf follows from the text of Article II.").

The district court's contrary conclusion rests largely on an overbroad reading of *Humphrey's Executor* and its progeny, Dkt. 22 at 10-11, stretching those decisions beyond their facts to encompass an agency that exercises substantial executive power. The Supreme Court in *Seila Law* made clear, however, that neither *Humphrey's Executor* nor the cases that followed extend so far. After *Seila Law*, "only a very narrow reading of those cases is still good law" and "little to nothing is left of the *Humphrey's* exception to the general rule that the President may freely remove his subordinates." *Severino v. Biden*, 71 F.4th 1038, 1050 (D.C. Cir. 2023) (Walker, J., concurring).

In *Humphrey's Executor*, the Supreme Court upheld the constitutionality of a provision prohibiting removal of Federal Trade Commissioners absent "inefficiency, neglect of duty, or malfeasance in office." 265 U.S. at 632. Despite reaffirming the then-recent holding in *Myers v. United States*, 272 U.S. 52 (1926), that the President "has unrestrictable power * * * to remove purely executive officers," the Court concluded that *Myers* did not control because the FTC Commissioner at issue was "an officer who occupies no place in the executive department

13

and who exercises no part of the executive power vested by the Constitution in the President," *id.* at 628, 632. Instead, *Humphrey's Executor* understood the FTC to be "an administrative body" that "carr[ied] into effect legislative policies" and "perform[ed] other specified duties as a legislative or judicial aid." *Id.* Those duties, according to the Court, "c[ould] not in any proper sense be characterized as an arm or an eye of the executive." *Id.* The Court understood the FTC not to be exercising executive power at all but rather to "act[] in part quasi legislatively and in part quasi judicially." *Id.* On that understanding, *Humphrey's Executor* upheld the provision restricting the removal of FTC Commissioners.

*Humphrey's Executor* thus approved the constitutionality of for-cause removal provisions only for multimember boards that do not exercise any executive power. *See Seila Law*, 591 U.S. at 219 n.4 (recognizing that "what matters is the set of powers the Court considered as the basis for its decision, not any latent powers that the agency may have had not alluded to by the Court"). To be sure, the assumption on which *Humphrey's Executor* rests—that the FTC's powers at the time were not properly characterized as executive in nature—has since been "repudiated" by the Supreme Court. *Seila Law*, 591 U.S. at 239 (Thomas, J., concurring in part); *see also Morrison*, 487 U.S. at 689 n.28, 691 (noting that "it is hard to dispute that

14

the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree").

In other words, even the 1935 FTC could today be understood as exercising executive power. *See Seila Law*, 591 U.S. at 216 n.2 (observing that *Humphrey's Executor*'s "conclusion that the FTC did not exercise executive power has not withstood the test of time"); *see also Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (noting that agencies may engage in activities that "take 'legislative' and 'judicial' forms, but [those activities] are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power'"). But that is all the more reason not to expansively read *Humphrey's Executor* as permitting removal protections for principal officers exercising executive powers that the Supreme Court did not consider when deciding that case.

The district court acknowledged that "it is true that the FLRA's power to conduct hearings and resolve complaints is greater than was described in *Humphrey's Executor*." Dkt. 22 at 13. While the district court did not view that fact as dispositive, *Seila Law* made clear that the *Humphrey's Executor* exception applies only to multimember agencies similarly situated to how "the Court viewed the FTC (as it existed in 1935)," and therefore exercise "'*no part* of the executive power.'" *Seila Law*, 591 U.S. at 215

15

(quoting *Humphrey's Executor*, 295 U.S. at 628) (emphasis added). "[W]hat matters is the set of powers the Court considered as the basis for its decision." *Seila Law*, 591 U.S. at 219 n.4.

The district court's assessment that the FLRA is an adjudicatory board and only has "narrow" regulatory authority, Dkt. 22 at 15, does not change the analysis. As the Supreme Court made clear in *Collins*, it is not the breadth of the regulatory authority that is outcome determinative, the "nature and breadth of an agency's authority is not dispositive in determining whether Congress may limit the President's [removal] power." *See Collins v. Yellen*, 594 U.S. 220, 251-252, 253 (2021). "Courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies," and "the constitutionality of removal restrictions [does not] hinge[] on such an inquiry." *Id.*

Fundamentally, the FLRA exercises executive power—indeed substantial executive power. Because the FLRA exercises executive power, it does not fall within the narrow *Humphrey's Executor* exception. Board Members must therefore be removable at will by the President. The district court's contrary conclusion was wrong, and any doubt about the government's likelihood of success has been resolved by the Supreme Court's opinion and stay order in *Wilcox*.

16

### 2. Grundmann cannot show entitlement to reinstatement

Defendants are also likely to succeed on a second ground. The district court erred by ordering that Grundmann "shall continue to serve as a Member" of the FLRA. Dkt. No. 21 at 2. Such *de jure* reinstatement "impinges on the 'conclusive and preclusive' power through which the President controls the Executive Branch that he is responsible for supervising." *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559668, at *14 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (quoting *Trump v. United States*, 603 U.S. 593, 614 (2024)). As Judge Katsas explained, there would be no doubt of "grave and irreparable" injury if the district court had ordered reinstatement of a dismissed Secretary of State, and any differences between the Department of State and the FLRA "go[] to the extent—not the character—of the President's injury." *Id.*

Neither this Court nor the Supreme Court has ever suggested that reinstatement is an appropriate remedy in such circumstances. To the contrary, the Supreme Court recognized long ago that a court "has no jurisdiction * * * to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867). The appointment and removal of principal officers is specifically entrusted to the President, *see Swan v. Clinton*, 100 F.3d 973, 979 (D.C. Cir. 1996)

(recognizing that "principal officers of the United States * * * must be appointed, and removed, by the President"), and thus a court may not, by injunction, order the reinstatement of a principal officer the President has removed. Accordingly, when principal officers have been removed from their posts, they generally have challenged that removal in suits for back pay. *See Humphrey's Executor*, 295 U.S. at 612 (challenge sought "to recover a sum of money alleged to be due"); *Myers v. United States*, 272 U.S. 52, 106 (1926) (same); *Wiener*, 357 U.S. at 349-351 (1958) (same). That rule reflects the obvious Article II problems that arise if a court attempts to reinstate—that is, reappoint—a principal executive officer removed by the President. Even if an improperly removed officer is entitled to some legal remedy, the President cannot be compelled to retain the services of a principal officer whom he has removed from office. Indeed, this Court stayed the district court orders that had reinstated the Special Counsel, Order, *Dellinger v. Bessent*, No. 25-5052, (Mar. 5, 2025). A motions panel of this Court likewise stayed the district court orders that had reinstated members of the MSPB and NLRB. March 28 Order, *Wilcox v. Trump*, No. 25-5057. Although the en banc court vacated those orders and denied a stay, the Supreme Court reversed, explaining that the President faces a great risk of harm "from an order allowing a removed

18

officer to continue exercising the executive power." *Wilcox* Order at 1. The same is true here.

An injunction reinstating Grundmann also exceeds the scope of the district court's equitable powers. A federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Reinstatement of a public official is not such a remedy. "It is * * * well settled that a court of equity has no jurisdiction over the appointment and removal of public officers." *In re Sawyer*, 124 U.S. 200, 212 (1888). Thus, "the power of a court of equity to restrain by injunction the removal of a [public] officer has been denied in many well-considered cases." *Id.*; *see, e.g.*, *Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying removal of a *federal* officer" reflect "a traditional limit upon equity jurisdiction"); *White v. Berry*, 171 U.S. 366, 377 (1898) ("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another."). This principle applies equally where, as here, relief is directed to the President's subordinate officers. Since only the President has the

19

authority to appoint, remove, and supervise agency heads, any relief preventing Grundmann's removal "necessarily targets the President." *Dellinger*, 2025 WL 559669, at *13 n.2 (Katsas, J., dissenting).

The district court's order cannot be squared with these precedents. In its opinion, the court grappled with the above case law, concluding that it could provide declaratory relief limited to the declaration that the removal was "unlawful." Dkt. No. 22 at 20. The court also determined that it did not need to resolve the question whether formal equitable reinstatement was available stating that Grundmann had sought, and the court was granting only the *de facto* reinstatement discussed by this Court in *Swan*, 100 F.3d at 979-80. But the court's declaration that plaintiff shall continue to remain a member of the FLRA, Dkt. No. 21 at 1, goes well beyond such limited declaratory relief and constitutes full reinstatement. This is particularly true when viewed next to the injunctive relief granted by the Court ordering that she "shall continue to serve as a Member of the" FLRA "until her term expires * * * unless she is earlier removed 'upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office,'" *id.* at 2 (quoting 5 U.S.C. § 7104(b)). Notwithstanding its discussion in the opinion, the only way to read the district court's order is as *de jure* reinstatement.

However styled, an order reinstating a principal officer removed by the President violates Article II.

Furthermore, the district court's reliance on *Swan* and *Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023), is also misplaced. Those decisions do not bear the weight the district court placed on them. In neither case did this Court review, much less sustain, an order like the ones presented here. Rather, the Court considered only its *jurisdiction* over an official's challenge to his removal. At most those cases can be read to stand for the proposition that equitable relief might be available to require a subordinate officer to allow a plaintiff to exercise some of the privileges of the office such as by "including [him] in Board meetings," or "giving him access to his former office." *Swan*, 100 F.3d at 980; *see also Severino*, 71 F.4th at 1043. The order issued by the district court here goes well beyond such *de facto* relief; it puts Grundmann back in office and orders that she shall continue to serve as a *de jure* member until the conclusion of her term.

Moreover, in both *Swan* and *Severino*, the Court recognized that even *de facto* relief—an order directing subordinate officials to treat the officer as not having been removed—might not ultimately be available even if the plaintiff were to prevail on the merits. In *Swan*, the Court recognized that the President could "undercut [the] relief" were he "to insist that" his

preferred replacement "occupy the position," 100 F.3d at 980-81, and in *Severino*, the Court noted other potential obstacles and relied on the fact that "at the motion to dismiss stage," the plaintiff needed only to "plausibly allege that relief could be afforded," 71 F.4th at 1043.

The sole issue addressed in *Severino* and *Swan* was whether the limits on the Court's equitable power against the President made the asserted injury non-redressable. *See Severino*, 71 F.4th at 1042 ("[O]ur jurisdiction does not depend on deciding whether an injunction ordering a presidential appointment would be available or appropriate."). Those cases cannot be read to have rejected the separate longstanding principle that equitable power may not be used to "restrain by injunction the removal of a [public] officer," *In re Sawyer*, 124 U.S. at 212, a principle not briefed or addressed in either of those cases. *Cf. Schindler Elevator Corp. v. Washington Metropolitan Area Transit Authority*, 16 F.4th 294, 299 (D.C. Cir. 2021) (an appellate decision in which a defect "is neither noted nor discussed * * * does not stand for the proposition that no defect existed"). Those cases therefore did not definitively resolve the question presented here. Because neither Swan nor Severino prevailed on the merits, the Court did not need to consider whether equitable relief would have been appropriate against the backdrop of those historic principles to resolve the

case. Thus, *Swan* and *Severino* may assist plaintiffs in establishing standing, but they cannot justify the relief the district court entered.

