[NOT YET SCHEDULED FOR ORAL ARGUMENT]

## No. 25-5165

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

SUSAN TSUI GRUNDMANN,

Plaintiff-Appellee,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District
Court for the District of Columbia

———————————

## PETITION FOR REHEARING EN BANC

———————————

Norman L. Eisen, D.C. Bar #435051
Tianna J. Mays, D.C. Bar #90005882
Jon M. Greenbaum, D.C. Bar #489887
Pooja Chaudhuri, D.C. Bar #888314523
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 601-8678

Counsel for Plaintiff-Appellee Susan Tsui
Grundmann

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND RULE 40(B)(2) STATEMENT ..........................................1

STATEMENT OF THE CASE ........................................................................4

   A.  STATUTORY BACKGROUND ................................................................4

   B.  FACTUAL AND PROCEDURAL BACKGROUND....................................5

ARGUMENT ..............................................................................................8

CONCLUSION ...........................................................................................15

#125092913v1

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Beame v. Friends of Earth*,
    434 U.S. 1010 (1977)...................................................................................11

*Collins v. Yellen*,
    594 U.S. 220 (2021)....................................................................................13

*Fontem US, LLC v. U.S. Food & Drug Admin.*,
    No. 22-1076, 2022 WL 2761393 (D.C. Cir. July 12, 2022).........................11, 12

*Free Enter. Fund v. Pub. Co. Acct. Oversight Board*,
    561 U.S. 477 (2010)....................................................................................13

*Harris v. Bessent ("Harris I")*,
    No. CV 23-412, 2025 WL 679303 (D.D.C. Mar. 04, 2025) .........................9, 10

*Harris v. Bessent ("Harris II")*,
    No. 25-5055 (D.C. Cir. March 6, 2025) .....................................................10, 11

*Humphrey's Ex'r v. United States*,
    295 U.S. 602 (1935)...................................................................................3, 12

*KalshiEX LLC v. CFTC*,
    119 F. 4th 58 (D.C. Cir. 2024)............................................................. 1, 2, 3, 8

*LeBlanc v. U.S. Privacy & Civil Liberties Bd.*
    (D.D.C. 2025) .............................................................................................10

*Morrison v. Olson*,
    487 U.S. (1988)...........................................................................................13

*Nken v. Holder*,
    556 U.S. 418, 435 (2009)..........................................................................14, 15

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020)....................................................................................13

*Trump v. Wilcox ("Wilcox III")*,
    145 S. Ct. 1415 (2025)...............................................................3, 9, 10, 12, 13

#125092913v1

*Wiener v. United States*,
    357 U.S. 349 (1958)..................................................................13

*Wilcox v. Trump (“Wilcox I”)*,
    No. CV 25-334, 2025 WL 720914 (D.D.C. March 6, 2025)........................10, 11

*Wilcox v. Trump* (“*Wilcox II*”),
    No. 25-5057 (D.C. Cir. Mar. 10, 2025) ............................................10

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ....................................................8

**Statutes**

Civil Service Reform Act, Pub. L. 95-454, 92 Stat. 1111 (Oct. 13,
    1978) ............................................................................4

Federal Service Labor-Management Relations Statute (“FSLMRS”), 5
    U.S.C. ch. 71 ....................................................................4

    § 7101(a)(2) ....................................................................15

    § 7104(a) .........................................................................4

    § 7104(b) ....................................................................5, 6, 14

    § 7104(c) .........................................................................4

    § 7104(f) .......................................................................5, 6

    § 7104(f)(1) ....................................................................14

    § 7104(f)(2) ....................................................................14

    § 7105(a)(2) ......................................................................5

    § 7105(a)(2)(G) .................................................................14

    § 7105(a)(2)(H) .................................................................14

**Other Authorities**

D.C. App. R. 40(b)(2)(A)............................................................1

D.C. App. R. 40(b)(2)(D)............................................................1

#125092913v1

## INTRODUCTION AND RULE 40(B)(2) STATEMENT

Appellee Susan Tsui Grundmann, who was removed from her position as a Member of the Federal Labor Relations Authority ("FLRA"), petitions this Court for rehearing of the panel's Order staying the district court's decision pending the merits of this appeal for two reasons. First, the panel's Order conflicts with this Circuit's decision in *KalshiEX LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024), and the full court's consideration is necessary to secure uniformity of the court's decisions about irreparable harm required for stays pending appeal. D.C. App. R. 40(b)(2)(A). Second, the proceeding involves a question of exceptional importance. D.C. App. R. 40(b)(2)(D).

This case involves President Trump's at-will removal of Ms. Grundmann in violation of the Federal Service Labor-Management Relations Statute ("FSLMRS"). It is one of several cases pending in this Court where (1) the district court has found that a President Trump's removal of an independent agency leader was ultra vires; (2) the district court ordered the Defendants to restore the leader to their position; and (3) in response to a motion for stay, either the Supreme Court or a special panel of this Court has stayed the district court order while this Court considers the merits. *Wilcox v. Trump*, No. 25-5037; *Harris v. Bessent*, No. 25-5055; and *LeBlanc v. U.S. Privacy and Civil Liberties Oversight Board*, No. 25-5197. In this case, a special

1

panel of this Court granted the government's Motion for a Stay Pending Appeal and an Administrative Stay ("Motion") in a brief order issued on July 3, 2025. Add. A.

This case differs from the other cases in one important respect that necessitates the *en banc* Court vacating the special panel's stay order. This Court's precedent requires that a party seeking a stay demonstrates all four stay factors. *KalshiEX LLC v. CFTC*, 119 F.4th 58, 63 (D.C. Cir. 2024). This Circuit has a strict standard of requiring a moving party seeking a stay to demonstrate irreparable harm, the second factor, and has denied a stay motion for that sole reason *Id.*

In this case, the district court granted Ms. Grundmann's Motion for Summary Judgment on March 12, 2025, Add. B, C, and she resumed her duties on March 13, 2025. The government did not notice its appeal until May 8, 2025, and did not move for a stay in the district court until May 27, 2025, seventy-six days after the district court's order. Add. D at 2. The government's lack of urgency stands in marked contrast to the other cases, where the government consistently acted promptly in noticing appeals and seeking stays. Any argument of irreparable harm is further weakened by the fact that the President can legally replace Ms. Grundmann on the Authority through the nomination and confirmation process at any time.

In granting the government's motion to stay, the special panel did not specifically address irreparable harm. Instead, it devoted half a sentence to the three equitable factors: "'[T]he Government faces greater risk of harm from an order

2

allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty.'" Order at 2 (quoting *Trump v. Wilcox* (*Wilcox III*), 145 S. Ct. 1415 (2025)).

Though the special panel stated that the Supreme Court's reasoning in *Wilcox III*, "fully applies to the FLRA," Add. A at 2, it did not address the differences in how the government's actions differ from that in *Wilcox III*, which involved both the *Wilcox* and *Harris* cases. A risk of harm, or even demonstrated harm, is not sufficient for a party to obtain a stay. The government must show, and a court must find, that there is *irreparable* harm. Given its delay, the government cannot satisfy its burden. The special panel did not find irreparable harm, nor could it.

Though this motion is not based on the other stay factors (though Plaintiff respectfully disagrees with the special panel's determination), a couple of points are worth noting. Congress designed the FLRA so that it was consistent with *Humphrey's Executor v. United States,* 295 U.S. 602 (1935), where the Supreme Court established that Congress could impose limitations on a President's authority to an independent agency leader under certain circumstances. In this case and the cases mentioned above, this Court, and likely the Supreme Court, will be engaging complex constitutional issues as well as detailed analyses of agency functions. This court has denied stays "when the question on the merits is close and difficult," and the movant cannot demonstrate irreparable harm, *KalshiEX*, 119 F.4th at 64. That

3

principle applies here. Regarding balance of harms and public interest, the stay affects not only Ms. Grundmann but the parties in the cases before the FLRA and the public. In her absence, the agency is left with two Members, which subjects cases to deadlock. When there is deadlock, the cases sit in abeyance until there is a third member.

For these reasons and as detailed below, Plaintiff-Appellee Grundmann requests that the en banc court vacate the stay ordered by the special panel.

## STATEMENT OF THE CASE

### A. STATUTORY BACKGROUND

In 1978, Congress enacted the FSLMRS, 5 U.S.C. ch. 71, as part of the comprehensive Civil Service Reform Act, Pub. L. 95-454, 92 Stat. 1111 (Oct. 13, 1978). Within the FSLMRS, Congress created the Federal Labor Relations Authority to "carry[] out the purpose" of the statute. 5 U.S.C. § 7105(a)(1). The Authority is multimember and bipartisan and serve five-year staggered terms. *Id.* § 7104(a), (c); Pub. L. 95–454, tit. VII, § 7104 (1978), 92 Stat. 1196. A member's term "shall not expire until the earlier of (1) the date on which the member's successor takes office, or (2) the last day of the Congress beginning after the date on which the member's term of office would (but for this paragraph) expire." 5 U.S.C. § 7104(c).

Members of the Authority (1) are appointed by the President with the advice and consent of the Senate and (2) may only be removed after notice and a hearing

4

and "only for inefficiency, neglect of duty, or malfeasance in office." *Id.* § 7104(b). The President designates a Chairman: "The President shall designate one member to serve as Chairman of the Authority. The Chairman is the chief executive and administrative officer of the Authority." *Id.* § 7104(b).

The FLRA's primary statutory duties are quasi-judicial, in that they encompass resolving unfair labor practice complaints, determining the appropriateness of units for labor organization representation, adjudicating exceptions to arbitrators' awards, adjudicating legal issues relating to the duty to bargain, and resolving impasses during collective bargaining. *Id.* § 7105(a)(2). Executive functions of investigating unfair labor practices and filing and prosecuting complaints are delegated to the General Counsel who is appointed by the President with the advice and consent of the Senate, and who can be removed by the President "at any time." *Id.* § 7104(f).

## B. FACTUAL AND PROCEDURAL BACKGROUND

Ms. Grundmann was nominated by the President and confirmed by the Senate on May 12, 2022, to the FLRA for a term set to expire on July 1, 2025. Add. B. at 5. Under the FSLMRS, she is permitted to continue serving until either her successor takes office or the last day of the Congress beginning after the original expiration date, which in her case would fall in January 2029. *Id.* at 5–6 (cleaned up).

On February 10, 2025, Ms. Grundmann received a two-sentence email from a

White House informing her that President Trump was removing her. *Id.* at 6. "She did not receive notice or a hearing, nor was any 'inefficiency, neglect of duty, or malfeasance in office' identified." *Id.* Ms. Grundmann was unable to perform her duties thereafter. *Id.*

Ms. Grundmann filed a Complaint against President Trump and Colleen Duffy Kiko, the President's designee for FLRA chair, regarding her removal and moved for summary judgment. *Id.* at 7. The defendants cross-moved for summary judgment. *Id.* Defendants conceded that Ms. Grundmann's removal violated the FSLMRS but claimed that the removal provision of the statute for FLRA members is unconstitutional and that the President has the at-will authority to remove Ms. Grundmann under Article II of the Constitution. *Id.* at 2–3.

On March 12, 2025, the district court granted Ms. Grundmann's Motion for Summary Judgment and denied Defendants' Cross-Motion in an Order, Add. C, and accompanying Memorandum Opinion, Add. B. Regarding remedies, the district court issued declaratory relief stating that Ms. Grundmann's removal was unlawful, that she remained a member of the FLRA, and would continue to do until expiration of her term or if the President removed her consistent with the provisions of 5 U.S.C. § 7104(b). Add. C at 1. The district court also enjoined Defendant Kiko "from removing Ms. Grundmann from her office without cause or in any way treating Ms. Grundmann as having been removed, from impeding in any way her ability to fulfill

her duties as a Member of the FLRA, and from denying or obstructing her authority or access to any benefits or resources of the office." *Id.* at 2.

Ms. Grundmann resumed work on March 13, 2025. The government waited fifty-seven days before filing their notice of appeal on May 8, 2025. Add D. at 2. It waited seventy-six days before moving for a stay in the district court on May 27, 2025. *Id.* On June 13, 2025, the District Court denied the motion for stay in an Order, ECF No. 30, and accompanying Memorandum Opinion. Add. D.

On June 13, 2025, the government moved this Court for an administrative stay and a stay pending appeal. On June 18, 2025, a special motions panel granted the administrative stay and set a briefing schedule for the stay. On July 3, 2025, the same special motions panel dissolved the administrative stay and granted a stay pending appeal. Add. A. It set forth its reasoning in a single paragraph:

> In analogous removal cases involving the National Labor Relations Board and the Merit Systems Protection Board, the Supreme Court stayed orders similar to the one at issue here. See Trump v. Wilcox, 145 S. Ct. 1415 (2025) (per curiam). The Court did so based on its conclusions that the NLRB and MSPB "exercise considerable executive power" and that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." Id. at 1415. The Supreme Court's reasoning fully applies to the FLRA, which possesses powers substantially similar to those of the NLRB. Compare 5 U.S.C. § 7104 et seq., with 29 U.S.C. § 153 et seq.

Add. A at 1–2.