## B. The Remaining Factors Favor A Stay

The equitable factors likewise weigh decisively in the government's favor, and "the public interest and balance of equities factors merge" where, as here, "the government is the party" against whom an injunction is sought. *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021). The Supreme Court has recently recognized in two similar cases that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." *Wilcox* Order at 1.

As discussed above, the district court's order works an extraordinary harm to the President's authority to exercise "all of" "the 'executive Power'" of the United States. *Seila Law*, 590 U.S. at 203. Because of that order, a person the President has chosen to remove from office is exercising executive power over the President's objection. That sort of harm to the Executive, and to the separation of powers, is transparently irreparable. A stay is equally warranted here. Conversely, a stay would not irreparably harm Grundmann. Although Grundmann's removal deprives her of

23

employment and salary, such consequences ordinarily do not amount to irreparable injury, "however severely they may affect a particular individual." *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). Thus, the traditional remedy for such claims has been an award of back pay at the end of the case, not interim reinstatement, and a stay pending appeal "would not substantially harm" Grundmann. *Dellinger*, 2025 WL 559669, at*17 (Katsas, J., dissenting). Any harm arising from Grundmann's inability to fulfill statutory duties is not irreparable; those duties are vested in her former office, and Grundmann has no personal right to exercise the powers of an office after she has been removed. Accordingly, the Supreme Court had no difficulty determining that the balance of harms favors a stay "to avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation." *Wilcox* Order at 2.

## CONCLUSION

This Court should stay the district court's order pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
LAURA E. MYRON
 */s/ Daniel Aguilar*
DANIEL AGUILAR
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

25

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,193 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Georgia, a proportionally spaced typeface.


*/s/ Daniel Aguilar*
Daniel Aguilar

**ATTACHMENT A:**

**District Court Summary Judgment Order**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUSAN TSUI GRUNDMANN,

*Plaintiff*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants*.

Civil Action No. 25-425 (SLS)

Judge Sparkle L. Sooknanan

### ORDER

Upon consideration of the Plaintiff's Motion for Summary Judgment, ECF No. 4, the Defendants' Cross-Motion for Summary Judgment, ECF No. 11, the legal memoranda in support and in opposition, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby:

**ORDERED** that the Plaintiff's Motion for Summary Judgment, ECF No. 4, is **GRANTED**; and the Defendants' Cross-Motion for Summary Judgment, ECF No. 11, is **DENIED**. It is further

**DECLARED** that the termination of the Plaintiff Susan Tsui Grundmann was unlawful, in violation of the Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7104(b). Ms. Grundmann remains a Member of the Federal Labor Relations Authority, having been appointed by the President, and confirmed by the Senate to a five-year term on May 12, 2022, and she may be removed by the President prior to the expiration of her term "only upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office," pursuant to 5 U.S.C. § 7104(b). It is further

**ORDERED** that the Plaintiff Susan Tsui Grundmann shall continue to serve as a Member of the Federal Labor Relations Authority (FLRA) until her term expires pursuant to 5 U.S.C. § 7104(c), unless she is earlier removed "upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office," *id.* § 7104(b). The Defendant Colleen Duffy Kiko, as well as her subordinates, agents, and employees, are **ENJOINED** from removing Ms. Grundmann from her office without cause or in any way treating Ms. Grundmann as having been removed, from impeding in any way her ability to fulfill her duties as a Member of the FLRA, and from denying or obstructing her authority or access to any benefits or resources of the office; it is further

**ORDERED** that the Defendant Colleen Duffy Kiko and her subordinates, agents, and employees provide the Plaintiff Susan Tsui Grundmann with access to the necessary government facilities and equipment so that she may carry out her duties during her term as a Member of the Federal Labor Relations Authority; and it is further

**ORDERED** that the Clerk of the Court close this case.

This is a final appealable order.

**SO ORDERED.**

SPARKLE L. SOOKNANAN
United States District Judge


Date: March 12, 2025

2

**ATTACHMENT B:**

**District Court Summary Judgment Opinion**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SUSAN TSUI GRUNDMANN,

  *Plaintiff*,

  v.

DONALD J. TRUMP, *et al.*,

  *Defendants*.

Civil Action No. 25‑425 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

The Constitution vests Congress with broad authority to organize the Executive Branch. U.S. Const. art. I, §§ 1, 8. From its earliest days, Congress exercised this power by creating institutions to structure the government. And for almost a century and a half, Congress has created independent federal agencies with specific expertise and limited the President's power to remove principal officers leading those agencies. The Supreme Court first blessed that approach in 1935 when it rejected the President's claim of "illimitable power of removal" over all federal officers, *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935), instead holding that our Constitution gives Congress the power to "create expert agencies led by a group of principal officers removable by the President only for good cause." *Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020) (emphasis omitted) (citing *Humphrey's Ex'r*, 295 U.S. 602). And the Supreme Court has repeatedly endorsed statutory removal protections for multimember and bipartisan expert agencies since then.

Congress created the Federal Labor Relations Authority (FLRA) to impartially manage and resolve disputes surrounding labor organization in the federal workforce. The independence of the

FLRA was central to its creation, as Congress wanted to ensure a fair, consistent, and unbiased process for managing federal labor relations that would not shift with political whims. To achieve this goal, Congress decided to give the three Members of the FLRA a limited statutory protection from removal by the President. They could be removed only for inefficiency, neglect of duty, or malfeasance in office during their staggered five-year terms, and only after notice and a hearing.

In the nearly fifty years since the FLRA's creation, no President has ever removed a Member. Until now. On February 10, 2025, the Plaintiff, Susan Tsui Grundmann, received a two-sentence email on behalf of President Donald J. Trump informing her that her position on the FLRA had been terminated. Ms. Grundmann received no explanation whatsoever for her termination. And she did not receive notice or a hearing. Ms. Grundmann is not alone. This is one of a series of cases filed in this District challenging the President's unprecedented removal of officers across the federal government without cause, including Members of the Merit Systems Protection Board and the National Labor Relations Board, as well as the Special Counsel.

The Government vigorously defends Ms. Grundmann's hasty termination on the basis that the Constitution vests the entirety of the "executive Power" in the President. U.S. Const. art. II, § 1, cl. 1. It argues that the President may remove federal officials on a whim, and in doing so, override Congress's considered judgment. The Government's arguments paint with a broad brush and threaten to upend fundamental protections in our Constitution. But ours is not an autocracy; it is a system of checks and balances. Our Founders recognized that the concentration of power in one branch of government would spell disaster. "The doctrine of the separation of powers was adopted by the convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevitable friction

incident to the distribution of the governmental powers among three departments, to save the people from autocracy." *Myers v. United States*, 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting).

The removal in this case was unlawful. The Government concedes that Ms. Grundmann's removal violated the FLRA's founding statute—a statute that Congress enacted and the President signed into law to revamp federal labor relations in the federal government. The Government's argument that the statutory removal provision is unconstitutional cannot be reconciled with longstanding Supreme Court precedent that is binding on this Court. And it would encroach on Congress's authority under Article I of the Constitution.[1]

As for remedies, the Government takes the position that this Court lacks the authority to provide meaningful relief in these circumstances. It argues that where a President removes a Senate-confirmed federal officer in violation of a duly enacted and constitutional statute, the only recourse is an award of backpay to that officer. Why? According to the Government, any order from this Court that results in the officer continuing her role against the President's will would raise grave separation-of-powers concerns. In other words, where a President exceeds his power under Article II of the Constitution and intrudes on Congress's Article I authority, the Government's position is that an Article III court may not interpret the law and redress the resulting injury. It is the Government's own argument that raises grave separation-of-powers concerns. There can be no doubt that "the President is bound to abide by the requirements of duly enacted and otherwise constitutional statutes." *Swan v. Clinton*, 100 F.3d. 973, 977 (D.C. Cir. 1996). And it is precisely the role of an Article III court to step in when that does not

---

[1] The Government has hinted that it intends to ask the Supreme Court to overrule its precedent, invalidating statutory provisions that have been in place for nearly a century and a half and leaving the President free to fire whomever he wants in the Executive Branch. *See* Letter from Sarah Harris, Acting Solicitor General, to Sen. Richard Durbin on Restrictions on the Removal of Certain Principal Officers of the United States (Feb. 12, 2025), https://perma.cc/D67G-FKK4.

happen. Ms. Grundmann is entitled to relief that would redress her injury and allow her to continue her work on the FLRA.

For those reasons and the reasons that follow, the Court grants Ms. Grundmann's Motion for Summary Judgment and denies the Defendants' Cross-Motion for Summary Judgment.

## BACKGROUND

### A.    Statutory Background

Nearly fifty years ago, Congress enacted the Federal Service Labor-Management Relations Statute (FSLMRS), 5 U.S.C. §§ 7101–7135, as part of the Civil Service Reform Act (CSRA), Pub. L. No. 95-454, 92 Stat. 1111 (1978). These statutes "comprehensively reorganized the structure of labor-management relations in the federal government." *Library of Cong. v. FLRA*, 699 F.2d 1280, 1283 (D.C. Cir. 1983). "Congress intended the new statutory system to serve the twin goals of protecting the right of public employees to organize and bargain collectively, while simultaneously strengthening the authority of federal management to hire and fire employees in the interest of a more effective public service." *Id.* (citing 5 U.S.C. § 7101).

Congress created the Federal Labor Relations Authority (FLRA) to "carry[] out the purpose" of the FSLMRS. 5 U.S.C. § 7105(a)(1). It tasked the FLRA with "conduct[ing] hearings and resolv[ing] complaints of unfair labor practices," "resolv[ing] issues relating to the duty to bargain in good faith," and "resolv[ing] exceptions to arbitrator's awards." *Id.* § 7105(a)(2). Congress also empowered the FLRA to supervise elections for the selection of labor organizations by employees and to prescribe certain criteria related to labor bargaining in the federal workforce. *Id.*

The FLRA is composed of three Members, all appointed by the President with the advice and consent of the Senate. *Id.* § 7104. No more than two of the three Members are permitted to

"be adherents of the same political party." *Id.* § 7104(a). And each Member is to serve a staggered

five-year term. *See* 5 U.S.C. § 7104(c) (establishing five-year terms); CSRA, Pub. L. No. 95-454,

§ 7104(c)(1), 92 Stat. 1196 (1978) (staggering terms). The Members can be removed by the

President "only upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance

in office." 5 U.S.C. § 7104(b). But the President has the authority to designate one of the Members

as the "Chairman of the Authority." *Id.*

The structure of the FLRA was meant to ensure "the resolution of disputes by the

intervention of neutral, independent, third parties[.]" 124 Cong. Rec. 25,720 (1978).

Congress sought to "eliminate what [was] perceived by Federal employee unions and others as

conflict of interest in the existing council," H.R. Rep. No. 95-1717, at 159 (1978), and to create a

body that was "impartial by independence from any direct responsibility to the incumbent

administration," S Rep. No. 95-969, at 7 (1978). As one sponsor stated:

> One of the central elements of a fair labor relations program is effective, impartial
> administration. Title VII provides for the creation of an independent and neutral
> Federal labor relations authority to administer the Federal labor management
> program . . . . Currently the Federal labor-management program is administered by
> the Federal Labor Relations Council which is composed of three administration
> officials, . . . none of whom can be considered neutral.

124 Cong. Rec. 25,721 (1978). The belief was that "[i]mpartiality [was] guaranteed by protecting

authority members from unwarranted 'Saturday night' removals." *Id.* at 25,721–25,722.