#125092913v1

## ARGUMENT

"A *stay* pending appeal is an 'extraordinary' remedy. To obtain such exceptional relief, the *stay* applicant must (1) make a strong showing that it is likely to succeed on the merits"; (2) *demonstrate* that it will be irreparably injured before the appeal concludes; (3) show that issuing a *stay* will *not* substantially injure the other parties interested in the proceeding; and (4) establish that the public interest favors a *stay*." *KalshiEX*, 119 F.4th at 63 (cleaned up) (emphases in original). "[When] the question on the merits is close and difficult, a [Moving Party] cannot obtain a *stay* . . . [if] it has *not demonstrated* that it or the public will be irreparably *harmed* while its appeal is heard. That failure is fatal to [a Movant's] *stay* request because a showing of *irreparable harm* is a necessary prerequisite for a *stay*." *Id.* at 63–64 (emphases in original); *id.* at 64 (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)) ("'We believe that analysis of the second factor disposes of the *stay* motions and, therefore, address only whether the petitioners have *demonstrated* that in the absence of a *stay*, they will suffer *irreparable harm*.'"). (emphases in original).

In granting the motion for stay, the special panel, in a one paragraph analysis, stated that the case was similar to the cases involving the agency heads of the National Labor Relations Board (*Wilcox*) and Merit Systems Protection Board (*Harris*) in *Wilcox III* and because the Supreme Court granted a stay in those cases,

a stay should be granted here. Simply relying on *Wilcox III* is not sufficient to justify the "extraordinary" remedy of a stay, when the government's delay in moving to appeal and stay the remedy in this case bears no resemblance to the urgency it demonstrated in the *Wilcox* and *Harris* cases and cannot support a determination of irreparable harm.

The government elected to wait two and a half months after the district court's decision before moving for a stay and fifty-seven days before even filing a notice of appeal. ECF No. 25. For seventy-six days, Plaintiff-Appellee Grundmann was working without the government seeking a stay. Even if the government is suffering harm, its inaction is incompatible with its argument that it is suffering *irreparable* harm by Plaintiff-Appellee Grundmann doing her job.

This differs from the NLRB and MSPB cases where the government took the position that allowing the removed board members to work for a single day was irreparable harm. Application to Stay the Judgments of the United States District Court for the District of Columbia and Request for Administrative Stay ("*Wilcox* Stay Application") at 4, *Wilcox III*, No. 24A966 (U.S. Apr. 7, 2025). And the government repeatedly acted right away, reflecting its view that a single day in office was an irreparable harm. In *Harris v. Bessent*, the district court ruled in favor of Ms. Harris on March 4. *Harris v. Bessent,* No. CV 23-412 (RC), 2025 WL 679303 (D.D.C. Mar. 4, 2025) ("*Harris I*"). The same day the government appealed to the

9

D.C. Circuit, Notice of Appeal, *id.*, ECF No. 41, and filed a motion to stay pending appeal in the district court, *id.*, ECF No. 42. When that motion was denied on March 5, *id.*, ECF No. 45, the government then moved for a stay in the D.C. Circuit the next day. Emergency Motion to Stay Underlying Order Pending Appeal, *Harris v. Bessent*, No. 25-5055 (D.C. Cir. Mar. 6, 2025).

In *Wilcox v. Trump*, involving the removal of the NLRB member, the district court issued its opinion on March 6, *Wilcox v. Trump,* No. CV 25-334 (BAH), 2025 WL 720914 (D.D.C. March 6, 2025) ("*Wilcox I*"). The government noticed its appeal the same day, *Wilcox I*, ECF No. 36. It filed a Motion for Stay Court's Order Pending Appeal the next day, *id.*, ECF No. 39, that was denied on March 8, *id.*, ECF No. 40. On March 10, the government filed an Emergency Motion to Stay Underlying Order Pending Appeal in the D.C. Circuit, *Wilcox v. Trump* ("*Wilcox II*"), No. 25-5057 (D.C. Cir. Mar. 10, 2025).  After the cases were consolidated and the D.C. Circuit en banc vacated the three-judge motion's panel decision to issue stays*, Harris v. Bessent (*"*Harris II*"), No. 25-5037, 2025 WL 1021435 (en banc), the government filed a motion for stay before the Supreme Court two days later. *Wilcox* Stay Application, *Wilcox III*, *supra* (U.S. Apr. 9, 2025).[1]

---

[1] In *LeBlanc*, the government filed its notice of appeal six days after the district court ruled in the plaintiffs' favor and filed moved for stay in the district court one day later. *LeBlanc v. U.S. Privacy & Civil Liberties Bd.* (D.D.C. 2025), ECF Nos. 24-26, 28.

#125092913v1

As illustrated above, in the *Wilcox* and *Harris* cases, each time the government filed its stay papers within two days of an adverse decision. Instead of *Wilcox III* providing the reason why the government satisfies the irreparable harm factor here, it illustrates why the government does not. By waiting seventy-six days, the government treated Ms. Grundmann's return to work as a nonurgent matter, in contrast to their responses to Ms. Harris and Ms. Wilcox returning to work where they acted immediately. Given this significant difference, the reasoning in the Supreme Court's order regarding the equitable factors is not applicable here.

Indeed, courts have held that a delay in moving to appeal and seeking a stay substantially weakens a claim of irreparable harm.  In *Beame v. Friends of Earth*, 434 U.S. 1310 (1977) (Marshall, J.), the Supreme Court denied a party's motion to stay a pending disposition of a petition for certiorari when the party waited the maximum amount of time before seeking certiorari and moved for a stay twenty days after that. The Court stated that "[t]he applicants' delay in filing their petition and seeking a stay vitiates much of the force of their allegations of irreparable harm." *Id.* at 1313; *see also Fontem US, LLC v. FDA*, No. 22-1076, 2022 WL 2761393, at *1 (D.C. Cir. July 12, 2022) ("[Applicant] has demonstrated that the marketing denial order is causing it harm, but by waiting more than two months after the marketing denial order's issuance to seek emergency relief, [Applicant] weakened its claim of irreparable harm.").

11

Moreover, as the district court noted, Add. D at 7, the government may obviate any harm to it caused by the injunction by obtaining Senate confirmation of Ms. Grundmann's successor.  Ms. Grundmann's term expired on July 1, 2025, meaning that she can be replaced as soon as her successor is confirmed through the regular appointment process. *Id.* By prioritizing the nomination and confirmation of her successor, Defendants can achieve their objective of permanently removing Ms. Grundmann without a stay and without this Court addressing the constitutionality of the removal statute. As the district court opined, unlike in *Wilcox III*, "[t]his means that a stay is not necessary 'to avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation.'" ECF No. 29 at 7 (quoting *Wilcox III*, 145 S. Ct. at 1415). Because there is no irreparable harm to the government, the special panel erred in granting the motion to stay.

Vacating the stay is particularly appropriate given the complexity and importance of the merits issues. Regarding the merits, because the government concedes that it has violated the removal provision, it must show that the provision is unconstitutional. When Congress enacted the FSLMRS, it constructed the agency so it was consistent with *Humphrey's Executor v. United States,* 295 U.S. 602 (1935), where the Supreme Court established that Congress could impose limitations on a President's authority to remove a member of a multimember, bipartisan independent agency leadership that had staggered terms and whose functions were

12

predominantly quasi-judicial or quasi-legislative. The Supreme Court has consistently reaffirmed the "*Humphrey's Executor* exception" to the President's authority to remove Executive Branch officials. *Wiener v. United States*, 357 U.S. 349 (1958) (applying *Humphrey's Executor* in holding that the President illegally removed members of the War Crimes Commission); *Morrison v. Olson*, 487 U.S. at 654, 688 & n.25 (1988) (recognizing that *Humphrey's Executor* is still good law); *Free Enter. Fund v. Pub. Co. Acct. Oversight Board*, 561 U.S. 477, 483 (2010) (declining to "reexamine" *Humphrey's Executor*); *Seila Law LLC v. CFPB*, 591 U.S. 197, 204, 228 (2020) (expressly stating twice that it was not revisiting *Humphrey's Executor*); *Collins v. Yellen*, 594 U.S. 220, 251 (2021) (same).

When describing the two exceptions to the President's authority to remove officers in *Seila Law*, the Court characterized the *Humphrey's Executor* exception as applying to "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 591 U.S. at 218.

The government does not contest that the FLRA is a multimember agency, or that is bipartisan, or has staggered terms. The issue of whether the FLRA exercises "substantial" or "considerable" power is a contested issue. Plaintiff-Appellee respectfully disagrees with the special panel, which stated that the FLRA likely wields "considerable executive power." App. A at 1–2 (quoting *Wilcox III*, 145 S. Ct. at 1415). The three-Member FLRA board's authority is primarily quasi-judicial because the

13

Members, as a board, predominantly act as an adjudicative appellate body, resolving legal disputes after factfinding has already occurred by administrative law judges or in arbitration.  5 U.S.C. § 7105(a)(2)(G), (H).

In contrast, the executive functions of the agency are almost entirely carried out by officers who are removable at will by the President.  The President designates one of the members of the Authority as the Chairman, who serves as "the chief executive and administrative officer of the Authority," 5 U.S.C. § 7104(b). The General Counsel exercises the executive functions of investigating, filing, and prosecuting complaints. 5 U.S.C. § 7104(f)(2). The General Counsel is appointed by the President with the advice and consent of the Senate and the "General Counsel may be removed at any time by the President." 5 U.S.C. § 7104(f)(1).

Because the structure and function of the FLRA closely tracks the *Humphrey's Executor* exception, Plaintiff-Appellee should prevail on the merits before this Court as it did in the district court. At a minimum, this case represents another example of a "close and difficult call" on the merits, *KalshiEX*, 119 F.4th at 63, where this Court has said a stay is not appropriate when the moving party fails to show irreparable harm.

Regarding the other factors, balance of harms and public interest, which are consolidated when the government is the movant, *Nken v. Holder*, 556 U.S. 418, 435 (2009), there is considerable harm to the public in granting a stay. The district court

14

noted that if a stay is granted, the FLRA would retain only two of its members, and would run the risk of deadlock, Add. D at 7, which results in a case being in abeyance until the third member is in place. The district court further noted deadlock was a significant problem when Ms. Grundmann served as part of a two-member Authority previously. *Id.* The public interest would be better served by avoiding deadlock by maintaining a three-member Authority and keeping Ms. Grundmann in place until her successor is nominated and confirmed. As in the district court, the government has not addressed how deadlock would not undermine Congress's determinations that "'labor organizations and collective bargaining in the civil service are in the public interest'" and that "'the public interest demands . . . the efficient accomplishment of the operations of the Government.'" *Id.* at 9 (quoting 5 U.S.C. § 7101(a)(2)).

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellee Susan Tsui Grundmann respectfully requests that the Court vacate the stay issued by the special panel.


Dated: July 7, 2025                    Respectfully submitted,


                                       */s/* Jon M. Greenbaum
                                       Norman L. Eisen, D.C. Bar #435051
                                       Tianna J. Mays, D.C. Bar #90005882
                                       Jon M. Greenbaum, D.C. Bar #489887
                                       Pooja Chaudhuri, D.C. Bar #888314523

15

DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Tel: (202) 601-8678
norman@statedemocracydefenders.org
tianna@statedemocracydefenders.org
jgreenbaum@justicels.com
pooja@statedemocracydefenders.org

16

# CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 40 (d)(3)(A) because it contains 3,722 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Times New Roman, a proportionally spaced typeface.

*/s/ Jon M. Greenbaum*

Jon M. Greenbaum

## ADDENDA TABLE OF CONTENTS

A.  July 3, 2025 Order Granting Motion to Stay

B.  March 12, 2025 Memorandum Opinion

C.  March 12, 2025 Order

D.  June 29, 2025 Memorandum Opinion

E.  Certificate of Parties and Amici

# ADDENDUM A

# United States Court of Appeals
## For The District of Columbia Circuit
_____

**No. 25-5165**                **September Term, 2024**

1:25-cv-00425-SLS

**Filed On:** July 3, 2025

Susan Tsui Grundmann,

      Appellee

   v.

Donald J. Trump, in his official capacity as
President and Colleen Duffy Kiko, in her
official capacity as chairman of the Federal
Labor Relations Authority,

      Appellants

    **BEFORE:**   Katsas, Rao, and Walker, Circuit Judges

## O R D E R

Upon consideration of the motion for stay pending appeal, the opposition thereto, and the reply, it is

**ORDERED** that the administrative stay entered on June 18, 2025, be dissolved. It is

**FURTHER ORDERED** that the motion for stay pending appeal be granted. This appeal presents the question whether the President may remove members of the Federal Labor Relations Authority without cause. A federal statute bars such removals absent inefficiency, neglect of duty, or malfeasance. 5 U.S.C. § 7104(b). Earlier this year, the President nonetheless removed FLRA member Susan Tsui Grundmann without determining whether the statutory removal standard was met. Grundmann sued, and the district court declared that the removal was unlawful and enjoined various defendants from effectuating it. Grundmann v. Trump, 770 F. Supp. 3d 166, 179–90 (D.D.C. 2025). The government appealed that ruling and moved for a stay pending appeal. It contends that the statutory removal restriction violates Article II of the Constitution.