## B.     Factual Background

The facts are drawn from the Plaintiff's Complaint and Statement of Material Facts, which

the Defendants do not dispute. Joint Status Report at 3, ECF No. 8.

The Plaintiff, Susan Tsui Grundmann, became a Member of the FLRA on May 12, 2022.

Compl. ¶ 3, ECF No. 1. She was appointed by President Joseph R. Biden and confirmed by the

Senate to a term set to expire on July 1, 2025. *Id.* But that expiration date was not set in stone.

Under the FSLMRS, she was permitted to continue serving until either her successor took office or the last day of the Congress beginning after the original expiration date, 5 U.S.C. § 7104(c), which in her case would fall in January 2029, Compl. ¶ 3. On January 3, 2023, President Biden designated her as Chairman of the Authority. Pl.'s Mot. for Summ. J. & Prelim. Inj. ("Pl.'s Mot.") at 1, ECF No. 4; Defs.' Opp'n to Pl.'s Mot. for Summ. J. ("Defs.' Opp'n") at 5, ECF No. 12.

The Government does not allege that Ms. Grundmann has been an ineffective Member of the FLRA. Yet on February 10, 2025, at 10:46 PM, Ms. Grundmann received a two-sentence email from Trent Morse, the Deputy Director of the White House Office of Presidential Personnel: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Federal Labor Relations Authority is terminated, effective immediately. Thank you for your service." Pl.'s Decl. in Supp. of Pl.'s Mot. for Summ. J. & Prelim. Inj. ("Pl.'s Decl.") ¶ 3, ECF No. 4-2. She did not receive notice or a hearing, nor was any "inefficiency, neglect of duty, or malfeasance in office" identified. Compl. ¶ 17. And she has since been unable to perform her duties as a Member of the FLRA. *Id.* ¶ 20. To the best of Ms. Grundmann's knowledge, this is the first time a President has ever removed a Member of the FLRA without cause. Pl.'s Decl. ¶ 12.

On February 11, 2025, President Trump named Colleen Duffy Kiko as Chairman, Compl. ¶ 19, leaving the FLRA with only two Members, *see id.* ¶ 20. Although the FLRA maintains a quorum, without Ms. Grundmann's tiebreaking vote, certain cases may deadlock and go into abeyance. *See* Pl.'s Decl. ¶ 7. This is exactly what happened when Ms. Grundmann served as one of only two Members of the FLRA for eighteen months, resulting in about one-third of the cases being deadlocked. *Id.*

### C.    Procedural Background

On February 13, 2025, Ms. Grundmann filed a Complaint alleging that her removal without cause violated the FSLMRS. *See* Compl. ¶¶ 22–25. She named President Trump and Ms. Kiko as Defendants, *id.* ¶¶ 4–5, and she requested both declaratory and injunctive relief, Compl., Prayer for Relief, ¶¶ 1–3. The next day, on February 14, 2025, she filed a Motion for Preliminary Injunction and Summary Judgment. *See* Pl.'s Mot. for Summ. J. & Prelim. Inj. ("Pl.'s Mot."). On February 25, 2025, the Defendants filed their Opposition to the Plaintiff's Motion for Summary Judgment, *see* Defs.' Opp'n, and a Cross-Motion for Summary Judgment, *see* Defs.' Cross-Mot. for Summ. J. ("Defs.' Cross-Mot."), ECF No. 11. The Plaintiff responded to both on February 28, 2025. *See* Pl.'s Mem. in Opp'n to Defs.' Cross-Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 15; Pl.'s Reply in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 16. And the Defendants filed their Reply in support of their Cross-Motion for Summary Judgment on March 5, 2025. *See* Defs. Reply in Supp. of Defs.' Cross-Mot. for Summ. J. ("Defs.' Reply"), ECF No. 18. The Court held a hearing on March 7, 2025. Both motions are now ripe for decision.

### LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The burden is on the movant to make the initial showing of the absence of any genuine issues of material fact." *Ehrman v. United States*, 429 F. Supp. 2d 61, 66 (D.D.C. 2006). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). When "both

parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman*, 429 F. Supp. 2d. at 67.

## DISCUSSION

The President violated the law when he removed Ms. Grundmann. The removal was in clear contravention of the FSLMRS. And under longstanding Supreme Court precedent, that statute was a valid exercise of Congress's authority under Article I of the Constitution.

### A.    Statutory Violation

The Government concedes that Ms. Grundmann's removal violated the FSLMRS. Motions H'rg (Mar. 7, 2025), Draft Tr. at 24:10–14. The statute provides that "Members of the Authority . . . may be removed by the President only upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 7104(b). But Ms. Grundmann received no notice or hearing. *See* Compl. ¶ 17. And the two-sentence email on behalf of the President informing her of the removal did not allege any inefficiency, neglect of duty, or malfeasance in office. *See id.* The Government instead argues that the removal protection in the FSLMRS is unconstitutional. *See* Defs.' Opp'n at 6–12.

### B.    Constitutionality of the Statute

"[T]he Necessary and Proper Clause grants Congress broad authority to enact federal legislation." *United States v. Comstock*, 560 U.S. 126, 133 (2010). This includes the power to provide removal protections to "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions." *Seila Law LLC*, 591 U.S. at 217. This power to "create a traditional independent agency headed by a multimember board or commission," *id.* at 207, "cannot well be doubted," *Humphrey's Ex'r*, 295 U.S. at 629. The Court has repeatedly endorsed such removal protections throughout the last century. *See, e.g.*, *id.*; *Wiener v. United States*, 357 U.S. 349 (1958).

But this power is not without limits. "Article II provides that '[t]he executive Power shall be vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law*, 591 U.S. at 213 (quoting U.S. Const. art. II, § 1, cl. 1; *id.*, § 3). This establishes a "general rule that the President possesses 'the authority to remove those who assist him in carrying out his duties.'" *Id.* at 215 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513–14 (2010)). The scope of Congress's power therefore turns on whether this general rule applies. *See id.* at 218.

The Supreme Court has identified "two exceptions" that "represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Id.* (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)). The first comes from *Humphrey's Executor*, and it extends to "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 591 U.S. at 218. The second comes from *Morrison v. Olson*, 487 U.S. 654 (1988), and it applies to "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 218. Congress may provide removal restrictions to an executive officer who fits within either of these two exceptions. *See id.*

### 1.    The *Humphrey's Executor* Exception

*Seila Law* is best read as teaching that the *Humphrey's Executor* exception applies in two steps. *Seila Law*, 591 U.S. at 218–19. First, courts must ask whether an agency's structure resembles that of the "New Deal-era FTC" described in *Humphrey's Executor*. *Seila Law*, 591 U.S. at 218. Second, courts must ensure that the agency does not exercise substantial executive power. *Id.* at 218–19. If both conditions are met, then Congress has the authority to provide removal restrictions. *Id.* at 218.

The Government quibbles with step two. Even though *Seila Law* squarely states that the exception extends to "multimember expert agencies that do not wield *substantial* executive power," *id.* (emphasis added), it argues that the exception is limited to agencies "that exercise *no* executive power," Defs.' Opp'n at 8 (emphasis added). Although some language in *Seila Law* could be read that way, a careful reading of each passage reveals that the opinion is more restrained.

*First*, *Seila Law* outlines its general rule in very broad terms. The Supreme Court says that "the 'executive Power'—all of it—is 'vested in a President.'" *Seila Law*, 591 U.S. at 203 (quoting U.S. Const. art. II, § 1, cl. 1; *id.*, § 3). Then it says that the President has the "power to remove . . . those who wield executive power on his behalf." *Id.* at 204. The combination of these two statements initially suggests that *all* executive power is wielded on behalf of the President, so anyone exercising *any* executive power must be removable at will. *See* Defs.' Opp'n at 7. But the Court immediately acknowledges that there are "two exceptions" to this removal power. *Seila Law*, 591 U.S. at 204. And it would make little sense to call them "exceptions" if they did not involve the exercise of any executive power at all. *Id.*

*Second*, *Seila Law* highlights that in *Humphrey's Executor*, "[r]ightly or wrongly, the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'" *Seila Law*, 591 U.S. at 215 (quoting *Humphrey's Ex'r*, 295 U.S. at 628)). This makes it into the summary of the holding: "In short, *Humphrey's Executor* permitted Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise *any* executive power." *Id.* at 216 (emphasis added). But we should not read into this because *Seila Law* cites *Wiener* as falling within the *Humphrey's Executor* exception. *See Seila Law*, 591 U.S. at 216. This could not be the case if

the exception applied only to agencies that were "said not to exercise *any* executive power." *Id.* (emphasis added). Neither *Wiener* nor *Seila Law* ever said such a thing about the War Claims Commission. *See generally Wiener*, 357 U.S. 349; *Seila Law*, 591 U.S. 197. The Court's summary of the *Humphrey's Executor* holding should therefore not be conflated with its description of the bounds of the *Humphrey's Executor* exception.

Collins v. Yellen, 594 U.S. 220 (2021), does not change this reading of *Seila Law*. The Government points to broad language from the opinion: "Courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies, and we do not think that the constitutionality of removal restrictions hinges on such an inquiry." *Collins*, 594 U.S. at 253. But *Collins* was a case about single agency heads, not multimember agencies, so the *Humphrey's Executor* exception was not at issue. *See id.* at 251. The Court in *Collins* merely declined to create a *new* exception—beyond the two recognized in *Seila Law*—for single agency heads that exercise minimal executive power. *Id.* at 250. *Collins* even included a footnote right after the broad language that limited its reach to single agency heads. *See id.* at 253 n.19. That footnote distinguished two historical examples of removal restrictions by saying that "those agencies are materially different because neither of them operated beyond the President's control, *and one of them was led by a multi-member Commission*." *Id.* (emphasis added). So the language the Government identifies was not meant to apply to multimember agencies. And the Court expressly warned against reading *Collins* to apply to agencies not before the Court. *See id.* at 256 n.21. This would make little sense if *Collins* were meant to change *Seila Law*.[2]

---

[2] A Fifth Circuit panel recently offered its own distillation of the *Humphrey's Executor* exception. *See Consumers' Rsch. v. CPSC*, 91 F.4th 342 (5th Cir. 2024). And it did not deal with this broad language from *Collins* at all, *see id.*, suggesting that it did not read the language as bearing on the exception.

2.    **The Structure of the FLRA**

The first question is whether the FLRA's structure resembles how *Humphrey's Executor* described the "New Deal-era FTC." *Seila Law*, 591 U.S. at 218. *Humphrey's Executor* "identified several organizational features that helped explain its characterization of the FTC as non-executive." *Seila Law*, 591 U.S. at 216. First, the Board was "[c]omposed of five members" with "no more than three from the same political party," signaling that it was "designed to be 'non-partisan' and to 'act with entire impartiality.'" *Id.* at 216 (quoting *Humphrey's Ex'r*, 295 U.S. at 624). Second, "[t]he FTC's duties were 'neither political nor executive,' but instead called for 'the trained judgment of a body of experts' 'informed by experience.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624). And third, "the Commissioners' staggered, seven-year terms enabled the agency to accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624).