In analogous removal cases involving the National Labor Relations Board and the Merit Systems Protection Board, the Supreme Court stayed orders similar to the one at issue here. See Trump v. Wilcox, 145 S. Ct. 1415 (2025) (per curiam). The Court did so based on its conclusions that the NLRB and MSPB "exercise considerable

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 25-5165**                          **September Term, 2024**

executive power" and that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." Id. at 1415. The Supreme Court's reasoning fully applies to the FLRA, which possesses powers substantially similar to those of the NLRB. Compare 5 U.S.C. § 7104 et seq., with 29 U.S.C. § 153 et seq.


**Per Curiam**


**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:    /s/
Selena R. Gancasz
Deputy Clerk

# ADDENDUM B

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SUSAN TSUI GRUNDMANN,

        *Plaintiff*,

    v.

DONALD J. TRUMP, *et al.*,

        *Defendants*.

Civil Action No. 25‑425 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

The Constitution vests Congress with broad authority to organize the Executive Branch. U.S. Const. art. I, §§ 1, 8. From its earliest days, Congress exercised this power by creating institutions to structure the government. And for almost a century and a half, Congress has created independent federal agencies with specific expertise and limited the President's power to remove principal officers leading those agencies. The Supreme Court first blessed that approach in 1935 when it rejected the President's claim of "illimitable power of removal" over all federal officers, *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935), instead holding that our Constitution gives Congress the power to "create expert agencies led by a group of principal officers removable by the President only for good cause." *Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020) (emphasis omitted) (citing *Humphrey's Ex'r*, 295 U.S. 602). And the Supreme Court has repeatedly endorsed statutory removal protections for multimember and bipartisan expert agencies since then.

Congress created the Federal Labor Relations Authority (FLRA) to impartially manage and resolve disputes surrounding labor organization in the federal workforce. The independence of the

FLRA was central to its creation, as Congress wanted to ensure a fair, consistent, and unbiased process for managing federal labor relations that would not shift with political whims. To achieve this goal, Congress decided to give the three Members of the FLRA a limited statutory protection from removal by the President. They could be removed only for inefficiency, neglect of duty, or malfeasance in office during their staggered five-year terms, and only after notice and a hearing.

In the nearly fifty years since the FLRA's creation, no President has ever removed a Member. Until now. On February 10, 2025, the Plaintiff, Susan Tsui Grundmann, received a two-sentence email on behalf of President Donald J. Trump informing her that her position on the FLRA had been terminated. Ms. Grundmann received no explanation whatsoever for her termination. And she did not receive notice or a hearing. Ms. Grundmann is not alone. This is one of a series of cases filed in this District challenging the President's unprecedented removal of officers across the federal government without cause, including Members of the Merit Systems Protection Board and the National Labor Relations Board, as well as the Special Counsel.

The Government vigorously defends Ms. Grundmann's hasty termination on the basis that the Constitution vests the entirety of the "executive Power" in the President. U.S. Const. art. II, § 1, cl. 1. It argues that the President may remove federal officials on a whim, and in doing so, override Congress's considered judgment. The Government's arguments paint with a broad brush and threaten to upend fundamental protections in our Constitution. But ours is not an autocracy; it is a system of checks and balances. Our Founders recognized that the concentration of power in one branch of government would spell disaster. "The doctrine of the separation of powers was adopted by the convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevitable friction

incident to the distribution of the governmental powers among three departments, to save the people from autocracy." *Myers v. United States*, 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting).

The removal in this case was unlawful. The Government concedes that Ms. Grundmann's removal violated the FLRA's founding statute—a statute that Congress enacted and the President signed into law to revamp federal labor relations in the federal government. The Government's argument that the statutory removal provision is unconstitutional cannot be reconciled with longstanding Supreme Court precedent that is binding on this Court. And it would encroach on Congress's authority under Article I of the Constitution.[1]

As for remedies, the Government takes the position that this Court lacks the authority to provide meaningful relief in these circumstances. It argues that where a President removes a Senate-confirmed federal officer in violation of a duly enacted and constitutional statute, the only recourse is an award of backpay to that officer. Why? According to the Government, any order from this Court that results in the officer continuing her role against the President's will would raise grave separation-of-powers concerns. In other words, where a President exceeds his power under Article II of the Constitution and intrudes on Congress's Article I authority, the Government's position is that an Article III court may not interpret the law and redress the resulting injury. It is the Government's own argument that raises grave separation-of-powers concerns. There can be no doubt that "the President is bound to abide by the requirements of duly enacted and otherwise constitutional statutes." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996). And it is precisely the role of an Article III court to step in when that does not

---

[1] The Government has hinted that it intends to ask the Supreme Court to overrule its precedent, invalidating statutory provisions that have been in place for nearly a century and a half and leaving the President free to fire whomever he wants in the Executive Branch. *See* Letter from Sarah Harris, Acting Solicitor General, to Sen. Richard Durbin on Restrictions on the Removal of Certain Principal Officers of the United States (Feb. 12, 2025), https://perma.cc/D67G-FKK4.

happen. Ms. Grundmann is entitled to relief that would redress her injury and allow her to continue her work on the FLRA.

For those reasons and the reasons that follow, the Court grants Ms. Grundmann's Motion for Summary Judgment and denies the Defendants' Cross-Motion for Summary Judgment.

## BACKGROUND

### A.    Statutory Background

Nearly fifty years ago, Congress enacted the Federal Service Labor-Management Relations Statute (FSLMRS), 5 U.S.C. §§ 7101–7135, as part of the Civil Service Reform Act (CSRA), Pub. L. No. 95-454, 92 Stat. 1111 (1978). These statutes "comprehensively reorganized the structure of labor-management relations in the federal government." *Library of Cong. v. FLRA*, 699 F.2d 1280, 1283 (D.C. Cir. 1983). "Congress intended the new statutory system to serve the twin goals of protecting the right of public employees to organize and bargain collectively, while simultaneously strengthening the authority of federal management to hire and fire employees in the interest of a more effective public service." *Id.* (citing 5 U.S.C. § 7101).

Congress created the Federal Labor Relations Authority (FLRA) to "carry[] out the purpose" of the FSLMRS. 5 U.S.C. § 7105(a)(1). It tasked the FLRA with "conduct[ing] hearings and resolv[ing] complaints of unfair labor practices," "resolv[ing] issues relating to the duty to bargain in good faith," and "resolv[ing] exceptions to arbitrator's awards." *Id.* § 7105(a)(2). Congress also empowered the FLRA to supervise elections for the selection of labor organizations by employees and to prescribe certain criteria related to labor bargaining in the federal workforce. *Id.*

The FLRA is composed of three Members, all appointed by the President with the advice and consent of the Senate. *Id.* § 7104. No more than two of the three Members are permitted to

"be adherents of the same political party." *Id.* § 7104(a). And each Member is to serve a staggered five-year term. *See* 5 U.S.C. § 7104(c) (establishing five-year terms); CSRA, Pub. L. No. 95-454, § 7104(c)(1), 92 Stat. 1196 (1978) (staggering terms). The Members can be removed by the President "only upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 7104(b). But the President has the authority to designate one of the Members as the "Chairman of the Authority." *Id.*

The structure of the FLRA was meant to ensure "the resolution of disputes by the intervention of neutral, independent, third parties[.]" 124 Cong. Rec. 25,720 (1978). Congress sought to "eliminate what [was] perceived by Federal employee unions and others as conflict of interest in the existing council," H.R. Rep. No. 95-1717, at 159 (1978), and to create a body that was "impartial by independence from any direct responsibility to the incumbent administration," S Rep. No. 95-969, at 7 (1978). As one sponsor stated:

> One of the central elements of a fair labor relations program is effective, impartial administration. Title VII provides for the creation of an independent and neutral Federal labor relations authority to administer the Federal labor management program . . . . Currently the Federal labor-management program is administered by the Federal Labor Relations Council which is composed of three administration officials, . . . none of whom can be considered neutral.

124 Cong. Rec. 25,721 (1978). The belief was that "[i]mpartiality [was] guaranteed by protecting authority members from unwarranted 'Saturday night' removals." *Id.* at 25,721–25,722.

## B.    Factual Background

The facts are drawn from the Plaintiff's Complaint and Statement of Material Facts, which the Defendants do not dispute. Joint Status Report at 3, ECF No. 8.

The Plaintiff, Susan Tsui Grundmann, became a Member of the FLRA on May 12, 2022. Compl. ¶ 3, ECF No. 1. She was appointed by President Joseph R. Biden and confirmed by the Senate to a term set to expire on July 1, 2025. *Id.* But that expiration date was not set in stone.

Under the FSLMRS, she was permitted to continue serving until either her successor took office or the last day of the Congress beginning after the original expiration date, 5 U.S.C. § 7104(c), which in her case would fall in January 2029, Compl. ¶ 3. On January 3, 2023, President Biden designated her as Chairman of the Authority. Pl.'s Mot. for Summ. J. & Prelim. Inj. ("Pl.'s Mot.") at 1, ECF No. 4; Defs.' Opp'n to Pl.'s Mot. for Summ. J. ("Defs.' Opp'n") at 5, ECF No. 12.

The Government does not allege that Ms. Grundmann has been an ineffective Member of the FLRA. Yet on February 10, 2025, at 10:46 PM, Ms. Grundmann received a two-sentence email from Trent Morse, the Deputy Director of the White House Office of Presidential Personnel: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Federal Labor Relations Authority is terminated, effective immediately. Thank you for your service." Pl.'s Decl. in Supp. of Pl.'s Mot. for Summ. J. & Prelim. Inj. ("Pl.'s Decl.") ¶ 3, ECF No. 4-2. She did not receive notice or a hearing, nor was any "inefficiency, neglect of duty, or malfeasance in office" identified. Compl. ¶ 17. And she has since been unable to perform her duties as a Member of the FLRA. Id. ¶ 20. To the best of Ms. Grundmann's knowledge, this is the first time a President has ever removed a Member of the FLRA without cause. Pl.'s Decl. ¶ 12.

On February 11, 2025, President Trump named Colleen Duffy Kiko as Chairman, Compl. ¶ 19, leaving the FLRA with only two Members, see id. ¶ 20. Although the FLRA maintains a quorum, without Ms. Grundmann's tiebreaking vote, certain cases may deadlock and go into abeyance. See Pl.'s Decl. ¶ 7. This is exactly what happened when Ms. Grundmann served as one of only two Members of the FLRA for eighteen months, resulting in about one-third of the cases being deadlocked. Id.

### C.    Procedural Background

On February 13, 2025, Ms. Grundmann filed a Complaint alleging that her removal without cause violated the FSLMRS. *See* Compl. ¶¶ 22–25. She named President Trump and Ms. Kiko as Defendants, *id.* ¶¶ 4–5, and she requested both declaratory and injunctive relief, Compl., Prayer for Relief, ¶¶ 1–3. The next day, on February 14, 2025, she filed a Motion for Preliminary Injunction and Summary Judgment. *See* Pl.'s Mot. for Summ. J. & Prelim. Inj. ("Pl.'s Mot."). On February 25, 2025, the Defendants filed their Opposition to the Plaintiff's Motion for Summary Judgment, *see* Defs.' Opp'n, and a Cross-Motion for Summary Judgment, *see* Defs.' Cross-Mot. for Summ. J. ("Defs.' Cross-Mot."), ECF No. 11. The Plaintiff responded to both on February 28, 2025. *See* Pl.'s Mem. in Opp'n to Defs.' Cross-Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 15; Pl.'s Reply in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 16. And the Defendants filed their Reply in support of their Cross-Motion for Summary Judgment on March 5, 2025. *See* Defs. Reply in Supp. of Defs.' Cross-Mot. for Summ. J. ("Defs.' Reply), ECF No. 18. The Court held a hearing on March 7, 2025. Both motions are now ripe for decision.

### LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The burden is on the movant to make the initial showing of the absence of any genuine issues of material fact." *Ehrman v. United States*, 429 F. Supp. 2d 61, 66 (D.D.C. 2006). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). When "both

parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman*, 429 F. Supp. 2d. at 67.

## DISCUSSION

The President violated the law when he removed Ms. Grundmann. The removal was in clear contravention of the FSLMRS. And under longstanding Supreme Court precedent, that statute was a valid exercise of Congress's authority under Article I of the Constitution.

### A.    Statutory Violation

The Government concedes that Ms. Grundmann's removal violated the FSLMRS. Motions H'rg (Mar. 7, 2025), Draft Tr. at 24:10–14. The statute provides that "Members of the Authority . . . may be removed by the President only upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 7104(b). But Ms. Grundmann received no notice or hearing. *See* Compl. ¶ 17. And the two-sentence email on behalf of the President informing her of the removal did not allege any inefficiency, neglect of duty, or malfeasance in office. *See id.* The Government instead argues that the removal protection in the FSLMRS is unconstitutional. *See* Defs.' Opp'n at 6–12.

### B.    Constitutionality of the Statute

"[T]he Necessary and Proper Clause grants Congress broad authority to enact federal legislation." *United States v. Comstock*, 560 U.S. 126, 133 (2010). This includes the power to provide removal protections to "multimember bodies with 'quasi-judicial' or 'quasi-legislative' functions." *Seila Law LLC*, 591 U.S. at 217. This power to "create a traditional independent agency headed by a multimember board or commission," *id.* at 207, "cannot well be doubted," *Humphrey's Ex'r*, 295 U.S. at 629. The Court has repeatedly endorsed such removal protections throughout the last century. *See, e.g.*, *id.*; *Wiener v. United States*, 357 U.S. 349 (1958).