All three features are present in the FLRA. First, the Authority has three Members, and no more than two of them may be "adherents of the same political party," which ensures bipartisanship. 5 U.S.C. § 7104(a). Second, "the FLRA was intended to develop specialized

---

There is also a more ambitious way to square *Collins*. As the Fifth Circuit noted, *id.* at 352 n.53, in *Seila Law*, the Chief Justice and two other Justices said that there "may be means of remedying the defect in the CFPB's structure," including, "for example, converting the CFPB into a multimember agency," 591 U.S. at 237 (opinion of Roberts, C.J.). This matters because the CFPB exercises "significant executive power," *id.* at 220 (majority opinion), suggesting the Court might be open to recognizing an exception for "traditional independent agenc[ies], run by a multimember board with a diverse set of viewpoints and experiences," *id.* at 205–06, regardless of the amount of executive power exercised. *Cf. Consumers' Rsch.*, 91 F.4th at 353–54 (arguing that a multimember agency is not removed from the *Humphrey's Executor* exception just because it exercises substantial executive power). After all, the Court said that the two definite exceptions "represent what *up to now* have been the outermost constitutional limits." *Seila Law*, 591 U.S. at 218 (emphasis added). If the Court were to take this step, then it would be true that "the constitutionality of removal restrictions" would not "hinge[]" on "the relative importance of the regulatory and enforcement authority of disparate agencies." *Collins*, 594 U.S. at 253.

expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the [Civil Service Reform Act]." *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 97 (1983). And third, each Member serves a staggered five-year term, allowing the agency to gain technical expertise. *See* 5 U.S.C. § 7104(c) (establishing five-year terms); CSRA, Pub. L. No. 95-454, § 7104(c)(1), 92 Stat. 1196 (1978) (staggering terms). The FLRA's structure therefore triggers the *Humphrey's Executor* exception.

### 3.    The Powers of the FLRA

The next step is to ensure that the FLRA does not exercise substantial executive power. *Seila Law*, 591 U.S. at 218–19. Whether an agency exercises substantial executive power is a fact-bound inquiry. *Humphrey's Executor* "acknowledged that between purely executive officers on the one hand, and officers that closely resembled the FTC Commissioners on the other, there existed 'a field of doubt' that the Court left 'for future consideration.'" *Seila Law*, 591 U.S. at 217 (quoting *Humphrey's Ex'r*, 295 U.S. at 632). This is because "[t]he versatility of circumstances often mocks a natural desire for definitiveness." *Wiener*, 357 U.S. at 252. In other words, bright-line rules are not always possible. But by all indications, none of the FRLA's powers identified by the Government qualifies as a substantial executive power.

*First*, the Government points to the fact that the FLRA "conduct[s] hearings and resolve[s] complaints of unfair labor practices." Defs.' Opp'n at 9 (quoting 5 U.S.C. § 7105(a)(2)(G)). They argue that this puts the FLRA in the same camp as the CFPB in *Seila Law*, which could "unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications." *Id.* (quoting 591 U.S. at 219). And it is true that the FLRA's power to conduct hearings and resolve complaints is greater than was described in *Humphrey's Executor*, where the FTC merely "submit[ed] recommended dispositions to an Article III court." *Seila Law*,

591 U.S. at 218–19. But the ability to issue final judgments is not a death knell for removal protections. Just look at *Wiener*. There, the War Claims Commission "was established as an adjudicating body with all the paraphernalia by which legal claims are put to the test of proof, with finality of determination not subject to review by any other official of the United States or by any court by mandamus or otherwise." 357 U.S. at 354–55 (cleaned up). Yet the Commission still counts as an example of an agency that fits within the *Humphrey's Executor* exception. *See Seila Law*, 591 U.S. at 216.

*Second*, the Government points out that the FLRA "has the authority to litigate and enforce its orders in federal court." Defs.' Opp'n at 9. It highlights three facts. *See id.*

1. The FLRA can "require an agency or a labor organization to cease and desist" from statutory violations and "require [the agency or labor organization] to take any remedial action it considers appropriate to carry out the policies" of the FSLMRS. Defs.' Opp'n at 9 (quoting 5 U.S.C. § 7105(g)(3)). But *Humphrey's Executor* was unbothered by the FTC's ability to "issue and cause to be served a cease and desist order." 295 U.S. at 620. And the FLRA's other tools do not resemble the wide range of remedies available to the CFPB in *Seila Law*, which included restitution, disgorgement, and "civil penalties of up to $1,000,000 (inflation adjusted) *for each day* that a violation occurs." 591 U.S. at 206.

2. The FLRA "may petition to enforce such an order in federal court[.]" Defs.' Opp'n at 9 (citing 5 U.S.C. § 7123(b)). It is true that *Seila Law* said that "the power to seek daunting monetary penalties against private parties in federal court" is "a quintessentially executive power[.]" 591 U.S. at 199. But it is not clear that the object of an FLRA order—an agency or labor union— should be considered a private party for this analysis. And either way, this is not a *substantial* exercise of executive power. In *Humphrey's Executor*, if an FTC "order [was] disobeyed, the

commission [could] apply to the appropriate Circuit Court of Appeals for its enforcement." 295 U.S. at 620–21. This posed no problem. *Id.* at 629.

3. The FLRA "has independent litigation authority to send its own attorneys (not Department of Justice attorneys) to litigate civil actions outside the Supreme Court in connection with any of its functions." Opp'n at 9 (citing 5 U.S.C. § 7105(h)). But again, it is not clear why this would make the power more substantial. When *Seila Law* described the CFPB's enforcement powers, it did not even mention whether the attorneys belonged to the CFPB. *See* 591 U.S. at 206. It was much more concerned about the scale of relief. *See id.* ("Since its inception, the CFPB has obtained over $11 billion in relief for over 25 million consumers, including a $1 billion penalty against a single bank in 2018.").

*Third*, the Government notes that the FLRA has the power to "prescribe rules and regulations to carry out the provisions of the [FSLMRS] applicable to [it]." Defs.' Opp'n at 9 (quoting 5 U.S.C. § 7134). This includes (1) specifying the criteria for determining when a labor organization represents "a substantial number of the employees of the agency," which allows the labor organization to be granted consultation rights by the agency, 5 U.S.C. §§ 7105(a)(2)(C), 7113(a); (2) determining whether an agency has a "compelling need" for an agency-wide regulation, which would allow the agency to avoid having to bargain in good faith with a proposal by a labor organization, 5 U.S.C. §§ 7105(a)(2)(D), 7117(b); *see also* Fed. Lab. Rels. Auth., *The Negotiability Guide* (June 17, 2013); and (3) determining "who is eligible to vote" for labor organization recognition and establishing the "rules governing such an election," subject to certain statutory limitations, 5 U.S.C. §§ 7105(a)(2)(B), 7111(d).

These narrow, largely administrative regulatory assignments pale in comparison to what was feared in *Seila Law*, where "the [CFPB] Director possess[ed] the authority to promulgate

binding rules fleshing out 19 federal statutes, including a broad prohibition on unfair and deceptive practices in a major segment of the U.S. economy." 591 U.S. at 218. The FLRA promulgates regulations under fewer statutes, Motions H'rg (Mar. 7, 2025), Draft Tr. at 31: 16–17; those statutes provide more guidance than the broad prohibition of "unfair and deceptive practices," *Seila Law*, 591 U.S. at 218; and the federal workforce is a smaller segment of the economy than was covered by the CFPB statutes, which included "everything from credit cards and car payments to mortgages and student loans," *id.* at 219.

### 4.   Other *Seila Law* Factors

*Seila Law* mentions other factors as well, although it is unclear how they should fit into the *Humphrey's Executor* exception. *See Consumers' Rsch. v. CPSC*, 91 F.4th 342, 355–56 (5th Cir. 2024). The Court need not solve this puzzle, however, because none of these factors apply.

*First*, the FLRA's structure is not "almost wholly unprecedented." *Seila Law*, 591 U.S. at 220. To the contrary, agencies like the FLRA are part of the fabric of our federal government. Congress has created independent multimember agencies for nearly a century and a half. *See* Marshall J. Berger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1116 (2000). The "structure, role, and functions of the [FLRA] were closely patterned after those of the NLRB." *Library of Congress v. FLRA*, 699 F.2d 1280, 1287 (D.C. Cir. 1983). And the powers of the NLRB were modeled after those of the FTC, *Dish Network Corp. v. NLRB*, 953 F.3d 370, 375 n.2 (5th Cir. 2020), only one month after *Humphrey's Executor* approved of the FTC's removal protections, *Free Enterprise Fund*, 561 U.S. at 547 (Breyer, J., dissenting). The FLRA is "a traditional independent agency, run by a multimember board with a diverse set of viewpoints and experiences." *Seila Law*, 591 U.S. at 205–06 (cleaned up).

*Second*, the FLRA has levers of Presidential accountability. The CFPB Director served a five-year term, leaving some Presidents without "any opportunity to shape its leadership and thereby influence its activities." *Seila Law*, 591 U.S. at 225. But the FLRA Members serve staggered five-year terms, allowing every President to wield influence over the agency. *See* 5 U.S.C. § 7104(c) (establishing five-year terms); CSRA, Pub. L. No. 95-454, § 7104(c)(1), 92 Stat. 1196 (1978) (staggering terms). If the President follows the ordinary course and nominates someone to replace Ms. Grundmann, her term would end on July 1, 2025. Defs.' Statement of Undisputed Material Facts (Defs.' SUMF) ¶ 1, ECF No. 11-2. The CFPB also received funds "outside the appropriations process," which "further aggravate[ed] the agency's threat to Presidential control." *Seila Law*, 591 U.S. at 226. But the FLRA receives its funding through the appropriations process, Further Consolidated Appropriations Act, Pub. L. No. 118–47, 138 Stat. 461 (2023), allowing the President "to recommend or veto spending bills that affect the operation of [the agency]," *Seila Law*, 591 U.S. at 226.

And that is not all. The General Counsel of the FLRA, who may investigate labor practices and prosecute complaints, "may be removed at any time by the President." 5 U.S.C. § 7104(f). With the selection of the General Counsel, the President can immediately influence the FLRA's investigative and prosecutorial power. The President may also "designate one member [of the FLRA] to serve as Chairman of the Authority," who serves as "the chief executive and administrative officer. *Id.* § 7104(b). And this title that may be revoked at will. Pl.'s Reply at 10; *see, e.g.*, Fed. Lab. Rels. Auth., Press Release, Patrick Pizzella Designated Acting FLRA Chairman (Sept. 10, 2019), https://perma.cc/ED2R-HVKG. There are therefore no additional features of the FLRA that render its Members' removal protections "even more problematic." *Seila Law*, 591 U.S. at 225.

\*\*\*

A straightforward reading of Supreme Court precedent thus resolves the merits of this case. The FLRA triggers and satisfies the *Humphrey's Executor* exception, making the FSLMRS removal provision a valid exercise of Congress's constitutional authority. Although the Government claims fidelity to *Humphrey's Executor* and the cases that follow, its arguments seem to contemplate absolute presidential authority over the removal of federal officers and would leave *Humphrey's Executor* toothless. Indeed, it is difficult to conceive of a federal agency that would fit within the *Humphrey's Executor* exception as the Government reads it. But it has been clear for almost a century that Article II does not give the President an "illimitable power of removal" over all federal officers. *Humphrey's Executor*, 295 U.S. at 629.