But this power is not without limits. "Article II provides that '[t]he executive Power shall be vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law*, 591 U.S. at 213 (quoting U.S. Const. art. II, § 1, cl. 1; *id.*, § 3). This establishes a "general rule that the President possesses 'the authority to remove those who assist him in carrying out his duties.'" *Id.* at 215 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513–14 (2010)). The scope of Congress's power therefore turns on whether this general rule applies. *See id.* at 218.

The Supreme Court has identified "two exceptions" that "represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Id.* (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)). The first comes from *Humphrey's Executor*, and it extends to "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 591 U.S. at 218. The second comes from *Morrison v. Olson*, 487 U.S. 654 (1988), and it applies to "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 218. Congress may provide removal restrictions to an executive officer who fits within either of these two exceptions. *See id.*

### 1.    The *Humphrey's Executor* Exception

*Seila Law* is best read as teaching that the *Humphrey's Executor* exception applies in two steps. *Seila Law*, 591 U.S. at 218–19. First, courts must ask whether an agency's structure resembles that of the "New Deal-era FTC" described in *Humphrey's Executor*. *Seila Law*, 591 U.S. at 218. Second, courts must ensure that the agency does not exercise substantial executive power. *Id.* at 218–19. If both conditions are met, then Congress has the authority to provide removal restrictions. *Id.* at 218.

The Government quibbles with step two. Even though *Seila Law* squarely states that the exception extends to "multimember expert agencies that do not wield *substantial* executive power," *id.* (emphasis added), it argues that the exception is limited to agencies "that exercise *no* executive power," Defs.' Opp'n at 8 (emphasis added). Although some language in *Seila Law* could be read that way, a careful reading of each passage reveals that the opinion is more restrained.

*First*, *Seila Law* outlines its general rule in very broad terms. The Supreme Court says that "the 'executive Power'—all of it—is 'vested in a President.'" *Seila Law*, 591 U.S. at 203 (quoting U.S. Const. art. II, § 1, cl. 1; *id.*, § 3). Then it says that the President has the "power to remove . . . those who wield executive power on his behalf." *Id.* at 204. The combination of these two statements initially suggests that *all* executive power is wielded on behalf of the President, so anyone exercising *any* executive power must be removable at will. *See* Defs.' Opp'n at 7. But the Court immediately acknowledges that there are "two exceptions" to this removal power. *Seila Law*, 591 U.S. at 204. And it would make little sense to call them "exceptions" if they did not involve the exercise of any executive power at all. *Id.*

*Second*, *Seila Law* highlights that in *Humphrey's Executor*, "[r]ightly or wrongly, the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'" *Seila Law*, 591 U.S. at 215 (quoting *Humphrey's Ex'r*, 295 U.S. at 628)). This makes it into the summary of the holding: "In short, *Humphrey's Executor* permitted Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise *any* executive power." *Id.* at 216 (emphasis added). But we should not read into this because *Seila Law* cites *Wiener* as falling within the *Humphrey's Executor* exception. *See Seila Law*, 591 U.S. at 216. This could not be the case if

the exception applied only to agencies that were "said not to exercise *any* executive power." *Id.* (emphasis added). Neither *Wiener* nor *Seila Law* ever said such a thing about the War Claims Commission. *See generally Wiener*, 357 U.S. 349; *Seila Law*, 591 U.S. 197. The Court's summary of the *Humphrey's Executor* holding should therefore not be conflated with its description of the bounds of the *Humphrey's Executor* exception.

    *Collins v. Yellen*, 594 U.S. 220 (2021), does not change this reading of *Seila Law*. The Government points to broad language from the opinion: "Courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies, and we do not think that the constitutionality of removal restrictions hinges on such an inquiry." *Collins*, 594 U.S. at 253. But *Collins* was a case about single agency heads, not multimember agencies, so the *Humphrey's Executor* exception was not at issue. *See id.* at 251. The Court in *Collins* merely declined to create a *new* exception—beyond the two recognized in *Seila Law*—for single agency heads that exercise minimal executive power. *Id.* at 250. *Collins* even included a footnote right after the broad language that limited its reach to single agency heads. *See id.* at 253 n.19. That footnote distinguished two historical examples of removal restrictions by saying that "those agencies are materially different because neither of them operated beyond the President's control, *and one of them was led by a multi-member Commission*." *Id.* (emphasis added). So the language the Government identifies was not meant to apply to multimember agencies. And the Court expressly warned against reading *Collins* to apply to agencies not before the Court. *See id.* at 256 n.21. This would make little sense if *Collins* were meant to change *Seila Law*.[2]

---

[2] A Fifth Circuit panel recently offered its own distillation of the *Humphrey's Executor* exception. *See Consumers' Rsch. v. CPSC*, 91 F.4th 342 (5th Cir. 2024). And it did not deal with this broad language from *Collins* at all, *see id.*, suggesting that it did not read the language as bearing on the exception.

### 2.      The Structure of the FLRA

The first question is whether the FLRA's structure resembles how *Humphrey's Executor* described the "New Deal-era FTC." *Seila Law*, 591 U.S. at 218. *Humphrey's Executor* "identified several organizational features that helped explain its characterization of the FTC as non-executive." *Seila Law*, 591 U.S. at 216. First, the Board was "[c]omposed of five members" with "no more than three from the same political party," signaling that it was "designed to be 'non-partisan' and to 'act with entire impartiality.'" *Id.* at 216 (quoting *Humphrey's Ex'r*, 295 U.S. at 624). Second, "[t]he FTC's duties were 'neither political nor executive,' but instead called for 'the trained judgment of a body of experts' 'informed by experience.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624). And third, "the Commissioners' staggered, seven-year terms enabled the agency to accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624).

All three features are present in the FLRA. First, the Authority has three Members, and no more than two of them may be "adherents of the same political party," which ensures bipartisanship. 5 U.S.C. § 7104(a). Second, "the FLRA was intended to develop specialized

---

There is also a more ambitious way to square *Collins*. As the Fifth Circuit noted, *id.* at 352 n.53, in *Seila Law*, the Chief Justice and two other Justices said that there "may be means of remedying the defect in the CFPB's structure," including, "for example, converting the CFPB into a multimember agency," 591 U.S. at 237 (opinion of Roberts, C.J.). This matters because the CFPB exercises "significant executive power," *id.* at 220 (majority opinion), suggesting the Court might be open to recognizing an exception for "traditional independent agenc[ies], run by a multimember board with a diverse set of viewpoints and experiences," *id.* at 205–06, regardless of the amount of executive power exercised. *Cf. Consumers' Rsch.*, 91 F.4th at 353–54 (arguing that a multimember agency is not removed from the *Humphrey's Executor* exception just because it exercises substantial executive power). After all, the Court said that the two definite exceptions "represent what *up to now* have been the outermost constitutional limits." *Seila Law*, 591 U.S. at 218 (emphasis added). If the Court were to take this step, then it would be true that "the constitutionality of removal restrictions" would not "hinge[]" on "the relative importance of the regulatory and enforcement authority of disparate agencies." *Collins*, 594 U.S. at 253.

expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the [Civil Service Reform Act]." *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 97 (1983). And third, each Member serves a staggered five-year term, allowing the agency to gain technical expertise. *See* 5 U.S.C. § 7104(c) (establishing five-year terms); CSRA, Pub. L. No. 95-454, § 7104(c)(1), 92 Stat. 1196 (1978) (staggering terms). The FLRA's structure therefore triggers the *Humphrey's Executor* exception.

### 3.    The Powers of the FLRA

The next step is to ensure that the FLRA does not exercise substantial executive power. *Seila Law*, 591 U.S. at 218–19. Whether an agency exercises substantial executive power is a fact-bound inquiry. *Humphrey's Executor* "acknowledged that between purely executive officers on the one hand, and officers that closely resembled the FTC Commissioners on the other, there existed 'a field of doubt' that the Court left 'for future consideration.'" *Seila Law*, 591 U.S. at 217 (quoting *Humphrey's Ex'r*, 295 U.S. at 632). This is because "[t]he versatility of circumstances often mocks a natural desire for definitiveness." *Wiener*, 357 U.S. at 252. In other words, bright-line rules are not always possible. But by all indications, none of the FRLA's powers identified by the Government qualifies as a substantial executive power.

*First*, the Government points to the fact that the FLRA "conduct[s] hearings and resolve[s] complaints of unfair labor practices." Defs.' Opp'n at 9 (quoting 5 U.S.C. § 7105(a)(2)(G)). They argue that this puts the FLRA in the same camp as the CFPB in *Seila Law*, which could "unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications." *Id.* (quoting 591 U.S. at 219). And it is true that the FLRA's power to conduct hearings and resolve complaints is greater than was described in *Humphrey's Executor*, where the FTC merely "submit[ed] recommended dispositions to an Article III court." *Seila Law*,

591 U.S. at 218–19. But the ability to issue final judgments is not a death knell for removal protections. Just look at *Wiener*. There, the War Claims Commission "was established as an adjudicating body with all the paraphernalia by which legal claims are put to the test of proof, with finality of determination not subject to review by any other official of the United States or by any court by mandamus or otherwise." 357 U.S. at 354–55 (cleaned up). Yet the Commission still counts as an example of an agency that fits within the *Humphrey's Executor* exception. *See Seila Law*, 591 U.S. at 216.

*Second*, the Government points out that the FLRA "has the authority to litigate and enforce its orders in federal court." Defs.' Opp'n at 9. It highlights three facts. *See id.*

1. The FLRA can "require an agency or a labor organization to cease and desist" from statutory violations and "require [the agency or labor organization] to take any remedial action it considers appropriate to carry out the policies" of the FSLMRS. Defs.' Opp'n at 9 (quoting 5 U.S.C. § 7105(g)(3)). But *Humphrey's Executor* was unbothered by the FTC's ability to "issue and cause to be served a cease and desist order." 295 U.S. at 620. And the FLRA's other tools do not resemble the wide range of remedies available to the CFPB in *Seila Law*, which included restitution, disgorgement, and "civil penalties of up to $1,000,000 (inflation adjusted) *for each day* that a violation occurs." 591 U.S. at 206.

2. The FLRA "may petition to enforce such an order in federal court[.]" Defs.' Opp'n at 9 (citing 5 U.S.C. § 7123(b)). It is true that *Seila Law* said that "the power to seek daunting monetary penalties against private parties in federal court" is "a quintessentially executive power[.]" 591 U.S. at 199. But it is not clear that the object of an FLRA order—an agency or labor union— should be considered a private party for this analysis. And either way, this is not a *substantial* exercise of executive power. In *Humphrey's Executor*, if an FTC "order [was] disobeyed, the

commission [could] apply to the appropriate Circuit Court of Appeals for its enforcement." 295 U.S. at 620–21. This posed no problem. *Id.* at 629.

3. The FLRA "has independent litigation authority to send its own attorneys (not Department of Justice attorneys) to litigate civil actions outside the Supreme Court in connection with any of its functions." Opp'n at 9 (citing 5 U.S.C. § 7105(h)). But again, it is not clear why this would make the power more substantial. When *Seila Law* described the CFPB's enforcement powers, it did not even mention whether the attorneys belonged to the CFPB. *See* 591 U.S. at 206. It was much more concerned about the scale of relief. *See id.* ("Since its inception, the CFPB has obtained over $11 billion in relief for over 25 million consumers, including a $1 billion penalty against a single bank in 2018.").

*Third*, the Government notes that the FLRA has the power to "prescribe rules and regulations to carry out the provisions of the [FSLMRS] applicable to [it]." Defs.' Opp'n at 9 (quoting 5 U.S.C. § 7134). This includes (1) specifying the criteria for determining when a labor organization represents "a substantial number of the employees of the agency," which allows the labor organization to be granted consultation rights by the agency, 5 U.S.C. §§ 7105(a)(2)(C), 7113(a); (2) determining whether an agency has a "compelling need" for an agency-wide regulation, which would allow the agency to avoid having to bargain in good faith with a proposal by a labor organization, 5 U.S.C. §§ 7105(a)(2)(D), 7117(b); *see also* Fed. Lab. Rels. Auth., *The Negotiability Guide* (June 17, 2013); and (3) determining "who is eligible to vote" for labor organization recognition and establishing the "rules governing such an election," subject to certain statutory limitations, 5 U.S.C. §§ 7105(a)(2)(B), 7111(d).

These narrow, largely administrative regulatory assignments pale in comparison to what was feared in *Seila Law*, where "the [CFPB] Director possess[ed] the authority to promulgate

binding rules fleshing out 19 federal statutes, including a broad prohibition on unfair and deceptive practices in a major segment of the U.S. economy." 591 U.S. at 218. The FLRA promulgates regulations under fewer statutes, Motions H'rg (Mar. 7, 2025), Draft Tr. at 31: 16–17; those statutes provide more guidance than the broad prohibition of "unfair and deceptive practices," *Seila Law*, 591 U.S. at 218; and the federal workforce is a smaller segment of the economy than was covered by the CFPB statutes, which included "everything from credit cards and car payments to mortgages and student loans," *id.* at 219.