When pressed at oral argument to identify existing federal agencies that would satisfy the *Humphrey's Executor* exception, the Government identified only a single agency: the Federal Reserve. Motions H'rg (Mar. 7, 2025), Draft Tr. at 36:19–20. But the Government declined to explain why the Federal Reserve would fit within the exception under the broad arguments it advances in this case. *Id.* at 36:21–37:5. The Federal Reserve sets the federal funds rate, 12 U.S.C. §§ 225, 263, which permeates every corner of the American economy. If control over that does not rise to an exercise of substantial executive power, then neither does laying down the administrative rules for labor organizing within the federal workforce.

**REMEDIES**

The Court now turns to the question of remedies. Ms. Grundmann requests both declaratory and injunctive relief. See Compl., Prayer for Relief, ¶¶ 1–2. The Government broadly argues that the Court lacks the authority to award either and is instead limited to an award of backpay to Ms. Grundmann. Motions H'rg (Mar. 7, 2025), Draft Tr. at 45:1–19. According to the

Government, because prior removed officials chose to seek backpay only, the Court may not award more than that. The Government held this line at oral argument, insisting that an Article III court is without authority to award relief to redress the injury caused by a President exceeding his Article II authority and intruding on Congress's Article I authority. *Id.* at 46:11. The Court disagrees. Ms. Grundmann is entitled to a declaratory judgment saying that her removal was unlawful. And she has also met her burden to receive the permanent injunction that she seeks.

### A.    Declaratory Relief

The Plaintiff requests that the Court "[d]eclare that Ms. Grundmann was unlawfully removed as a member of the [FLRA]." Compl., Prayer for Relief, ¶ 1. The Court has the authority to issue such a declaratory judgment, and it exercises its discretion to do so.

The Declaratory Judgment Act (DJA) provides that, "in a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, *whether or not* further relief is or could be sought." 28 U.S.C. § 2201(a) (emphasis added). The DJA "alone does not provide a court with jurisdiction," *California v. Texas*, 593 U.S. 659, 672 (2021), but it does "enlarge[] the range of remedies available in the federal courts" that have established jurisdiction, *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). This Court has jurisdiction over this federal-question case because, at minimum, it could provide backpay to establish redressability. *See* Compl., Prayer for Relief, ¶ 3 (asking for "all other appropriate relief"); Motions H'rg (Mar. 7, 2025), Draft Tr. at 45:1–46:12 (conceding backpay is available). So the DJA allows for declaratory relief.

In its reply brief, the Government appears to take the position that the Court may not award "declaratory relief stating that the President's removal of Plaintiff was unlawful." *See* Defs.' Reply

at 15. In support, they cite a single quote from a concurring opinion that is inapposite and not binding on this Court. *See Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part and concurring the judgment) ("I think we cannot issue a declaratory judgment against the President."). When pressed at oral argument, the Government walked this back and agreed that the Court could issue a declaratory judgment saying that Ms. Grundmann's removal was unlawful. Motions H'rg (Mar. 7, 2025), Draft Tr. at 42:19-20 ("A declaratory judgment saying that the removal was unlawful I think would be an acceptable outcome."). To be sure, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). That applies even when the person violating the law is the President. *See, e.g.*, *Clinton v. New York*, 524 U.S. 417, 421 (1998) (affirming a declaratory judgment invalidating the President's power to wield a line-item veto pen as unconstitutional).

The Government also makes a more modest argument that declaratory relief is generally unavailable whenever injunctive relief is unavailable. *See* Defs.' Reply at 15. They cite *Samuels v. Mackell* for support. 401 U.S. 66, 73 (1971) ("[W]here an injunction would be impermissible under these principles, declaratory relief should ordinarily be denied as well."). But *Samuels* merely extended *Younger* abstention to relief under the Declaratory Judgment Act from ongoing state criminal prosecutions, explaining that a declaratory judgment could have a res judicata effect on the state court proceedings that is not meaningfully different from an injunction. *See id.* at 68, 73 ("[T]he basic policy against federal interference with pending state criminal prosecutions will be frustrated as much by a declaratory judgment as it would be by an injunction."). The Court "express[ed] no views on the propriety of declaratory relief when no state proceedings is pending at the time the federal suit is begun." *Id.* at 73. So *Samuels* does not apply.

"[I]t is well settled that a declaratory judgment always rests within the sound discretion of the court." *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980). A declaratory judgment will "ordinarily be granted only when it will either 'serve a useful purpose in clarifying the legal relations in issue' or 'terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Id.* (quoting E. Borchard, Declaratory Judgments 299 (2d ed. 1941)). The case before the Court involves legal relations that clearly need to be clarified. Ms. Grundmann has challenged her removal by the President as unlawful and needs to know if she can resume her work on the Authority. On the other side, the Government argues that Congress overstepped when it enacted a provision limiting the President's ability to remove Members of the FLRA without cause. The Court therefore exercises its discretion and provides the requested declaratory relief.

### B.    Injunctive Relief

The question of injunctive relief is more difficult. An injunction ordering the President to reinstate Ms. Grundmann would raise complicated questions about the separation of powers. And the availability of such an order may turn on technical differences between equitable remedies and legal remedies. These questions can largely be avoided, however, because Ms. Grundmann has never sought reinstatement from the President and ultimately requests a type of injunction that has been blessed by the D.C. Circuit. The Court therefore has the authority to issue the requested injunctive relief, and it finds that such relief is warranted.

### 1.      Availability of Injunctive Relief

Ms. Grundmann has requested various types of injunctive relief throughout these proceedings. She originally asked the Court to enter an injunction ordering Ms. Kiko to reinstate her as a Member of the Authority. But Ms. Kiko lacks the authority to formally reinstate Ms. Grundmann, and it is not clear how such an injunction could be squared with *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), given the plausible evidence that wrongfully removed executive officers were historically reinstated by courts of law instead of courts of equity. Fortunately for Ms. Grundmann, the D.C. Circuit has twice recognized a more modest equitable remedy when an officer has been removed by the President. *See Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996), and *Severino v. Biden*, 71 F.4th 1038 (D.C. 2023). These cases teach that courts may order the members of an agency—or even just the Chair—to recognize the unlawfully removed member as a member and to halt any efforts to hinder her work in that capacity. While this relief may be less complete than formal reinstatement, the D.C. Circuit has said that it strikes the right balance between respecting the rule of law and avoiding conflicts between the branches of government. The Plaintiff now requests this more modest relief, and the Court has the authority to grant it.

### a.   Formal Reinstatement

In her Complaint, Ms. Grundmann asked the Court to "[e]nter an injunction against Defendant Kiko, ordering her to reinstate Ms. Grundmann as a member of the Board and to refrain from taking any further action to obstruct Ms. Grundmann's ability to carry out her duties." Compl., Prayer for Relief, ¶ 2. There are two problems with this request.

*First*, Ms. Kiko lacks the authority to reinstate Ms. Grundmann. "Members of the Authority shall be appointed by the President by and with the advice and consent of the Senate."

5 U.S.C. § 7104(b). The Plaintiff conceded this at oral argument. *See* Motions H'rg (Mar. 7, 2025), Draft Tr. at 18:12–16.

*Second*, it is not clear how such an injunction can be squared with *Grupo*. The Supreme Court in *Grupo* taught that "the general availability of injunctive relief . . . depend[s] on traditional principles of equity jurisdiction." 527 U.S. at 318–19 (internal citations omitted). This means that "unless Congress expressly provides otherwise, equitable remedies must track remedies traditionally afforded by the equity courts." *Goodluck v. Biden*, 104 F.4th 920, 924 (D.C. Cir. 2024) (citing *Grupo*, 527 U.S. at 318–19). But a preliminary review of the historical record suggests that, at least by the late nineteenth century, wrongfully removed executive officers sought relief in courts of law, not courts of equity. *See White v. Berry*, 171 U.S. 366 (1898); *In re Sawyer*, 124 U.S. 200 (1888). Whether this was already true at the Founding is less clear.

It is easy to find evidence from the turn of the last century. In 1888, the Supreme Court said it was "well settled that a court of equity has no jurisdiction over the appointment and removal of public officers." *In re Sawyer*, 124 U.S. at 212. And it repeated that statement ten years later. *White*, 171 U.S. at 377; *see also Harkrader v. Wadley*, 172 U.S. 148, 165 (1898). According to the Court, "[t]he jurisdiction to determine the title to a public office belong[ed] exclusively to the courts of law, and [was] exercised either by *certiorari*, error, or appeal, or by *mandamus*, prohibition, *quo warranto*, or information in the nature of the writ of *quo warranto*." *In re Sawyer*, 124 U.S. at 212; *see also White*, 171 U.S. at 377. This is consistent with treatises from the time. *See, e.g.*, 2 James L. High, *A Treatise on the Law of Injunctions* § 1312 (2d ed., Chicago, Callaghan & Co., 1880) ("No principle of the law of injunctions, and perhaps no doctrine of equity jurisprudence, is more definitely fixed or more clearly established than that courts of equity will not interfere by injunction to determine questions concerning the appointment of public officers

or their title to office."); Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 496 (Chicago, Callaghan & Co., 1890) (saying quo warranto allows courts "not only to oust the respondent [officer] but also to install the relator [officer]"). And the Supreme Court reiterated this view shortly before the merger of law and equity. *See Walton v. House of Representatives of Okla.*, 265 U.S. 487, 490 (1924) ("A court of equity has no jurisdiction over the appointment and removal of public officers"). So it was not a stretch for the Court to say that these cases "reflect . . . a traditional limit upon equity jurisdiction." *Baker v. Carr*, 369 U.S. 186, 231 (1962).

But evidence from the 1880s might not settle the *Grupo* debate. *See Grupo*, 527 U.S. at 318 (discussing equitable principles "at the time of the separation of the two countries" (quoting *Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563, 568 (1939))); *id.* at 335 (Ginsburg, J., concurring in part and dissenting in part) (discussing equitable principles "at the time of the founding"); *Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting) (discussing equitable remedies "at the time of the Nation's founding"). And the earlier evidence is sparse.

The Court looks in vain to *In re Sawyer* for help. 124 U.S. 200. The Court there said that "[n]o English case has been found of a bill for an injunction to restrain the appointment or removal of a municipal officer." *Id.* at 212. But this argument from silence is far from determinative. And the only English cases cited dealt with corporate officers. *See Att'y Gen. v. Earl of Clarendon*, 17 Ves. Jr. 490, 498, 34 Eng. Rep. 190, 193 (Ch. 1810); *Queen v. Saddlers' Co.*, 10 H.L. Cas. 404 (1863); *Osgood v. Nelson*, L. R. 5 H. L. 636 (1872). The Court also cited many "well-considered" state court cases denying "the power of a court of equity to restrain by injunction the removal of a municipal officer." *In re Sawyer*, 124 U.S. at 212. But all of those cases were decided at least a half century after the Founding. *See Tappan v. Gray*, 7 Hill 259 (N.Y. 1843); *Hagner v. Heyberger*, 3 Pa. L.J. 370 (1844); *Updegraff v. Crans*, 47 Pa. 103 (1864); *Cochran v. McCleary*, 22 Iowa 75

(1867); *Delahanty v. Warner*, 75 Ill. 185 (1874); *Sheridan v. Colvin*, 78 Ill. 237 (1875); *Dickey v. Reed*, 78 Ill. 261 (1875); *Harris v. Schryock*, 82 Ill. 119 (1876); *Beebe v. Robinson*, 52 Ala. 66 (1875); *Moulton v. Reid*, 54 Ala. 320 (1875); *cf. State v. Sheldon*, 6 N.W. 757 (Neb. 1880); *State v. Oleson*, 18 N.W. 45 (Neb. 1883); *State v. Meeker*, 27 N.W. 427 (Neb. 1886).