### 4.    Other *Seila Law* Factors

*Seila Law* mentions other factors as well, although it is unclear how they should fit into the *Humphrey's Executor* exception. *See Consumers' Rsch. v. CPSC*, 91 F.4th 342, 355–56 (5th Cir. 2024). The Court need not solve this puzzle, however, because none of these factors apply.

*First*, the FLRA's structure is not "almost wholly unprecedented." *Seila Law*, 591 U.S. at 220. To the contrary, agencies like the FLRA are part of the fabric of our federal government. Congress has created independent multimember agencies for nearly a century and a half. *See* Marshall J. Berger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1116 (2000). The "structure, role, and functions of the [FLRA] were closely patterned after those of the NLRB." *Library of Congress v. FLRA*, 699 F.2d 1280, 1287 (D.C. Cir. 1983). And the powers of the NLRB were modeled after those of the FTC, *Dish Network Corp. v. NLRB*, 953 F.3d 370, 375 n.2 (5th Cir. 2020), only one month after *Humphrey's Executor* approved of the FTC's removal protections, *Free Enterprise Fund*, 561 U.S. at 547 (Breyer, J., dissenting). The FLRA is "a traditional independent agency, run by a multimember board with a diverse set of viewpoints and experiences." *Seila Law*, 591 U.S. at 205–06 (cleaned up).

*Second*, the FLRA has levers of Presidential accountability. The CFPB Director served a five-year term, leaving some Presidents without "any opportunity to shape its leadership and thereby influence its activities." *Seila Law*, 591 U.S. at 225. But the FLRA Members serve staggered five-year terms, allowing every President to wield influence over the agency. *See* 5 U.S.C. § 7104(c) (establishing five-year terms); CSRA, Pub. L. No. 95-454, § 7104(c)(1), 92 Stat. 1196 (1978) (staggering terms). If the President follows the ordinary course and nominates someone to replace Ms. Grundmann, her term would end on July 1, 2025. Defs.' Statement of Undisputed Material Facts (Defs.' SUMF) ¶ 1, ECF No. 11-2. The CFPB also received funds "outside the appropriations process," which "further aggravate[ed] the agency's threat to Presidential control." *Seila Law*, 591 U.S. at 226. But the FLRA receives its funding through the appropriations process, Further Consolidated Appropriations Act, Pub. L. No. 118–47, 138 Stat. 461 (2023), allowing the President "to recommend or veto spending bills that affect the operation of [the agency]," *Seila Law*, 591 U.S. at 226.

And that is not all. The General Counsel of the FLRA, who may investigate labor practices and prosecute complaints, "may be removed at any time by the President." 5 U.S.C. § 7104(f). With the selection of the General Counsel, the President can immediately influence the FLRA's investigative and prosecutorial power. The President may also "designate one member [of the FLRA] to serve as Chairman of the Authority," who serves as "the chief executive and administrative officer. *Id.* § 7104(b). And this title that may be revoked at will. Pl.'s Reply at 10; *see, e.g.*, Fed. Lab. Rels. Auth., Press Release, Patrick Pizzella Designated Acting FLRA Chairman (Sept. 10, 2019), https://perma.cc/ED2R-HVKG. There are therefore no additional features of the FLRA that render its Members' removal protections "even more problematic." *Seila Law*, 591 U.S. at 225.

\*\*\*

A straightforward reading of Supreme Court precedent thus resolves the merits of this case. The FLRA triggers and satisfies the *Humphrey's Executor* exception, making the FSLMRS removal provision a valid exercise of Congress's constitutional authority. Although the Government claims fidelity to *Humphrey's Executor* and the cases that follow, its arguments seem to contemplate absolute presidential authority over the removal of federal officers and would leave *Humphrey's Executor* toothless. Indeed, it is difficult to conceive of a federal agency that would fit within the *Humphrey's Executor* exception as the Government reads it. But it has been clear for almost a century that Article II does not give the President an "illimitable power of removal" over all federal officers. *Humphrey's Executor*, 295 U.S. at 629.

When pressed at oral argument to identify existing federal agencies that would satisfy the *Humphrey's Executor* exception, the Government identified only a single agency: the Federal Reserve. Motions H'rg (Mar. 7, 2025), Draft Tr. at 36:19–20. But the Government declined to explain why the Federal Reserve would fit within the exception under the broad arguments it advances in this case. *Id.* at 36:21–37:5. The Federal Reserve sets the federal funds rate, 12 U.S.C. §§ 225, 263, which permeates every corner of the American economy. If control over that does not rise to an exercise of substantial executive power, then neither does laying down the administrative rules for labor organizing within the federal workforce.

## REMEDIES

The Court now turns to the question of remedies. Ms. Grundmann requests both declaratory and injunctive relief. See Compl., Prayer for Relief, ¶¶ 1–2. The Government broadly argues that the Court lacks the authority to award either and is instead limited to an award of backpay to Ms. Grundmann. Motions H'rg (Mar. 7, 2025), Draft Tr. at 45:1–19. According to the

Government, because prior removed officials chose to seek backpay only, the Court may not award more than that. The Government held this line at oral argument, insisting that an Article III court is without authority to award relief to redress the injury caused by a President exceeding his Article II authority and intruding on Congress's Article I authority. *Id.* at 46:11. The Court disagrees. Ms. Grundmann is entitled to a declaratory judgment saying that her removal was unlawful. And she has also met her burden to receive the permanent injunction that she seeks.

### A.     Declaratory Relief

The Plaintiff requests that the Court "[d]eclare that Ms. Grundmann was unlawfully removed as a member of the [FLRA]." Compl., Prayer for Relief, ¶ 1. The Court has the authority to issue such a declaratory judgment, and it exercises its discretion to do so.

The Declaratory Judgment Act (DJA) provides that, "in a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, *whether or not* further relief is or could be sought." 28 U.S.C. § 2201(a) (emphasis added). The DJA "alone does not provide a court with jurisdiction," *California v. Texas*, 593 U.S. 659, 672 (2021), but it does "enlarge[] the range of remedies available in the federal courts" that have established jurisdiction, *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). This Court has jurisdiction over this federal-question case because, at minimum, it could provide backpay to establish redressability. *See* Compl., Prayer for Relief, ¶ 3 (asking for "all other appropriate relief"); Motions H'rg (Mar. 7, 2025), Draft Tr. at 45:1–46:12 (conceding backpay is available). So the DJA allows for declaratory relief.

In its reply brief, the Government appears to take the position that the Court may not award "declaratory relief stating that the President's removal of Plaintiff was unlawful." *See* Defs.' Reply

at 15. In support, they cite a single quote from a concurring opinion that is inapposite and not binding on this Court. *See Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part and concurring the judgment) ("I think we cannot issue a declaratory judgment against the President."). When pressed at oral argument, the Government walked this back and agreed that the Court could issue a declaratory judgment saying that Ms. Grundmann's removal was unlawful. Motions H'rg (Mar. 7, 2025), Draft Tr. at 42:19-20 ("A declaratory judgment saying that the removal was unlawful I think would be an acceptable outcome."). To be sure, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). That applies even when the person violating the law is the President. *See, e.g.*, *Clinton v. New York*, 524 U.S. 417, 421 (1998) (affirming a declaratory judgment invalidating the President's power to wield a line-item veto pen as unconstitutional).

The Government also makes a more modest argument that declaratory relief is generally unavailable whenever injunctive relief is unavailable. *See* Defs.' Reply at 15. They cite *Samuels v. Mackell* for support. 401 U.S. 66, 73 (1971) ("[W]here an injunction would be impermissible under these principles, declaratory relief should ordinarily be denied as well."). But *Samuels* merely extended *Younger* abstention to relief under the Declaratory Judgment Act from ongoing state criminal prosecutions, explaining that a declaratory judgment could have a res judicata effect on the state court proceedings that is not meaningfully different from an injunction. *See id.* at 68, 73 ("[T]he basic policy against federal interference with pending state criminal prosecutions will be frustrated as much by a declaratory judgment as it would be by an injunction."). The Court "express[ed] no views on the propriety of declaratory relief when no state proceedings is pending at the time the federal suit is begun." *Id.* at 73. So *Samuels* does not apply.

"[I]t is well settled that a declaratory judgment always rests within the sound discretion of the court." *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980). A declaratory judgment will "ordinarily be granted only when it will either 'serve a useful purpose in clarifying the legal relations in issue' or 'terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Id.* (quoting E. Borchard, Declaratory Judgments 299 (2d ed. 1941)). The case before the Court involves legal relations that clearly need to be clarified. Ms. Grundmann has challenged her removal by the President as unlawful and needs to know if she can resume her work on the Authority. On the other side, the Government argues that Congress overstepped when it enacted a provision limiting the President's ability to remove Members of the FLRA without cause. The Court therefore exercises its discretion and provides the requested declaratory relief.

## B.    Injunctive Relief

The question of injunctive relief is more difficult. An injunction ordering the President to reinstate Ms. Grundmann would raise complicated questions about the separation of powers. And the availability of such an order may turn on technical differences between equitable remedies and legal remedies. These questions can largely be avoided, however, because Ms. Grundmann has never sought reinstatement from the President and ultimately requests a type of injunction that has been blessed by the D.C. Circuit. The Court therefore has the authority to issue the requested injunctive relief, and it finds that such relief is warranted.

### 1.    Availability of Injunctive Relief

Ms. Grundmann has requested various types of injunctive relief throughout these proceedings. She originally asked the Court to enter an injunction ordering Ms. Kiko to reinstate her as a Member of the Authority. But Ms. Kiko lacks the authority to formally reinstate Ms. Grundmann, and it is not clear how such an injunction could be squared with *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), given the plausible evidence that wrongfully removed executive officers were historically reinstated by courts of law instead of courts of equity. Fortunately for Ms. Grundmann, the D.C. Circuit has twice recognized a more modest equitable remedy when an officer has been removed by the President. *See Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996), and *Severino v. Biden*, 71 F.4th 1038 (D.C. 2023). These cases teach that courts may order the members of an agency—or even just the Chair—to recognize the unlawfully removed member as a member and to halt any efforts to hinder her work in that capacity. While this relief may be less complete than formal reinstatement, the D.C. Circuit has said that it strikes the right balance between respecting the rule of law and avoiding conflicts between the branches of government. The Plaintiff now requests this more modest relief, and the Court has the authority to grant it.

### a.  Formal Reinstatement

In her Complaint, Ms. Grundmann asked the Court to "[e]nter an injunction against Defendant Kiko, ordering her to reinstate Ms. Grundmann as a member of the Board and to refrain from taking any further action to obstruct Ms. Grundmann's ability to carry out her duties." Compl., Prayer for Relief, ¶ 2. There are two problems with this request.

*First*, Ms. Kiko lacks the authority to reinstate Ms. Grundmann. "Members of the Authority shall be appointed by the President by and with the advice and consent of the Senate."

22

5 U.S.C. § 7104(b). The Plaintiff conceded this at oral argument. *See* Motions H'rg (Mar. 7, 2025), Draft Tr. at 18:12–16.

*Second*, it is not clear how such an injunction can be squared with *Grupo*. The Supreme Court in *Grupo* taught that "the general availability of injunctive relief . . . depend[s] on traditional principles of equity jurisdiction." 527 U.S. at 318–19 (internal citations omitted). This means that "unless Congress expressly provides otherwise, equitable remedies must track remedies traditionally afforded by the equity courts." *Goodluck v. Biden*, 104 F.4th 920, 924 (D.C. Cir. 2024) (citing *Grupo*, 527 U.S. at 318–19). But a preliminary review of the historical record suggests that, at least by the late nineteenth century, wrongfully removed executive officers sought relief in courts of law, not courts of equity. *See White v. Berry*, 171 U.S. 366 (1898); *In re Sawyer*, 124 U.S. 200 (1888). Whether this was already true at the Founding is less clear.

It is easy to find evidence from the turn of the last century. In 1888, the Supreme Court said it was "well settled that a court of equity has no jurisdiction over the appointment and removal of public officers." *In re Sawyer*, 124 U.S. at 212. And it repeated that statement ten years later. *White*, 171 U.S. at 377; *see also Harkrader v. Wadley*, 172 U.S. 148, 165 (1898). According to the Court, "[t]he jurisdiction to determine the title to a public office belong[ed] exclusively to the courts of law, and [was] exercised either by *certiorari*, error, or appeal, or by *mandamus*, prohibition, *quo warranto*, or information in the nature of the writ of *quo warranto*." *In re Sawyer*, 124 U.S. at 212; *see also White*, 171 U.S. at 377. This is consistent with treatises from the time. *See, e.g.*, 2 James L. High, *A Treatise on the Law of Injunctions* § 1312 (2d ed., Chicago, Callaghan & Co., 1880) ("No principle of the law of injunctions, and perhaps no doctrine of equity jurisprudence, is more definitely fixed or more clearly established than that courts of equity will not interfere by injunction to determine questions concerning the appointment of public officers

or their title to office."); Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 496 (Chicago, Callaghan & Co., 1890) (saying quo warranto allows courts "not only to oust the respondent [officer] but also to install the relator [officer]"). And the Supreme Court reiterated this view shortly before the merger of law and equity. *See Walton v. House of Representatives of Okla.*, 265 U.S. 487, 490 (1924) ("A court of equity has no jurisdiction over the appointment and removal of public officers"). So it was not a stretch for the Court to say that these cases "reflect . . . a traditional limit upon equity jurisdiction." *Baker v. Carr*, 369 U.S. 186, 231 (1962).