The vintage of these cases matters. *In re Sawyer* itself recognized that the Supreme Court of Alabama had only recently decided that reinstatement was not available in equity, "overruling its own prior decisions to the contrary." 124 U.S. at 214 (citing *Beebe*, 52 Ala. 66; *Moulton*, 54 Ala. 320). Those prior decisions had allowed courts of equity to enjoin an unlawfully appointed sheriff where the incumbent sheriff could not proceed by *quo warranto*, *Bruner v. Bryan*, 50 Ala. 522, 529 (1874), and to exercise jurisdiction over a dispute about the identity of the true mayor because a *quo warranto* "would not be a complete remedy," *Reid v. Moulton*, 51 Ala. 255, 266 (1874). This flip-flopping could be read as evidence that the consensus view recognized in *In re Sawyer* was not as well-established at the Founding. But the Court need not come to a firm conclusion on this point since the Plaintiff now seeks different relief.

### b. De Facto Reinstatement

This brings us to the relief that is really at issue. In her later briefing and at oral argument, Ms. Grundmann clarified that she seeks only the relief discussed in *Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996), and *Severino v. Biden*, 71 F.4th 1038 (D.C. 2023). That is, she "seeks injunctive relief from Defendant Kiko, a subordinate official, to treat her as a de facto member of the FLRA." Pl.'s Reply at 14. While resuming her work on the Authority "in this *de facto* fashion might not be as complete a remedy for [the Plaintiff] as an official reinstatement by the President," *Swan*, 100 F.3d at 980, the D.C. Circuit has twice recognized that this relief is available and advisable. *See id.* at 979–81; *Severino*, 71 F.4th at 1042–43.

The D.C. Circuit is no stranger to removal challenges. In *Swan*, a Senate-confirmed Board member of an independent agency was removed by President Clinton after being appointed by President Bush. *See* 100 F.3d at 975–76. He sued President Clinton and some staff who had implemented the firing, "seeking to have his removal . . . declared unlawful and to obtain injunctive relief ordering his reinstatement as a member of the Board." *Id.* at 975. The district court granted summary judgment for the government, and the plaintiff appealed. *Id.* at 976. On appeal, the D.C. Circuit assessed the plaintiff's standing, focusing on the redressability prong. *See id.* at 976. It questioned "whether a federal court has the power to grant injunctive relief against the President of the United States in the exercise of his official duties." *Id.* at 976.

Resolving this question required balancing two important values. On the one hand, the Court recognized the "bedrock principle that our system of government is founded on the rule of law, and it is sometimes a necessary function of the judiciary to determine if the executive branch is abiding by the terms of legislative enactments." *Id.* at 978. On the other hand, ordering the President "to perform particular executive [acts] . . . at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers." *Id.* (internal quotation marks and citations omitted). The Court struggled to resolve this tension the usual way, by enjoining a subordinate official, "because only the President has the power to remove or reinstate [the] Board members." *Id.* at 979.

The Court then concluded that certain subordinate officials had enough authority to "substantially redress" the injury without formal reinstatement. *See id.* at 979. The Executive Director of the agency "could direct the staff to treat [the plaintiff] as a Board member." *Id.* at 979. And although they were not initially named in the complaint, the "Chairman, other NCUA Board members[, and] the Board Secretary" could accomplish reinstatement "*de facto* by treating Swan

as a member of the NCUA Board and allowing him to exercise the privileges of that office." *Id.* at 979–80. The Court decided that such "partial relief [was] sufficient for standing purposes when determining whether [it could] order more complete relief would require [it] to delve into the complicated and exceptionally difficult questions regarding the constitutional relationship between the judiciary and the executive branch." *Id.* at 981.

The D.C. Circuit recited this same analysis just two years ago. In *Severino*, a member of the Administrative Conference of the United States Council was removed by President Biden after being appointed by President Trump. *See* 71 F.4th at 1041. He sued President Biden and others, "request[ing] that the court issue an injunction requiring that the President restore him to his position on the Council." *Id.* at 1041 (cleaned up). The Court again assessed redressability, looking to *Swan* for guidance. *Severino*, 71 F.4th at 1042–43. It declined to answer whether such an injunction could run against the President because it could "enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment." *Id.* at 1042–43 (quoting *Swan*, 100 F.3d at 980). It explained that the Conference's Chairperson could include the plaintiff in Board meetings and give him access to his former office, among other things, thereby providing partial relief. *Id.* at 1043.

The Government argues that *Swan* and *Severino* are inapposite because they are standing cases. *See* Defs.' Reply at 11–12. The Court disagrees. The redressability analysis asks whether it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Swan*, 100 F.3d at 976 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). So a remedy cannot establish redressability if it is beyond the authority of the court. *See, e.g.*, *Ege v. U.S. Dep't of Homeland Sec.*, 784 F.3d 791, 793 (D.C. Cir. 2015) ("And because we have no jurisdiction under 49 U.S.C. § 46110 to issue an order binding the TSC, we *ipso facto*

cannot redress Ege's injury even if we were inclined to agree with him."); *Newdow v. Roberts*, 603 F.3d 1002, 1010 (D.C. Cir. 2010) (identifying a redressability problem because "[i]t is impossible for this court to grant such relief"); *Love v. Vilsack*, 908 F. Supp. 2d 139, 144–45 (D.D.C. 2012) ("To satisfy [redressability], a plaintiff must show in the first instance that the court is capable of granting the relief sought."). *Swan* itself assessed redressability only because "[a] question exists . . . as to whether a federal court has the power to grant injunctive relief against the President." 100 F.3d at 976. It therefore makes little sense to hermetically seal the question of redressability from that of remedial availability.

And this Court is in good company reading *Swan* and *Severino* as standing for the proposition that such de facto reinstatement is an available remedy. *See, e.g.*, *Harris v. Bessent*, -- F. Supp. 3d --, No. 25-cv-412, 2025 WL 521027 (D.D.C. Feb. 18, 2025) (Contreras, J.); *Dellinger v. Bessent*, -- F. Supp. 3d --, No. 25-cv-385, 2025 WL 665041 (D.D.C. Mar. 1, 2025) (Berman Jackson, J.); *Wilcox v. Trump*, -- F. Supp. 3d --, No. 25-cv-334, 2025 WL 720914 (D.D.C. Mar. 6, 2025) (Howell, J.); *Spicer v. Biden*, 575 F. Supp. 3d 93, 97 (D.D.C. 2021) (Friedrich, J.) ("Following *Swan*, the Court could grant effective relief in this case by ordering Ruppersberger and Thalakottur, in their capacities as the Board's Chairman and DFO, to treat the plaintiffs are full members of the Board.").

The Government's other arguments seem to ignore the existence of *Swan* and *Severino* altogether. First, it argues that "[w]hen executive officers have challenged their removal by the President, they have traditionally sought back pay, not reinstatement." Defs.' Opp'n at 12 (citing *Parsons v. United States*, 167 U.S. 324, 326 (1897); *Shurtleff v. United States*, 189 U.S. 311, 318 (1903); *Myers*, 272 U.S. at 106; *Humphrey's Ex'r*, 295 U.S. at 612; *Wiener*, 357 U.S. at 350). But reinstatement was not an issue in *Humphrey's Executor* or *Myers* because

those plaintiffs were both deceased. *See Humphrey's Ex'r*, 295 U.S. at 618–19; *Myers*, 272 U.S. at 106. Nor did it make sense in *Wiener* since the Commission had been abolished. *See* 357 U.S. at 350–51. And any argument from past practice should account for the cases where the plaintiffs *did* seek reinstatement. *See Swan*, 100 F.3d at 361; *Severino*, 71 F.4th at 1041.

Second, the Government argues that "members of the First Congress argued against requiring the Senate's advice and consent for removals precisely because of the risk that such a procedure would require the President to retain someone he had sought to remove." Defs.' Opp'n at 13. It points to three Representatives in particular. *See id.* (citing *Myers*, 272 U.S. at 124 (saying that Rep. Benson worried that "the President would then have a man forced on him whom he considered as unfaithful"); *id.* at 131–32 (saying that Rep. Boudinot bemoaned a situation where the President would be "surrounded by officers . . . in whom he can have no confidence"); *id.* at 132 (saying that Rep. Sedwick asked whether such "a man under these circumstances" should "be saddled upon the President")). But this paints with too broad a brush. Those very same Representatives highlighted the special danger of removal protections for the office at issue—the Secretary of Foreign Affairs—on the ground that "the direction of our foreign relations" was an "unquestioned field of executive prerogative." Edward S. Corwin, *Tenure of Office and the Removal Power Under the Constitution*, 27 Colum. L. Rev. 353, 364–66 (1927) (collecting quotations). So their concerns may well have been limited to the character of the office. *See id.* at 366 And in any case, three individuals cannot speak for the entire First Congress, especially considering the wide spectrum of opinion it expressed on removal protections. *See id.* at 361–62. The "implications of the debate, properly understood, were highly ambiguous and prone to overreading." John F. Manning, *Separation of Powers as Ordinary*

*Interpretation*, 124 Harv. L. Rev. 1939, 1965 n.135 (2011). The Court declines to enter this historical fray.

Third, the Government argues that *Grupo* forecloses reinstatement, "[w]hether the order is expressly directed at the President or not." Defs.' Opp'n at 15. But this argument fails to appreciate the nuance of the remedy recognized in *Swan* and *Severino*. The Court has already acknowledged the strong—albeit imperfect—evidence that reinstatement was not traditionally available in a court of equity. *See supra* at 23–25. But that evidence does not clearly extend to de facto reinstatement; nor does the Government offer a theory for how it could. The Court is particularly hesitant to second-guess its authority to order de facto reinstatement now that the D.C. Circuit has reaffirmed the remedy's availability even after *Grupo*. *See Severino*, 71 F.4th at 1042–43.

Finally, the Government invites the Court to consider afresh the values already weighed by the D.C. Circuit in *Swan* and *Severino*. It argues that the "Plaintiff's injunction necessarily targets the President." Defs.' Reply at 11 (cleaned up). But issuing no relief at all would undermine "the bedrock principle that our system of government is founded on the rule of law." *Swan*, 100 F.3d at 978. The Court therefore defers to the careful balance struck by the D.C. Circuit in *Swan* and *Severino*, which are binding on this Court.

For all of these reasons, the Court concludes that it has the authority to order injunctive relief as to Ms. Kiko.[3]

---

[3] In a Notice of Supplemental Authority and at oral argument, the Plaintiff asks the Court to consider a writ of mandamus as an alternative remedy. *See* ECF No. 17 at 1. Given the lack of briefing on mandamus as a remedy, the Court leaves it for another day. But as other courts in this District have found, a writ of mandamus may well be an available remedy were injunctive relief unavailable in this case. *See, e.g.*, *Harris v. Bessent*, No. 25-cv-412, 2025 WL 679303, at *11 (D.D.C. Mar. 4 2025); *Wilcox v. Trump*, No. 25-cv-334, 2025 WL 720914, at *16 n.22 (D.D.C. Mar. 6, 2025).