But evidence from the 1880s might not settle the *Grupo* debate. *See Grupo*, 527 U.S. at 318 (discussing equitable principles "at the time of the separation of the two countries" (quoting *Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563, 568 (1939))); *id.* at 335 (Ginsburg, J., concurring in part and dissenting in part) (discussing equitable principles "at the time of the founding"); *Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting) (discussing equitable remedies "at the time of the Nation's founding"). And the earlier evidence is sparse.

The Court looks in vain to *In re Sawyer* for help. 124 U.S. 200. The Court there said that "[n]o English case has been found of a bill for an injunction to restrain the appointment or removal of a municipal officer." *Id.* at 212. But this argument from silence is far from determinative. And the only English cases cited dealt with corporate officers. *See Att'y Gen. v. Earl of Clarendon*, 17 Ves. Jr. 490, 498, 34 Eng. Rep. 190, 193 (Ch. 1810); *Queen v. Saddlers' Co.*, 10 H.L. Cas. 404 (1863); *Osgood v. Nelson*, L. R. 5 H. L. 636 (1872). The Court also cited many "well-considered" state court cases denying "the power of a court of equity to restrain by injunction the removal of a municipal officer." *In re Sawyer*, 124 U.S. at 212. But all of those cases were decided at least a half century after the Founding. *See Tappan v. Gray*, 7 Hill 259 (N.Y. 1843); *Hagner v. Heyberger*, 3 Pa. L.J. 370 (1844); *Updegraff v. Crans*, 47 Pa. 103 (1864); *Cochran v. McCleary*, 22 Iowa 75

(1867); *Delahanty v. Warner*, 75 Ill. 185 (1874); *Sheridan v. Colvin*, 78 Ill. 237 (1875); *Dickey v. Reed*, 78 Ill. 261 (1875); *Harris v. Schryock*, 82 Ill. 119 (1876); *Beebe v. Robinson*, 52 Ala. 66 (1875); *Moulton v. Reid*, 54 Ala. 320 (1875); *cf. State v. Sheldon*, 6 N.W. 757 (Neb. 1880); *State v. Oleson*, 18 N.W. 45 (Neb. 1883); *State v. Meeker*, 27 N.W. 427 (Neb. 1886).

The vintage of these cases matters. *In re Sawyer* itself recognized that the Supreme Court of Alabama had only recently decided that reinstatement was not available in equity, "overruling its own prior decisions to the contrary." 124 U.S. at 214 (citing *Beebe*, 52 Ala. 66; *Moulton*, 54 Ala. 320). Those prior decisions had allowed courts of equity to enjoin an unlawfully appointed sheriff where the incumbent sheriff could not proceed by *quo warranto*, *Bruner v. Bryan*, 50 Ala. 522, 529 (1874), and to exercise jurisdiction over a dispute about the identity of the true mayor because a *quo warranto* "would not be a complete remedy," *Reid v. Moulton*, 51 Ala. 255, 266 (1874). This flip-flopping could be read as evidence that the consensus view recognized in *In re Sawyer* was not as well-established at the Founding. But the Court need not come to a firm conclusion on this point since the Plaintiff now seeks different relief.

### b. De Facto Reinstatement

This brings us to the relief that is really at issue. In her later briefing and at oral argument, Ms. Grundmann clarified that she seeks only the relief discussed in *Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996), and *Severino v. Biden*, 71 F.4th 1038 (D.C. 2023). That is, she "seeks injunctive relief from Defendant Kiko, a subordinate official, to treat her as a de facto member of the FLRA." Pl.'s Reply at 14. While resuming her work on the Authority "in this *de facto* fashion might not be as complete a remedy for [the Plaintiff] as an official reinstatement by the President," *Swan*, 100 F.3d at 980, the D.C. Circuit has twice recognized that this relief is available and advisable. *See id.* at 979–81; *Severino*, 71 F.4th at 1042–43.

The D.C. Circuit is no stranger to removal challenges. In *Swan*, a Senate-confirmed Board member of an independent agency was removed by President Clinton after being appointed by President Bush. *See* 100 F.3d at 975–76. He sued President Clinton and some staff who had implemented the firing, "seeking to have his removal . . . declared unlawful and to obtain injunctive relief ordering his reinstatement as a member of the Board." *Id.* at 975. The district court granted summary judgment for the government, and the plaintiff appealed. *Id.* at 976. On appeal, the D.C. Circuit assessed the plaintiff's standing, focusing on the redressability prong. *See id.* at 976. It questioned "whether a federal court has the power to grant injunctive relief against the President of the United States in the exercise of his official duties." *Id.* at 976.

Resolving this question required balancing two important values. On the one hand, the Court recognized the "bedrock principle that our system of government is founded on the rule of law, and it is sometimes a necessary function of the judiciary to determine if the executive branch is abiding by the terms of legislative enactments." *Id.* at 978. On the other hand, ordering the President "to perform particular executive [acts] . . . at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers." *Id.* (internal quotation marks and citations omitted). The Court struggled to resolve this tension the usual way, by enjoining a subordinate official, "because only the President has the power to remove or reinstate [the] Board members." *Id.* at 979.

The Court then concluded that certain subordinate officials had enough authority to "substantially redress" the injury without formal reinstatement. *See id.* at 979. The Executive Director of the agency "could direct the staff to treat [the plaintiff] as a Board member." *Id.* at 979. And although they were not initially named in the complaint, the "Chairman, other NCUA Board members[, and] the Board Secretary" could accomplish reinstatement "*de facto* by treating Swan

as a member of the NCUA Board and allowing him to exercise the privileges of that office." *Id.* at 979–80. The Court decided that such "partial relief [was] sufficient for standing purposes when determining whether [it could] order more complete relief would require [it] to delve into the complicated and exceptionally difficult questions regarding the constitutional relationship between the judiciary and the executive branch." *Id.* at 981.

The D.C. Circuit recited this same analysis just two years ago. In *Severino*, a member of the Administrative Conference of the United States Council was removed by President Biden after being appointed by President Trump. *See* 71 F.4th at 1041. He sued President Biden and others, "request[ing] that the court issue an injunction requiring that the President restore him to his position on the Council." *Id.* at 1041 (cleaned up). The Court again assessed redressability, looking to *Swan* for guidance. *Severino*, 71 F.4th at 1042–43. It declined to answer whether such an injunction could run against the President because it could "enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment." *Id.* at 1042–43 (quoting *Swan*, 100 F.3d at 980). It explained that the Conference's Chairperson could include the plaintiff in Board meetings and give him access to his former office, among other things, thereby providing partial relief. *Id.* at 1043.

The Government argues that *Swan* and *Severino* are inapposite because they are standing cases. *See* Defs.' Reply at 11–12. The Court disagrees. The redressability analysis asks whether it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Swan*, 100 F.3d at 976 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). So a remedy cannot establish redressability if it is beyond the authority of the court. *See, e.g.*, *Ege v. U.S. Dep't of Homeland Sec.*, 784 F.3d 791, 793 (D.C. Cir. 2015) ("And because we have no jurisdiction under 49 U.S.C. § 46110 to issue an order binding the TSC, we *ipso facto*

cannot redress Ege's injury even if we were inclined to agree with him."); *Newdow v. Roberts*, 603 F.3d 1002, 1010 (D.C. Cir. 2010) (identifying a redressability problem because "[i]t is impossible for this court to grant such relief"); *Love v. Vilsack*, 908 F. Supp. 2d 139, 144–45 (D.D.C. 2012) ("To satisfy [redressability], a plaintiff must show in the first instance that the court is capable of granting the relief sought."). *Swan* itself assessed redressability only because "[a] question exists . . . as to whether a federal court has the power to grant injunctive relief against the President." 100 F.3d at 976. It therefore makes little sense to hermetically seal the question of redressability from that of remedial availability.

And this Court is in good company reading *Swan* and *Severino* as standing for the proposition that such de facto reinstatement is an available remedy. *See, e.g.*, *Harris v. Bessent*, -- F. Supp. 3d --, No. 25-cv-412, 2025 WL 521027 (D.D.C. Feb. 18, 2025) (Contreras, J.); *Dellinger v. Bessent*, -- F. Supp. 3d --, No. 25-cv-385, 2025 WL 665041 (D.D.C. Mar. 1, 2025) (Berman Jackson, J.); *Wilcox v. Trump*, -- F. Supp. 3d --, No. 25-cv-334, 2025 WL 720914 (D.D.C. Mar. 6, 2025) (Howell, J.); *Spicer v. Biden*, 575 F. Supp. 3d 93, 97 (D.D.C. 2021) (Friedrich, J.) ("Following *Swan*, the Court could grant effective relief in this case by ordering Ruppersberger and Thalakottur, in their capacities as the Board's Chairman and DFO, to treat the plaintiffs are full members of the Board.").

The Government's other arguments seem to ignore the existence of *Swan* and *Severino* altogether. First, it argues that "[w]hen executive officers have challenged their removal by the President, they have traditionally sought back pay, not reinstatement." Defs.' Opp'n at 12 (citing *Parsons v. United States*, 167 U.S. 324, 326 (1897); *Shurtleff v. United States*, 189 U.S. 311, 318 (1903); *Myers*, 272 U.S. at 106; *Humphrey's Ex'r*, 295 U.S. at 612; *Wiener*, 357 U.S. at 350). But reinstatement was not an issue in *Humphrey's Executor* or *Myers* because

those plaintiffs were both deceased. *See Humphrey's Ex'r*, 295 U.S. at 618–19; *Myers*, 272 U.S. at 106. Nor did it make sense in *Wiener* since the Commission had been abolished. *See* 357 U.S. at 350–51. And any argument from past practice should account for the cases where the plaintiffs *did* seek reinstatement. *See Swan*, 100 F.3d at 361; *Severino*, 71 F.4th at 1041.

Second, the Government argues that "members of the First Congress argued against requiring the Senate's advice and consent for removals precisely because of the risk that such a procedure would require the President to retain someone he had sought to remove." Defs.' Opp'n at 13. It points to three Representatives in particular. *See id.* (citing *Myers*, 272 U.S. at 124 (saying that Rep. Benson worried that "the President would then have a man forced on him whom he considered as unfaithful"); *id.* at 131–32 (saying that Rep. Boudinot bemoaned a situation where the President would be "surrounded by officers . . . in whom he can have no confidence"); *id.* at 132 (saying that Rep. Sedwick asked whether such "a man under these circumstances" should "be saddled upon the President")). But this paints with too broad a brush. Those very same Representatives highlighted the special danger of removal protections for the office at issue—the Secretary of Foreign Affairs—on the ground that "the direction of our foreign relations" was an "unquestioned field of executive prerogative." Edward S. Corwin, *Tenure of Office and the Removal Power Under the Constitution*, 27 Colum. L. Rev. 353, 364–66 (1927) (collecting quotations). So their concerns may well have been limited to the character of the office. *See id.* at 366 And in any case, three individuals cannot speak for the entire First Congress, especially considering the wide spectrum of opinion it expressed on removal protections. *See id.* at 361–62. The "implications of the debate, properly understood, were highly ambiguous and prone to overreading." John F. Manning, *Separation of Powers as Ordinary*

*Interpretation*, 124 Harv. L. Rev. 1939, 1965 n.135 (2011). The Court declines to enter this historical fray.

Third, the Government argues that *Grupo* forecloses reinstatement, "[w]hether the order is expressly directed at the President or not." Defs.' Opp'n at 15. But this argument fails to appreciate the nuance of the remedy recognized in *Swan* and *Severino*. The Court has already acknowledged the strong—albeit imperfect—evidence that reinstatement was not traditionally available in a court of equity. *See supra* at 23–25. But that evidence does not clearly extend to de facto reinstatement; nor does the Government offer a theory for how it could. The Court is particularly hesitant to second-guess its authority to order de facto reinstatement now that the D.C. Circuit has reaffirmed the remedy's availability even after *Grupo*. *See Severino*, 71 F.4th at 1042–43.

Finally, the Government invites the Court to consider afresh the values already weighed by the D.C. Circuit in *Swan* and *Severino*. It argues that the "Plaintiff's injunction necessarily targets the President." Defs.' Reply at 11 (cleaned up). But issuing no relief at all would undermine "the bedrock principle that our system of government is founded on the rule of law." *Swan*, 100 F.3d at 978. The Court therefore defers to the careful balance struck by the D.C. Circuit in *Swan* and *Severino*, which are binding on this Court.

For all of these reasons, the Court concludes that it has the authority to order injunctive relief as to Ms. Kiko.[3]

---

[3] In a Notice of Supplemental Authority and at oral argument, the Plaintiff asks the Court to consider a writ of mandamus as an alternative remedy. *See* ECF No. 17 at 1. Given the lack of briefing on mandamus as a remedy, the Court leaves it for another day. But as other courts in this District have found, a writ of mandamus may well be an available remedy were injunctive relief unavailable in this case. *See, e.g.*, *Harris v. Bessent*, No. 25-cv-412, 2025 WL 679303, at *11 (D.D.C. Mar. 4 2025); *Wilcox v. Trump*, No. 25-cv-334, 2025 WL 720914, at *16 n.22 (D.D.C. Mar. 6, 2025).