## 2.    Permanent Injunction

Having established its authority to grant injunctive relief, the Court now addresses whether an injunction is appropriate in this case. "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* Ms. Grundmann has satisfied all four factors. The Court therefore grants a permanent injunction.[4]

### a.    Irreparable Harm and Inadequate Remedy at Law

The first two factors "are often considered together." *Wilcox*, 2025 WL 720914, at *15 n.20 (citing *Ridgley v. Lew*, 55 F. Supp. 3d 89, 98 (D.D.C. 2014)). And Ms. Grundmann has satisfied both. Her "unlawful removal from office by the President" was an irreparable harm. *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (Mem.) (D.C. Cir. 1983). And as the Government conceded at oral argument, there is no available remedy at law that would effectuate her reinstatement. *See* Motions H'rg (Mar. 7, 2025), Draft Tr. at 45:18–46:12.

---

[4] The Plaintiff filed a Motion for Preliminary Injunction and Summary Judgment. *See* Pl.'s Mot. In her Reply, she sought only a permanent injunction. *See* Pl.'s Reply at 11–21. The Government has argued that the Plaintiff is not entitled to a preliminary injunction or permanent injunction. *See* Defs.' Opp'n at 16 n.5. Because this Court grants the Plaintiff's Motion for Summary Judgment, it awards a permanent injunction.

Ms. Grundmann claims that "[h]er removal has deprived her of her statutory right to function in her office." Pl.'s Reply at 16. And courts in this District have recognized that this harm can be irreparable. *See, e.g.*, *Berry*, 1983 WL 538, at *5 (recognizing as irreparable the plaintiffs' "deprivation of their statutory right to function as Commissioners"); *Wilcox*, 2025 WL 720914, at *15 (recognizing as irreparable the plaintiff's deprivation "of a presidentially appointed and congressionally confirmed position of high importance"). The Government argues that loss of employment does not amount to an irreparable harm because backpay is available. *See* Defs.' Opp'n at 17–18 (citing *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974)). But *Sampson* expressly contemplates "that cases may arise in which the circumstances surrounding an employee's discharge . . . may so far depart from the normal situation that irreparable injury might be found." 415 U.S. at 92 n.68. This is such a "genuinely extraordinary situation." *Id.* Far from a mere claim of lost employment, this is a case of constitutional significance. Backpay does not get Ms. Grundmann back into her role as a Member of the FLRA—a role that the President appointed her to, that the Senate confirmed her for, in an agency that both Congress and the President in their considered judgment created *to be independent* and free from political meddling. *See Harris*, 2025 WL 679303, at *13. A check in the mail does not address the gravamen of this lawsuit. Perhaps that is why Ms. Grundmann has not even asked for one.

According to the Government, several cases "reject[] the notion that the deprivation of a unique, singular, or high-level position is any more of an irreparable injury." Defs.' Opp'n at 17–18. But the Government's cases cannot support such a broad rule. *See id.* (cases involving corporate managers, subordinate local and state officials, lower-level federal employees, and a credit union board member). Ms. Grundmann is a Senate-confirmed principal officer of a congressionally-created independent agency. She accepted the President's nomination and earned

Senate confirmation in order to serve her country at the highest possible level in her field. This represented the capstone of her long career in public service, *see* Pl.'s Decl. ¶ 7, and her unlawful termination deprived her of the opportunity to make her mark in this statutorily protected role.

### b.  Balance of the Equities and Public Interest

The final two injunction factors merge when the Government is a party. *Wilcox*, 2025 WL 720914, at *17 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And Ms. Grundmann has satisfied both. The Authority needs all three voters to avoid deadlock, especially at a time when there have been mass firings across the federal government. And the Government's arguments about the separation of powers actually weigh *in favor* of an injunction.

Without this relief, the Authority has only two of its three Members. This runs the risk of letting cases deadlock with no tiebreaker, which would cause those cases to go into abeyance. Pl.'s Mot. at 14; *see also* Pl.'s Decl. ¶ 7. This is not mere speculation either. "[D]uring the eighteen-month period that Plaintiff Grundmann served as part of a two-member Authority, approximately one-third of the Authority's cases deadlocked, leading to duplicative disputes and resource waste." Pl.'s Mot. at 14. Abeyance "results in increased costs and confusion to the parties" and adds "to the bottom line of the agencies, the cost of which is ultimately borne by taxpayers." Pl.'s Decl. ¶ 10. "It also creates legal uncertainty and likely inconsistency in labor practices the longer key labor issues remain unsolved." Pl.'s Reply at 20. And this would be a particularly bad time for deadlock considering the widespread firings across the federal workforce in recent months. *See* Pl.'s Mot. at 15; Pl.'s Reply at 20. In fact, only weeks ago, a court in this District told fired federal workers to pursue their claims before the FLRA before seeking judicial relief. *See Nat'l Treasury Emps.' Union v. Trump*, No. 25-cv-420, 2025 WL 561080, at *8 (D.D.C. Feb. 20, 2025). Leaving the Authority with only two voters would make that instruction hollow.

The Government argues that providing this relief raises grave separation-of-powers concerns. *See* Defs.' Opp'n at 19. They say that "[s]uch a remedy would undermine the accountability of the Executive Branch enshrined in the Constitution" and that "[t]he Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *Id.* at 20 (citing *Sampson v. Murray*, 415 U.S. 61, 83 (1974)). But the Government ignores the separation-of-powers risks posed by non-intervention. If the Government had its way, it would place unchecked power in the hands of the President, which is antithetical to our system of government. Again, nearly fifty years ago, Congress and the President worked together to create the FLRA as an independent agency. The President appointed Ms. Grundmann to her position, and the Senate confirmed her. The two political branches decided to give her removal protections—protections that have now been ruled constitutional by a federal court. Providing no injunctive relief would allow the President to flout not only Congress's Article I power to create independent multimember agencies, but also the Court's Article III power to maintain the rule of law, *see Swan*, 100 F.3d at 978.[5]

Congress has already balanced the equities at stake in this case. The FLRA "safeguards the public interest" and "contributes to the effective conduct of public business." 5 U.S.C. § 7101(a)(1). "[L]abor organizations and collective bargaining in the civil service are in the public interest," and "the public interest demands . . . the efficient accomplishment of the

---

[5] The Government also argues that the President "cannot be compelled to retain the services of a principal officer whom the President no longer believes should be entrusted with the exercise of executive power." *See* Defs.' Opp'n at 20. But Congress set forth permissible limits on the President's ability to remove Ms. Grundmann. And the Government has made no attempt to establish inefficiency, neglect of duty, or malfeasance in office on Ms. Grundmann's part. Absent cause to remove Ms. Grundmann, the President may of course nominate someone to replace her when her term expires in less than four months. Curiously, although the FLRA's General Counsel may be removed at will, the President has taken no steps to remove that officer.

operations of the Government." *Id.* § 7101(a)(2). The public interest therefore favors Ms. Grundmann, and a permanent injunction is warranted.

## CONCLUSION

For the foregoing reasons, the Court grants the Plaintiff's Motion for Summary Judgment and denies the Defendants' Cross-Motion for Summary Judgment.

The Court has issued a separate order consistent with this Memorandum Opinion.

———————————————
SPARKLE L. SOOKNANAN
United States District Judge

Date:    March 12, 2025

35

**ATTACHMENT C:**

**District Court Order Denying Stay Pending Appeal**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUSAN TSUI GRUNDMANN,

          *Plaintiff*,

    v.

DONALD J. TRUMP, *et al.*,

          *Defendants*.

Civil Action No. 25-425 (SLS)

Judge Sparkle L. Sooknanan

### ORDER

For the reasons stated in the Court's Memorandum Opinion, ECF No. 29, the Court **DENIES** the Defendants' Motion to Stay the Court's Order Pending Appeal, ECF No. 26.

**SO ORDERED.**

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   June 13, 2025

**ATTACHMENT D:**

**District Court Stay Opinion**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SUSAN TSUI GRUNDMANN,

        *Plaintiff*,

      v.

DONALD J. TRUMP, *et al.*,

        *Defendants*.

Civil Action No. 25‑425 (SLS)

Judge Sparkle L. Sooknanan

## MEMORANDUM OPINION

Susan Tsui Grundmann was removed by the President from her position on the Federal Labor Relations Authority (FLRA) in February 2025. She came to this Court a few days later, claiming that her removal without cause violated the statutory protections afforded to FLRA members. The Government did not contest that claim. It instead argued that those statutory protections violated Article II of the U.S. Constitution. On March 12, 2025, the Court ruled for Ms. Grundmann, ordering her de facto reinstatement for the remainder of her term. Almost two months later, the Government appealed the Court's decision. And nearly three weeks after that, it now moves to stay the Court's order pending appeal. The Court denies this belated request.

## BACKGROUND

President Donald J. Trump removed Ms. Grundmann from the FLRA on February 10, 2025, when the Deputy Director of the White House Office of Presidential Personnel sent her a two-sentence email informing her of her termination. *See* Compl. ¶ 16, ECF No. 1 (first sentence); *see also id.*, Ex. A, ECF No. 1-1 (second sentence). Ms. Grundmann challenged her removal by filing a Complaint in this Court on February 13, 2025, claiming that the President and the Chairman of the FLRA had violated the removal protections guaranteed by the Federal Service Labor-

Management Relations Statute. *See* Compl. ¶¶ 22–25 (citing 5 U.S.C. § 7104); *id.* ¶¶ 4–5. Ms. Grundmann then filed a combined Motion for Preliminary Injunction and Summary Judgment on February 14, 2025. *See* Pl.'s Mot. Prelim. Inj. & Summ. J., ECF No. 4. The Government responded by arguing that the statutory removal protections ran afoul of Article II of the U.S. Constitution. *See* Defs.' Cross-Mot. Summ. J., ECF No. 11; Defs.' Opp'n to Prelim. Inj., ECF No. 12. The Parties briefed the motions. *See* Pl.'s Opp'n Cross-Mot. Summ. J., ECF No. 15; Pls.' Reply Supp. Prelim. Inj., ECF No. 16; Defs.' Reply Supp. Cross-Mot. Summ. J., ECF No. 18. And the Court ruled for Ms. Grundmann on March 12, 2025, ordering de facto reinstatement in accordance with D.C. Circuit precedent. *See* Order, ECF No. 21; Mem. Op., ECF No. 22; *see also Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996); *Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023).

That brings us to the second wave of proceedings. The Government appealed the Court's decision on May 8, 2025, only a few days before the sixty-day deadline. *See* Notice of Appeal, ECF No. 24; *see also* D.C. Circuit Rule 4(a)(1)(B) (providing sixty days to appeal). Nearly three weeks after that, on May 27, 2025, it filed a Motion to Stay the Court's Order Pending Appeal, ECF No. 26. The Court now considers this stay motion.

## LEGAL STANDARD

"A stay pending appeal is an extraordinary remedy." *M.M.V. v. Barr*, 459 F. Supp. 3d 1, 4 (D.D.C. 2020) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985)). "It is 'an intrusion into the ordinary processes of administration and judicial review,'" *id.* (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009) (cleaned up)), "and accordingly 'is not a matter of right, even if irreparable injury might otherwise result to the appellant,'" *Nken*, 556 U.S. at 427 (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)). "It is instead an exercise of judicial discretion, and [t]he propriety of its issue is dependent upon the circumstances of the particular

case." *Id.* at 433 (cleaned up). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34.