### 2.    Permanent Injunction

Having established its authority to grant injunctive relief, the Court now addresses whether an injunction is appropriate in this case. "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* Ms. Grundmann has satisfied all four factors. The Court therefore grants a permanent injunction.[4]

### a.    Irreparable Harm and Inadequate Remedy at Law

The first two factors "are often considered together." *Wilcox*, 2025 WL 720914, at *15 n.20 (citing *Ridgley v. Lew*, 55 F. Supp. 3d 89, 98 (D.D.C. 2014)). And Ms. Grundmann has satisfied both. Her "unlawful removal from office by the President" was an irreparable harm. *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (Mem.) (D.C. Cir. 1983). And as the Government conceded at oral argument, there is no available remedy at law that would effectuate her reinstatement. *See* Motions H'rg (Mar. 7, 2025), Draft Tr. at 45:18–46:12.

---

[4] The Plaintiff filed a Motion for Preliminary Injunction and Summary Judgment. *See* Pl.'s Mot. In her Reply, she sought only a permanent injunction. *See* Pl.'s Reply at 11–21. The Government has argued that the Plaintiff is not entitled to a preliminary injunction or permanent injunction. *See* Defs.' Opp'n at 16 n.5. Because this Court grants the Plaintiff's Motion for Summary Judgment, it awards a permanent injunction.

Ms. Grundmann claims that "[h]er removal has deprived her of her statutory right to function in her office." Pl.'s Reply at 16. And courts in this District have recognized that this harm can be irreparable. *See, e.g.*, *Berry*, 1983 WL 538, at *5 (recognizing as irreparable the plaintiffs' "deprivation of their statutory right to function as Commissioners"); *Wilcox*, 2025 WL 720914, at *15 (recognizing as irreparable the plaintiff's deprivation "of a presidentially appointed and congressionally confirmed position of high importance"). The Government argues that loss of employment does not amount to an irreparable harm because backpay is available. *See* Defs.' Opp'n at 17–18 (citing *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974)). But *Sampson* expressly contemplates "that cases may arise in which the circumstances surrounding an employee's discharge . . . may so far depart from the normal situation that irreparable injury might be found." 415 U.S. at 92 n.68. This is such a "genuinely extraordinary situation." *Id.* Far from a mere claim of lost employment, this is a case of constitutional significance. Backpay does not get Ms. Grundmann back into her role as a Member of the FLRA—a role that the President appointed her to, that the Senate confirmed her for, in an agency that both Congress and the President in their considered judgment created *to be independent* and free from political meddling. *See Harris*, 2025 WL 679303, at *13. A check in the mail does not address the gravamen of this lawsuit. Perhaps that is why Ms. Grundmann has not even asked for one.

According to the Government, several cases "reject[] the notion that the deprivation of a unique, singular, or high-level position is any more of an irreparable injury." Defs.' Opp'n at 17–18. But the Government's cases cannot support such a broad rule. *See id.* (cases involving corporate managers, subordinate local and state officials, lower-level federal employees, and a credit union board member). Ms. Grundmann is a Senate-confirmed principal officer of a congressionally-created independent agency. She accepted the President's nomination and earned

Senate confirmation in order to serve her country at the highest possible level in her field. This represented the capstone of her long career in public service, *see* Pl.'s Decl. ¶ 7, and her unlawful termination deprived her of the opportunity to make her mark in this statutorily protected role.

### b.  Balance of the Equities and Public Interest

The final two injunction factors merge when the Government is a party. *Wilcox*, 2025 WL 720914, at *17 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And Ms. Grundmann has satisfied both. The Authority needs all three voters to avoid deadlock, especially at a time when there have been mass firings across the federal government. And the Government's arguments about the separation of powers actually weigh *in favor* of an injunction.

Without this relief, the Authority has only two of its three Members. This runs the risk of letting cases deadlock with no tiebreaker, which would cause those cases to go into abeyance. Pl.'s Mot. at 14; *see also* Pl.'s Decl. ¶ 7. This is not mere speculation either. "[D]uring the eighteen-month period that Plaintiff Grundmann served as part of a two-member Authority, approximately one-third of the Authority's cases deadlocked, leading to duplicative disputes and resource waste." Pl.'s Mot. at 14. Abeyance "results in increased costs and confusion to the parties" and adds "to the bottom line of the agencies, the cost of which is ultimately borne by taxpayers." Pl.'s Decl. ¶ 10. "It also creates legal uncertainty and likely inconsistency in labor practices the longer key labor issues remain unsolved." Pl.'s Reply at 20. And this would be a particularly bad time for deadlock considering the widespread firings across the federal workforce in recent months. *See* Pl.'s Mot. at 15; Pl.'s Reply at 20. In fact, only weeks ago, a court in this District told fired federal workers to pursue their claims before the FLRA before seeking judicial relief. *See Nat'l Treasury Emps.' Union v. Trump*, No. 25-cv-420, 2025 WL 561080, at *8 (D.D.C. Feb. 20, 2025). Leaving the Authority with only two voters would make that instruction hollow.

The Government argues that providing this relief raises grave separation-of-powers concerns. *See* Defs.' Opp'n at 19. They say that "[s]uch a remedy would undermine the accountability of the Executive Branch enshrined in the Constitution" and that "[t]he Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *Id.* at 20 (citing *Sampson v. Murray*, 415 U.S. 61, 83 (1974)). But the Government ignores the separation-of-powers risks posed by non-intervention. If the Government had its way, it would place unchecked power in the hands of the President, which is antithetical to our system of government. Again, nearly fifty years ago, Congress and the President worked together to create the FLRA as an independent agency. The President appointed Ms. Grundmann to her position, and the Senate confirmed her. The two political branches decided to give her removal protections—protections that have now been ruled constitutional by a federal court. Providing no injunctive relief would allow the President to flout not only Congress's Article I power to create independent multimember agencies, but also the Court's Article III power to maintain the rule of law, *see Swan*, 100 F.3d at 978.[5]

Congress has already balanced the equities at stake in this case. The FLRA "safeguards the public interest" and "contributes to the effective conduct of public business." 5 U.S.C. § 7101(a)(1). "[L]abor organizations and collective bargaining in the civil service are in the public interest," and "the public interest demands . . . the efficient accomplishment of the

---

[5] The Government also argues that the President "cannot be compelled to retain the services of a principal officer whom the President no longer believes should be entrusted with the exercise of executive power." *See* Defs.' Opp'n at 20. But Congress set forth permissible limits on the President's ability to remove Ms. Grundmann. And the Government has made no attempt to establish inefficiency, neglect of duty, or malfeasance in office on Ms. Grundmann's part. Absent cause to remove Ms. Grundmann, the President may of course nominate someone to replace her when her term expires in less than four months. Curiously, although the FLRA's General Counsel may be removed at will, the President has taken no steps to remove that officer.

operations of the Government." *Id.* § 7101(a)(2). The public interest therefore favors

Ms. Grundmann, and a permanent injunction is warranted.

**CONCLUSION**

For the foregoing reasons, the Court grants the Plaintiff's Motion for Summary Judgment

and denies the Defendants' Cross-Motion for Summary Judgment.

The Court has issued a separate order consistent with this Memorandum Opinion.


SPARKLE L. SOOKNANAN
United States District Judge

Date:   March 12, 2025

# ADDENDUM C

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUSAN TSUI GRUNDMANN,

*Plaintiff*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants*.

Civil Action No. 25-425 (SLS)

Judge Sparkle L. Sooknanan

## <u>ORDER</u>

Upon consideration of the Plaintiff's Motion for Summary Judgment, ECF No. 4, the Defendants' Cross-Motion for Summary Judgment, ECF No. 11, the legal memoranda in support and in opposition, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby:

**ORDERED** that the Plaintiff's Motion for Summary Judgment, ECF No. 4, is **GRANTED**; and the Defendants' Cross-Motion for Summary Judgment, ECF No. 11, is **DENIED**. It is further

**DECLARED** that the termination of the Plaintiff Susan Tsui Grundmann was unlawful, in violation of the Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7104(b). Ms. Grundmann remains a Member of the Federal Labor Relations Authority, having been appointed by the President, and confirmed by the Senate to a five-year term on May 12, 2022, and she may be removed by the President prior to the expiration of her term "only upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office," pursuant to 5 U.S.C. § 7104(b). It is further

**ORDERED** that the Plaintiff Susan Tsui Grundmann shall continue to serve as a Member of the Federal Labor Relations Authority (FLRA) until her term expires pursuant to 5 U.S.C. § 7104(c), unless she is earlier removed "upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office," *id.* § 7104(b). The Defendant Colleen Duffy Kiko, as well as her subordinates, agents, and employees, are **ENJOINED** from removing Ms. Grundmann from her office without cause or in any way treating Ms. Grundmann as having been removed, from impeding in any way her ability to fulfill her duties as a Member of the FLRA, and from denying or obstructing her authority or access to any benefits or resources of the office; it is further

**ORDERED** that the Defendant Colleen Duffy Kiko and her subordinates, agents, and employees provide the Plaintiff Susan Tsui Grundmann with access to the necessary government facilities and equipment so that she may carry out her duties during her term as a Member of the Federal Labor Relations Authority; and it is further

**ORDERED** that the Clerk of the Court close this case.

This is a final appealable order.

**SO ORDERED.**

_____

SPARKLE L. SOOKNANAN
United States District Judge

Date: March 12, 2025

2

# ADDENDUM D

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SUSAN TSUI GRUNDMANN,

*Plaintiff*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants*.

Civil Action No. 25‑425 (SLS)

Judge Sparkle L. Sooknanan

## MEMORANDUM OPINION

Susan Tsui Grundmann was removed by the President from her position on the Federal Labor Relations Authority (FLRA) in February 2025. She came to this Court a few days later, claiming that her removal without cause violated the statutory protections afforded to FLRA members. The Government did not contest that claim. It instead argued that those statutory protections violated Article II of the U.S. Constitution. On March 12, 2025, the Court ruled for Ms. Grundmann, ordering her de facto reinstatement for the remainder of her term. Almost two months later, the Government appealed the Court's decision. And nearly three weeks after that, it now moves to stay the Court's order pending appeal. The Court denies this belated request.

## BACKGROUND

President Donald J. Trump removed Ms. Grundmann from the FLRA on February 10, 2025, when the Deputy Director of the White House Office of Presidential Personnel sent her a two-sentence email informing her of her termination. *See* Compl. ¶ 16, ECF No. 1 (first sentence); *see also id.*, Ex. A, ECF No. 1-1 (second sentence). Ms. Grundmann challenged her removal by filing a Complaint in this Court on February 13, 2025, claiming that the President and the Chairman of the FLRA had violated the removal protections guaranteed by the Federal Service Labor-

Management Relations Statute. *See* Compl. ¶¶ 22–25 (citing 5 U.S.C. § 7104); *id.* ¶¶ 4–5. Ms. Grundmann then filed a combined Motion for Preliminary Injunction and Summary Judgment on February 14, 2025. *See* Pl.'s Mot. Prelim. Inj. & Summ. J., ECF No. 4. The Government responded by arguing that the statutory removal protections ran afoul of Article II of the U.S. Constitution. *See* Defs.' Cross-Mot. Summ. J., ECF No. 11; Defs.' Opp'n to Prelim. Inj., ECF No. 12. The Parties briefed the motions. *See* Pl.'s Opp'n Cross-Mot. Summ. J., ECF No. 15; Pls.' Reply Supp. Prelim. Inj., ECF No. 16; Defs.' Reply Supp. Cross-Mot. Summ. J., ECF No. 18. And the Court ruled for Ms. Grundmann on March 12, 2025, ordering de facto reinstatement in accordance with D.C. Circuit precedent. *See* Order, ECF No. 21; Mem. Op., ECF No. 22; *see also Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996); *Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023).

That brings us to the second wave of proceedings. The Government appealed the Court's decision on May 8, 2025, only a few days before the sixty-day deadline. *See* Notice of Appeal, ECF No. 24; *see also* D.C. Circuit Rule 4(a)(1)(B) (providing sixty days to appeal). Nearly three weeks after that, on May 27, 2025, it filed a Motion to Stay the Court's Order Pending Appeal, ECF No. 26. The Court now considers this stay motion.

## LEGAL STANDARD

"A stay pending appeal is an extraordinary remedy." *M.M.V. v. Barr*, 459 F. Supp. 3d 1, 4 (D.D.C. 2020) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985)). "It is 'an intrusion into the ordinary processes of administration and judicial review,'" *id.* (quoting *Nken v. Holder*, 556 U.S. 418, 427 (2009) (cleaned up)), "and accordingly 'is not a matter of right, even if irreparable injury might otherwise result to the appellant,'" *Nken*, 556 U.S. at 427 (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)). "It is instead an exercise of judicial discretion, and [t]he propriety of its issue is dependent upon the circumstances of the particular

case." *Id.* at 433 (cleaned up). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34.