"A court is supposed to consider four factors in connection with a stay motion: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *M.M.V.*, 459 F. Supp. 3d at 4 (cleaned up). As to the first factor, the D.C. Circuit has said that the chance of success on the merits must be "substantial," *id.* (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977), and "a movant's failure to satisfy this stringent standard . . . is 'an arguably fatal flaw for a stay application,'" *id.* (quoting *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam)). As to the second factor, "[w]here there is a low likelihood of success on the merits, a movant must show a proportionally greater irreparable injury[.]" *Id.* (citing *Cuomo*, 772 F.2d at 974). And the final two factors "merge when the Government is the opposing party." *Id.* (quoting *Nken*, 556 U.S. at 435).

## DISCUSSION

The Government has failed to meet its burden to justify a stay pending appeal. The Court is not convinced that the Government is likely to succeed on the merits, that it will be irreparably injured absent a stay, or that the balance of equities favors a stay.

### A.    Likelihood of Success on the Merits

For all of the reasons explained in the Court's summary judgment opinion, *see* Mem. Op., the Government has failed to show a substantial likelihood of success on the merits. *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), recognized that Congress may constitutionally limit the President's removal authority when creating "multimember expert agencies that do not wield

substantial executive power." *Id.* at 218 (discussing the exception recognized in *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935)); *see also id.* at 216 (citing *Wiener v. United States*, 357 U.S. 349, 356 (1958)). And the FLRA fits that description. First, it shares "several organizational features" with the FTC from *Humphrey's Executor*—the same features that "helped explain [the Court's] characterization of the FTC as non-executive." *Seila L.*, 591 U.S. at 216. Namely, it is a small multimember agency balanced along partisan lines with staggered terms and duties ordered toward expertise. *See id.* Second, it does not wield substantial executive power. It may conduct hearings and resolve complaints, much like the War Claims Commission in *Wiener*. *See Seila L.*, 591 U.S. at 216. It may enforce its orders in court, like the FTC as described in *Humphrey's Executor*. *See* 295 U.S. at 620–21. And its power to promulgate regulations governing the administration of labor disputes in the federal workforce pales in comparison to the wide-ranging regulatory power chastised in *Seila Law*. *See* 591 U.S. at 218 ("[T]he [CFPB] Director possess[ed] the authority to promulgate binding rules fleshing out 19 federal statutes, including a broad prohibition on unfair and deceptive practices in a major segment of the U.S. economy.").

The Government argues that the Supreme Court's recent stay order in *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), demands the opposite result. There, the Supreme Court granted a stay in part because it thought "the Government [was] likely to show that both the NLRB and MSPB exercise considerable executive power." *Id.* at 1415. But this single sentence is not enough to alter the Court's prior analysis as to the FLRA. The Court already catalogued the powers wielded by the FLRA and triangulated where each one fits within *Humphrey's Executor*, *Wiener*, and *Seila Law*, ultimately concluding that the FLRA does not exercise substantial executive power. *See* Mem. Op. at 13–16. The *Wilcox* order does not identify which of the purportedly executive powers exercised by the NLRB and the MSPB might be "considerable." *Wilcox*, 145 S. Ct. at 1415.

So the Court cannot be sure that those powers are present in this case. Nor does the Court believe that the Supreme Court meant to announce a new rule by using the adjective "considerable," *id.*, instead of "substantial," *Seila L.*, 591 U.S. at 218.

The Government believes that the NLRB and the FLRA should rise or fall together, pointing to D.C. Circuit language previously cited by the Court: "[T]he 'structure, role, and functions of the [FLRA] were closely patterned after those of the NLRB.'" Mot. Stay at 3 (quoting Mem. Op. at 16 (quoting *Libr. of Cong. v. FLRA*, 699 F.2d 1280, 1287 (D.C. Cir. 1983))). But there are a few problems with this argument.

*First*, the language about structure has nothing to do with the powers exercised by the FLRA. The Court already explained in its summary judgment opinion that it reads *Seila Law* "as teaching that the *Humphrey's Executor* exception applies in two steps." Mem. Op. at 9 (citing *Seila L.* 218–19). The first question is whether an agency's structure triggers the exception. *See id.* The second is whether the agency exercises substantial executive power. *See id.* The Court therefore sees no tension when it comes to the language about structure.

*Second*, the language about roles fits most neatly within the first question rather than the second. When *Seila Law* identified the "organizational features" of the FTC that "helped explain" *Humphrey's Executor's* "characterization of the FTC as non-executive," it highlighted that the FTC's "duties" were apolitical and demanded "the trained judgment of a body of experts." *Seila L.*, 591 U.S. at 216 (cleaned up). The FLRA similarly plays the role of providing "trained judgment" by a "body of experts." *Id.*

*Third*, the language about functions may be distinguished from the question about power. *See id.* at 216 ("'To the extent that [the FTC] exercise[d] any executive *function*[,] as distinguished from executive *power* in the constitutional sense,' it did so only in the discharge of its 'quasi-

legislative or quasi-judicial powers.'" (emphasis in original) (quoting *Humphrey's Ex'r*, 295 U.S. at 628)). And even if that were not the case, the very same D.C. Circuit opinion said that "[t]he *scope* of collective bargaining is far broader in the private sector," where the NLRB governs, as opposed to the public sector, which is the FLRA's wheelhouse. *Libr. of Cong.*, 699 F.2d at 1287 (emphasis added). And *Seila Law* taught that the scope of an agency's powers impacts whether those powers are substantial. *See* 591 U.S. at 218 (identifying as problematic that the CFPB Director has the power to "promulgate binding rules . . . in a *major segment* of the U.S. economy" (emphasis added)).

It is therefore not obvious that the NLRB and the FLRA are tied at the hip. This is especially true since the Supreme Court did not explain which of the NLRB's purportedly executive powers were likely to be considerable. The Government has failed to meet its burden as to the first factor. And failure on this factor is "an arguably fatal flaw for a stay application." *M.M.V.*, 459 F. Supp. 3d at 4 (quoting *Citizens for Resp. & Ethics in Wash.*, 904 F.3d at 1019).

### B.    Irreparable Injury and the Balance of Equities

Nor has the Government shown irreparable injury absent a stay. They again point to the *Wilcox* order, which said that it "reflect[ed] the [Supreme Court's] judgment that the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." Mot. Stay at 3 (quoting *Wilcox*, 145 S. Ct. at 1415). Even though this language seems to speak more to the balance of equities rather than irreparable harm, *see Wilcox*, 145 S. Ct. at 1415 (citing *Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam) ("The purpose of . . . interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." (citation omitted))), the Government argues

that it can be read to support the proposition that the "Defendants will be irreparably harmed absent a stay, such that the balance of the equities and public interest overwhelmingly favor a stay pending appeal," Mot. Stay at 3. In the Government's view, "no basis exists for distinguishing the Supreme Court's assessment of the equities in the *Wilcox* Stay Order from those at play here[.]" *Id.* But the Court sees two important distinctions that illustrate why the propriety of a stay "is dependent upon the circumstances of the particular case." *Nken*, 556 U.S. at 433 (cleaned up).

*First*, any harm to the Government will be particularly short-lived because the President will be free to nominate her replacement in eighteen days on July 1, 2025, when her five-year term comes to an end. *See* Compl. ¶ 3. Under the statute, Ms. Grundmann may continue to serve only until her replacement takes office. *See* 5 U.S.C. § 7104(c). This means that a stay is not necessary "to avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation." *Wilcox*, 145 S. Ct. at 1415.

*Second*, the Government's actions in this case reflect a lack of urgency inconsistent with irreparable harm. It waited nearly two months after the Court's March 12, 2025, summary judgment decision to file its notice of appeal on May 8, 2025. *See* Notice of Appeal. And it waited almost another three weeks to file this motion to stay on May 27, 2025. *See* Mot. Stay at 4. This is not the sort of reaction one expects from a party claiming irreparable injury. *See Lightfoot v. District of Columbia*, No. 01-cv-1484, 2006 WL 175222, at *8 (D.D.C. Jan. 24, 2006) (saying government defendants' "relative inaction . . . indicate[d] that they themselves do not perceive the possible injury as 'irreparable'" where they did not appeal to the D.C. Circuit until almost a month after the district court denied their motion for reconsideration, where they did not ask for an expedited appeal, and where they did not file a motion for stay pending appeal until about three weeks after appealing); *Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (saying

7

"applicants' delay in filing their [certiorari] petition and seeking a stay vitiates much of the force of their allegations of irreparable harm" where they waited the maximum ninety days before filing their petition); *cf. Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) ("Courts have found that '[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm.'" (quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005)); *id.* ("The D.C. Circuit has found that a delay of forty-days before bringing action for injunctive relief was 'inexcusable,' and 'bolstered' the 'conclusion that an injunction should not issue,' particularly where the party seeking an injunction had knowledge of the pending nature of the alleged irreparable harm." (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975)). The Government seemed unbothered that Ms. Grundmann was back at her desk for months on end. The Court therefore struggles to understand how the harm inquiry has suddenly changed.[1]

And other facts favor Ms. Grundmann as well. First, were the Court's order to be stayed, the FLRA would retain only two of its three Members, running the risk of deadlock. *See* Mem. Op. at 33; *see also id.* ("[D]uring the eighteen-month period that Plaintiff Grundmann served as part of a two-member Authority, approximately one-third of the Authority's cases deadlocked, leading to duplicative disputes and resource waste." (cleaned up)). As the Court previously noted, this deadlock would come at a particularly bad time "considering the widespread firings across the federal workforce in recent months." *Id.* (citations omitted). Second, and relatedly, Congress has

---

[1] One would expect an irreparable injury to cause the Government to act the way it did in *Harris v. Bessent*, No. 25-cv-412, 2025 WL 679303 (D.D.C. Mar. 4, 2025), and *Wilcox v. Trump*, No. 25-cv-334, 2025 WL 720914 (D.D.C. Mar. 6, 2025). In *Harris*, the Government appealed the district court's removal decision, No. 25-cv-412, ECF No. 41, and filed a motion to stay pending appeal, *id.*, ECF No. 42, on the very same day that the district court issued its order. And in *Wilcox*, the Government appealed the district court's removal decision on the same day, No. 25-cv-334, ECF No. 36, and filed a motion to stay pending appeal the next day, *id.*, ECF No. 39.

already balanced the equities in a way that counsels against allowing deadlock. *See id.* at 33–34

(citation omitted). It has said that "labor organizations and collective bargaining in the civil service

are in the public interest" and that "the public interest demands . . . the efficient accomplishment

of the operations of the Government." 5 U.S.C. § 7101(a)(2). The Court made these points in

its prior opinion, *see* Mem. Op. at 33–34, and the Government did not address them in the instant

motion, *see* Mot. Stay. The Government has not satisfied the stringent requirements to justify a

stay pending appeal.

## CONCLUSION

For the foregoing reasons, the Court denies the Defendants' Motion to Stay the Court's

Order Pending Appeal, ECF No. 26.

A separate order will issue.

_____

SPARKLE L. SOOKNANAN
United States District Judge

Date:    June 13, 2025

9