"A court is supposed to consider four factors in connection with a stay motion: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *M.M.V.*, 459 F. Supp. 3d at 4 (cleaned up). As to the first factor, the D.C. Circuit has said that the chance of success on the merits must be "substantial," *id.* (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977), and "a movant's failure to satisfy this stringent standard . . . is 'an arguably fatal flaw for a stay application,'" *id.* (quoting *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam)). As to the second factor, "[w]here there is a low likelihood of success on the merits, a movant must show a proportionally greater irreparable injury[.]" *Id.* (citing *Cuomo*, 772 F.2d at 974). And the final two factors "merge when the Government is the opposing party." *Id.* (quoting *Nken*, 556 U.S. at 435).

## DISCUSSION

The Government has failed to meet its burden to justify a stay pending appeal. The Court is not convinced that the Government is likely to succeed on the merits, that it will be irreparably injured absent a stay, or that the balance of equities favors a stay.

### A.    Likelihood of Success on the Merits

For all of the reasons explained in the Court's summary judgment opinion, *see* Mem. Op., the Government has failed to show a substantial likelihood of success on the merits. *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), recognized that Congress may constitutionally limit the President's removal authority when creating "multimember expert agencies that do not wield

substantial executive power." *Id.* at 218 (discussing the exception recognized in *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935)); *see also id.* at 216 (citing *Wiener v. United States*, 357 U.S. 349, 356 (1958)). And the FLRA fits that description. First, it shares "several organizational features" with the FTC from *Humphrey's Executor*—the same features that "helped explain [the Court's] characterization of the FTC as non-executive." *Seila L.*, 591 U.S. at 216. Namely, it is a small multimember agency balanced along partisan lines with staggered terms and duties ordered toward expertise. *See id.* Second, it does not wield substantial executive power. It may conduct hearings and resolve complaints, much like the War Claims Commission in *Wiener*. *See Seila L.*, 591 U.S. at 216. It may enforce its orders in court, like the FTC as described in *Humphrey's Executor*. *See* 295 U.S. at 620–21. And its power to promulgate regulations governing the administration of labor disputes in the federal workforce pales in comparison to the wide-ranging regulatory power chastised in *Seila Law*. *See* 591 U.S. at 218 ("[T]he [CFPB] Director possess[ed] the authority to promulgate binding rules fleshing out 19 federal statutes, including a broad prohibition on unfair and deceptive practices in a major segment of the U.S. economy.").

The Government argues that the Supreme Court's recent stay order in *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), demands the opposite result. There, the Supreme Court granted a stay in part because it thought "the Government [was] likely to show that both the NLRB and MSPB exercise considerable executive power." *Id.* at 1415. But this single sentence is not enough to alter the Court's prior analysis as to the FLRA. The Court already catalogued the powers wielded by the FLRA and triangulated where each one fits within *Humphrey's Executor*, *Wiener*, and *Seila Law*, ultimately concluding that the FLRA does not exercise substantial executive power. *See* Mem. Op. at 13–16. The *Wilcox* order does not identify which of the purportedly executive powers exercised by the NLRB and the MSPB might be "considerable." *Wilcox*, 145 S. Ct. at 1415.

So the Court cannot be sure that those powers are present in this case. Nor does the Court believe that the Supreme Court meant to announce a new rule by using the adjective "considerable," *id.*, instead of "substantial," *Seila L.*, 591 U.S. at 218.

The Government believes that the NLRB and the FLRA should rise or fall together, pointing to D.C. Circuit language previously cited by the Court: "[T]he 'structure, role, and functions of the [FLRA] were closely patterned after those of the NLRB.'" Mot. Stay at 3 (quoting Mem. Op. at 16 (quoting *Libr. of Cong. v. FLRA*, 699 F.2d 1280, 1287 (D.C. Cir. 1983))). But there are a few problems with this argument.

*First*, the language about structure has nothing to do with the powers exercised by the FLRA. The Court already explained in its summary judgment opinion that it reads *Seila Law* "as teaching that the *Humphrey's Executor* exception applies in two steps." Mem. Op. at 9 (citing *Seila L.* 218–19). The first question is whether an agency's structure triggers the exception. *See id.* The second is whether the agency exercises substantial executive power. *See id.* The Court therefore sees no tension when it comes to the language about structure.

*Second*, the language about roles fits most neatly within the first question rather than the second. When *Seila Law* identified the "organizational features" of the FTC that "helped explain" *Humphrey's Executor's* "characterization of the FTC as non-executive," it highlighted that the FTC's "duties" were apolitical and demanded "the trained judgment of a body of experts." *Seila L.*, 591 U.S. at 216 (cleaned up). The FLRA similarly plays the role of providing "trained judgment" by a "body of experts." *Id.*

*Third*, the language about functions may be distinguished from the question about power. *See id.* at 216 ("'To the extent that [the FTC] exercise[d] any executive *function*[,] as distinguished from executive *power* in the constitutional sense,' it did so only in the discharge of its 'quasi-

5

legislative or quasi-judicial powers.'" (emphasis in original) (quoting *Humphrey's Ex'r*, 295 U.S. at 628)). And even if that were not the case, the very same D.C. Circuit opinion said that "[t]he *scope* of collective bargaining is far broader in the private sector," where the NLRB governs, as opposed to the public sector, which is the FLRA's wheelhouse. *Libr. of Cong.*, 699 F.2d at 1287 (emphasis added). And *Seila Law* taught that the scope of an agency's powers impacts whether those powers are substantial. *See* 591 U.S. at 218 (identifying as problematic that the CFPB Director has the power to "promulgate binding rules . . . in a *major segment* of the U.S. economy" (emphasis added)).

It is therefore not obvious that the NLRB and the FLRA are tied at the hip. This is especially true since the Supreme Court did not explain which of the NLRB's purportedly executive powers were likely to be considerable. The Government has failed to meet its burden as to the first factor. And failure on this factor is "an arguably fatal flaw for a stay application." *M.M.V.*, 459 F. Supp. 3d at 4 (quoting *Citizens for Resp. & Ethics in Wash.*, 904 F.3d at 1019).

B.    **Irreparable Injury and the Balance of Equities**

Nor has the Government shown irreparable injury absent a stay. They again point to the *Wilcox* order, which said that it "reflect[ed] the [Supreme Court's] judgment that the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." Mot. Stay at 3 (quoting *Wilcox*, 145 S. Ct. at 1415). Even though this language seems to speak more to the balance of equities rather than irreparable harm, *see Wilcox*, 145 S. Ct. at 1415 (citing *Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam) ("The purpose of . . . interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." (citation omitted))), the Government argues

that it can be read to support the proposition that the "Defendants will be irreparably harmed absent a stay, such that the balance of the equities and public interest overwhelmingly favor a stay pending appeal," Mot. Stay at 3. In the Government's view, "no basis exists for distinguishing the Supreme Court's assessment of the equities in the *Wilcox* Stay Order from those at play here[.]" *Id.* But the Court sees two important distinctions that illustrate why the propriety of a stay "is dependent upon the circumstances of the particular case." *Nken*, 556 U.S. at 433 (cleaned up).

*First*, any harm to the Government will be particularly short-lived because the President will be free to nominate her replacement in eighteen days on July 1, 2025, when her five-year term comes to an end. *See* Compl. ¶ 3. Under the statute, Ms. Grundmann may continue to serve only until her replacement takes office. *See* 5 U.S.C. § 7104(c). This means that a stay is not necessary "to avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation." *Wilcox*, 145 S. Ct. at 1415.

*Second*, the Government's actions in this case reflect a lack of urgency inconsistent with irreparable harm. It waited nearly two months after the Court's March 12, 2025, summary judgment decision to file its notice of appeal on May 8, 2025. *See* Notice of Appeal. And it waited almost another three weeks to file this motion to stay on May 27, 2025. *See* Mot. Stay at 4. This is not the sort of reaction one expects from a party claiming irreparable injury. *See Lightfoot v. District of Columbia*, No. 01-cv-1484, 2006 WL 175222, at *8 (D.D.C. Jan. 24, 2006) (saying government defendants' "relative inaction . . . indicate[d] that they themselves do not perceive the possible injury as 'irreparable'" where they did not appeal to the D.C. Circuit until almost a month after the district court denied their motion for reconsideration, where they did not ask for an expedited appeal, and where they did not file a motion for stay pending appeal until about three weeks after appealing); *Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (saying

"applicants' delay in filing their [certiorari] petition and seeking a stay vitiates much of the force of their allegations of irreparable harm" where they waited the maximum ninety days before filing their petition); *cf. Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) ("Courts have found that '[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm.'" (quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005)); *id.* ("The D.C. Circuit has found that a delay of forty-days before bringing action for injunctive relief was 'inexcusable,' and 'bolstered' the 'conclusion that an injunction should not issue,' particularly where the party seeking an injunction had knowledge of the pending nature of the alleged irreparable harm." (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975)). The Government seemed unbothered that Ms. Grundmann was back at her desk for months on end. The Court therefore struggles to understand how the harm inquiry has suddenly changed.[1]

And other facts favor Ms. Grundmann as well. First, were the Court's order to be stayed, the FLRA would retain only two of its three Members, running the risk of deadlock. *See* Mem. Op. at 33; *see also id.* ("[D]uring the eighteen-month period that Plaintiff Grundmann served as part of a two-member Authority, approximately one-third of the Authority's cases deadlocked, leading to duplicative disputes and resource waste." (cleaned up)). As the Court previously noted, this deadlock would come at a particularly bad time "considering the widespread firings across the federal workforce in recent months." *Id.* (citations omitted). Second, and relatedly, Congress has

---

[1] One would expect an irreparable injury to cause the Government to act the way it did in *Harris v. Bessent*, No. 25-cv-412, 2025 WL 679303 (D.D.C. Mar. 4, 2025), and *Wilcox v. Trump*, No. 25-cv-334, 2025 WL 720914 (D.D.C. Mar. 6, 2025). In *Harris*, the Government appealed the district court's removal decision, No. 25-cv-412, ECF No. 41, and filed a motion to stay pending appeal, *id.*, ECF No. 42, on the very same day that the district court issued its order. And in *Wilcox*, the Government appealed the district court's removal decision on the same day, No. 25-cv-334, ECF No. 36, and filed a motion to stay pending appeal the next day, *id.*, ECF No. 39.

already balanced the equities in a way that counsels against allowing deadlock. *See id.* at 33–34

(citation omitted). It has said that "labor organizations and collective bargaining in the civil service

are in the public interest" and that "the public interest demands . . . the efficient accomplishment

of the operations of the Government." 5 U.S.C. § 7101(a)(2). The Court made these points in

its prior opinion, *see* Mem. Op. at 33–34, and the Government did not address them in the instant

motion, *see* Mot. Stay. The Government has not satisfied the stringent requirements to justify a

stay pending appeal.

## CONCLUSION

For the foregoing reasons, the Court denies the Defendants' Motion to Stay the Court's

Order Pending Appeal, ECF No. 26.

A separate order will issue.


_____

SPARKLE L. SOOKNANAN
United States District Judge


Date:   June 13, 2025

# ADDENDUM E

[NOT YET SCHEDULED FOR ORAL ARGUMENT]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

SUSAN TSUI GRUNDMANN,

*Plaintiff-Appellee*,

vs.

DONALD J. TRUMP, in his official capacity
as President, and COLLEEN DUFFY KIKO, in
her official capacity as chairman of the Federal
Labor Relations Authority,

*Defendants-Appellants.*

No. 25-5165

---

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Plaintiff-Appellee Susan Tsui Grundmann certifies as follows:

**A. Parties**

Susan Tsui Grundmann is Plaintiff-Appellee. Defendants-Appellants are President Donald J. Trump and Colleen Duffy Kiko, Chairman of the Federal Labor Relations Authority. There have been no intervenors or amici.

## B. Rulings Under Review

Defendants-Appellants have sought appellate review of the district court's March 12, 2025 Order, *see* ECF No. 21, and Memorandum Opinion, *see* ECF No. 22, granting summary judgment and entering declaratory and injunctive relief for Plaintiff-Appellee. The district court's opinion will be published in F. Supp. 3d and is currently available at 2025 WL 782665.

## C. Related Cases

There has been no previous appeal in this case. There are no other related cases involving substantially the same parties *and* the same or similar issues. This case involves the legality of Defendants-Appellees' removal of Plaintiff-Appellee Grundmann as a member of a Federal Labor Relations Authority, an independent federal agency. As identified in the Defendants-Appellees' Certificate as to Parties, Rulings, and Related Cases, there are cases pending before this court involving the President's removal of independent agency leaders, but those cases involve different plaintiffs and different agencies.

Dated July 7, 2025

/s/   Jon M. Greenbaum
Norman L. Eisen, D.C. Bar #435051
Tianna J. Mays, D.C. Bar #90005882
Jon M. Greenbaum, D.C. Bar #489887
Pooja Chaudhuri, D.C. Bar #888314523
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003

Tel: (202) 601-8678
norman@statedemocracydefenders.org
tianna@statedemocracydefenders.org
jgreenbaum@justicels.com
pooja@statedemocracydefenders.org

Counsel for Plaintiff-Appellee Susan Tsui
Grundmann

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2025, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system, and all parties will be served by the CM/ECF system.

*/s/ Jon M. Greenbaum*
Jon M. Greenbaum