[NOT YET SCHEDULED FOR ORAL ARGUMENT]

**No. 25-5165**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

SUSAN TSUI GRUNDMANN,

Plaintiff-Appellee,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

Defendants-Appellants.

_____

On Appeal from the United States District
Court for the District of Columbia

_____

**APPELLEE'S BRIEF**

_____

Norman L. Eisen, D.C. Bar #435051
Tianna J. Mays, D.C. Bar #90005882
Pooja Chaudhuri, D.C. Bar #888314523
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003

Jon Greenbaum, D.C. Bar #489887
JUSTICE LEGAL STRATEGIES, PLLC
P.O. Box 27015
Washington, D.C. 20038
Tel: (202) 601-8678

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Plaintiff-Appellee Susan Tsui Grundmann certifies as follows:

### A. Parties

Susan Tsui Grundmann is Plaintiff-Appellee. Defendants-Appellants are President Donald J. Trump and Colleen Duffy Kiko, Chairman of the Federal Labor Relations Authority. There were no intervenors or amici before the district court.

The Commonwealth of Kentucky, State of Alabama, State of Arizona, State of Arkansas, State of Florida, State of Georgia, State of Idaho, State of Iowa, State of Kansas, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, State of West Virginia, and the Arizona State Legislature filed an amended amicus brief in support of Defendants-Appellants in this Court on September 12, 2025.

### B. Rulings Under Review

Defendants-Appellants have sought appellate review of the district court's (Judge Sparkle L. Sooknanan) March 12, 2025 Order, *see* ECF No. 21, and Memorandum Opinion, *see* ECF No. 22, granting summary judgment and entering declaratory and injunctive relief for Plaintiff-Appellee. The district court's opinion is published in 770 F. Supp. 3d 166 (D.D.C. 2025).

## C. Related Cases

There has been no previous appeal in this case. There are no other related cases involving substantially the same parties *and* the same or similar issues. This case involves the legality of Defendants-Appellees' removal of Plaintiff-Appellee Grundmann as a member of a Federal Labor Relations Authority, an independent federal agency. As identified in the Defendants-Appellees' Certificate as to Parties, Rulings, and Related Cases, there are cases pending before this court and the Fourth Circuit Court of Appeals involving the President's removal of independent agency leaders, but those cases involve different plaintiffs and different agencies.


Dated October 3, 2025          /s/   Jon M. Greenbaum
                               Norman L. Eisen, D.C. Bar #435051
                               Tianna J. Mays, D.C. Bar #90005882
                               Pooja Chaudhuri, D.C. Bar #888314523
                               DEMOCRACY DEFENDERS FUND
                               600 Pennsylvania Avenue SE #15180
                               Washington, DC 20003

                               Jon M. Greenbaum
                               JUSTICE LEGAL STRATEGIES PLLC
                               P.O. Box 27015
                               Washington, DC 20038
                               (202) 601-6878

# <u>TABLE OF CONTENTS</u>

GLOSSARY ............................................................................................ vii

INTRODUCTION .................................................................................... 1

STATEMENT OF JURISDICTION ......................................................... 5

STATEMENT OF THE ISSUES ............................................................. 6

STATEMENT OF THE CASE.................................................................. 6

    A.    Statutory Background........................................................... 6

    B.    Factual and Procedural Background ................................... 10

SUMMARY OF ARGUMENT................................................................. 16

STANDARD OF REVIEW .................................................................... 18

ARGUMENT ......................................................................................... 18

I.    The district court correctly found that the provision restricting the removal of FLRA members to instances of inefficiency, neglect of duty, or malfeasance in office is constitutional. ....................................... 18

    A.    Under the Humphrey's Executor exception, Congress has the authority to limit Presidential removal of principal officers of multimember expert agencies that do not wield substantial executive power............................................................................ 18

    B.    The FLRA has the structure of a multimember independent agency of experts that falls within the Humphrey's Executor exception. ....................................................................... 28

    C.    The FLRA does not exercise significant executive authority and thus falls within the Humphrey's Executor exception. ........... 30

II.    The District Court properly awarded injunctive relief. ............................ 34

    A.    The district court correctly determined that when the President has no authority to remove a principal officer, courts have the power to order de facto reinstatement. ............................ 34

    B.    The injunction factors weigh in favor of Appellee. ....................... 43

CONCLUSION ....................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFGE Council of Locals v. FLRA*,
  798 F.2d 1525 (D.C. 1986) ..................................................................29

*AFGE v. Trump*,
  929 F.3d 748 (D.C. Cir. 2019) ............................................................29

*Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*,
  64 F.4th 1354 (D.C. Cir. 2023) ...........................................................18

*Aviel v. Gor*,
  No. 25-5105, 2025 WL 1600446 (D.C. Cir. June 5, 2025) ................36

*BATF v. FLRA*,
  464 U.S. 89 (1983) ................................................................................7

*Bivens v. Six Unknown Named Agents of Federal Bureau of Investigation*,
  403 U.S. 388 (1972) ............................................................................27

*In re Cheney*,
  406 F.3d 723 (D.C. Cir. 2005) ............................................................41

*City of Arlington, Texas v. F.C.C.*,
  569 U.S. 290 (2013) ............................................................................26

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ............................................................................40

*Collins v. Yellen*,
  594 U.S. 220 (2021) ................................................................20, 27, 28

*Department of Defense v. FLRA*,
  659 F.2d 1140 (D.C. Cir. 1981) ............................................................9

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) ................................................................18, 43, 44

*FEC v. NRA Political Victory Fund*,
  6 F.3d 821 (D.C. Cir. 1993) ................................................................33

ii

*Franklin v. Massachusetts*,
　　505 U.S. 788 (1992) ....................................................................39, 40

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
　　561 U.S. 477 (2010) ...........................................................................20

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
　　527 U.S. 308 (1999) ....................................................................38, 40

*Harris v. Bessent*,
　　No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) .........................35, 36

*Humphrey's Ex'r v. United States*,
　　285 U.S. 602 (1935) ...................................... 1, 19, 20, 21, 22, 26, 28, 29, 32, 37

*James Bagg's Case*,
　　(1615) 77 Eng. Rep. 1271 (K.B.) ........................................................40

*Library of Cong. v. FLRA*,
　　699 F.2d 1280 (D.C. Cir. 1983) ..........................................................6

*Mallory v. Norfolk S. Ry. Co.*,
　　600 U.S. 122 (2023) ...........................................................................4

*Marbury v. Madison*,
　　5 U.S. (1 Cranch) 137 (1803) ...........................................................40

*Marshall v. Whirlpool Corp.*,
　　593 F.2d 715 (6th Cir. 1979) .............................................................41

*Media Matters for Am. v. Paxton*,
　　138 F.4th 563 (D.C. Cir. 2025) ..........................................................44

*Mical Commc'ns, Inc. v. Sprint Telemedia, Inc.*,
　　1 F.3d 1031 (10th Cir. 1993) .............................................................41

*Mississippi v. Johnson*,
　　71 U.S. (4 Wall.) 475 (1867) .............................................................37

*Morrison v. Olson*,
　　487 U.S. 654 (1988) ...........................................................................20

*N.M. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*,
148 F.4th 755 (D.C. Cir. 2025) ........................................................................18

*Sampson v. Murray*,
415 U.S. 61 (1974) ...........................................................................................44

*In re Sawyer*,
124 U.S. 200 (1888) ..........................................................................................40

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .......................... 1, 19, 20, 21, 22, 24, 27, 28, 29, 30, 31, 32

*Severino v. Biden*,
581 F. Supp. 3d 110 (D.D.C. 2022) ..................................................................39

*Severino v. Biden*,
71 F.4th 1038 (D.C. Cir. 2023) .......................................................15, 24, 34, 35

*Slaughter v. Trump*,
2025 WL 1984396 (D.D.C. July 17, 2025) .......................................................22

*Slaughter v. Trump*,
No. 25-2561, 2025 WL 2551247 (D.C. Cir. Sept. 2, 2025) .......19, 22, 31, 32, 35

*Slaughter v. Trump*,
No. 25A264, 2025 WL 2692050 (U.S. Sept. 22, 2025) .......................................4

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) ............................................. 15, 34, 35, 38, 39, 42

*Trump v. United States*,
603 U.S. 593 (2024) .....................................................................................36, 37

*Trump v. Wilcox*,
145 S. Ct. 1415 (2025) .............................................................................4, 21, 45

*Turgeon v. FLRA*,
677 F.2d 937 (D.C. Cir. 1982) ...................................................................8, 9, 33

*White v. Berry*,
171 U.S. 366 (1898) ..........................................................................................40

iv

*Wiener v. United States*,
   357 U.S. 349 (1958)............................................................13, 19, 23, 31

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)............................................................24, 25, 37, 39

**Constitution and Statutes**

U.S. Const., art. II, § 1 ...................................................................18

U.S. Const., art. II, § 3 ...................................................................18

5 U.S.C. §§ 7101–35 ....................................................................2, 6

      § 7101(a).............................................................................7

      § 7104(a).........................................................................8, 29

      § 7104(b)......................................................................6, 8, 33

      § 7104(c).........................................................................8, 29

      § 7104(f)(1)........................................................................33

      § 7104(f)(2)........................................................................33

      § 7105(a)(1).........................................................................7

      § 7105(a)(2)(G)...................................................................30

      § 7105(a)(2)(H)...................................................................30

      § 7105(g)(3).......................................................................31

      § 7105(h)..........................................................................32

      § 7123(b)..........................................................................31

28 U.S.C. § 1291 ............................................................................5

28 U.S.C. § 1331 ............................................................................5

28 U.S.C. § 1361 ..........................................................................41

Pub. L. No. 95-454, 92 Stat. 1111 (1978).......................................6, 8, 29

Pub L. No. 49-104, 24 Stat. 379, 383 (1887)..............................................1

**Other Authorities**

5 C.F.R. § 1200.3(b) ..................................................................45

124 Cong. Rec. 25,721 (1978)...............................................9, 10

Fed. R. Civ. P. 81(b) .................................................................41

*Power of the President to Remove Members of the Tennessee Valley*
    *Authority from Office*,
    39 Op. Att'y Gen. 145 (1938) .............................................25

S. Rep. No. 95-969 (1978) .........................................................9

## <u>GLOSSARY</u>

| | |
|---|---|
| CFPB | Consumer Financial Protection Bureau |
| CSRA | Civil Service Reform Act |
| FLRA or Authority or Agency | Federal Labor Relations Authority |
| FSLMRS or the Statute | Federal Service Labor-Management Relations Statute |
| FTC | Federal Trade Commission |
| ICA | Interstate Commerce Act |
| ICC | Interstate Commerce Commission |
| J.A. | Joint Appendix |
| MSPB | Merit Systems Protection Board |
| NLRB | National Labor Relations Board |

## INTRODUCTION

When Congress created the first multimember independent regulatory agency, the Interstate Commerce Commission ("ICC"), in 1887 as part of the Interstate Commerce Act ("ICA"), the ICA provided that the five Commissioners would serve six-year terms appointed by the President and confirmed by the Senate and that no more than three Commissioners could be from one political party. The ICA also provided that Commissioners could only be removed by the President for inefficiency, neglect of duty, or malfeasance in office.  Interstate Commerce Act of 1887, Pub L. No. 49-104, 24 Stat. 379, 383 (1887).

The Federal Trade Commission ("FTC") was among the independent agencies where Congress modeled its structure after the ICC. When a member of the FTC sued President Roosevelt after the President removed him for policy differences, the Supreme Court unanimously held in *Humphrey's Executor v. United States*, 285 U.S. 602, 624 (1935), that that the FTC removal statute was constitutional for a commission whose duties were "predominantly quasi judicial and quasi legislative" as opposed to "political and executive."  The Supreme Court has reaffirmed *Humphrey's Executor* several times since, with the Court in *Seila Law LLC v. CFPB*, 591 U.S. 197, 219 (2020), describing the *Humphrey's Executor* exception for limiting Presidential removal for members of "multimember expert agencies that do not wield substantial executive power."

1

The agency at issue in this appeal—the Federal Labor Relations Authority ("FLRA" or "Authority" or "Agency")—is among the independent agencies that Congress created in the tradition of independent regulatory agencies and in accordance with *Humphrey's Executor*. As part of civil service reform in the late 1970's, Congress enacted the Federal Service Labor-Management Relations Statute (FSLMRS or "the Statute"), 5 U.S.C. §§ 7101–35, and the FLRA was tasked with carrying out the purposes of the Statute. The Statute empowered the Authority to serve as a primarily quasi-judicial body that adjudicates labor-management disputes in the federal workforce. The three-member Authority, like the FTC in *Humphrey's Executor*, is multimember and bipartisan and serves five-year staggered terms, are appointed by the President with the advice and consent of the Senate, and may only be removed for inefficiency, neglect of duty, or malfeasance in office. In recognition of the constitutional significance of quasi-judicial and quasi-legislative as opposed to executive functions, Congress created a General Counsel who carries out the Agency's prosecutorial functions. The General Counsel is independent from the members of the Authority but directly accountable to the President who both appoints the General Counsel (who also must be confirmed by the Senate) and can remove the General Counsel. Additionally, the President has sole discretion to choose the Chairman of the Authority, who serves as the chief administrative officer, from among the members.

In creating the Authority, Congress determined that it needed an independent and bipartisan body to adjudicate labor-management disputes in the federal workforce. Prior to the FLRA, these disputes were decided by the Federal Labor Relations Council, which was considered not independent and therefore defective because its members were drawn exclusively from management. To maintain the Authority's independence, Congress considered the limitations on Presidential removal to be essential.

Plaintiff-Appellee Susan Tsui Grundmann was appointed to the Authority in 2022. She filed this case against the President and the Chairman of the Authority seeking declaratory and injunctive relief after she was informed in a two-sentence email that the President was removing her. The parties cross-moved for summary judgment. The Government acknowledged Defendants' actions violated the Statute but claimed that the Statute was unconstitutional, and that even if Ms. Grundmann prevailed on liability, her only relief was back pay, not an injunction that would enable her to continue serving.

In what it described as "[a] straightforward reading of Supreme Court precedent," J.A.52, the district court determined that the removal provision of the Statute was constitutional because the FLRA is a multimember expert agency that does not wield substantial executive power. It also found that the injunctive relief Ms. Grundmann sought was available under D.C. Circuit authority and that Ms.

Grundmann satisfied the requirements for injunctive relief.

The Government's appeal is largely a rehash of the same arguments it made in the district court updated to reflect the Supreme Court's interim order in *Trump v. Wilcox*, 145 S. Ct. 1415 (2025). In *Wilcox*, the Supreme Court on its emergency docket stayed lower court injunctions in removal cases involving members of the National Labor Relations Board and the Merit Systems Protection Board. In that order, the Supreme Court stated that "the Government is likely to show that both the NLRB and MSPB exercise considerable executive power," *id.* at 1415, but it did not provide any explanation as to why. Along similar lines, the Supreme Court issued an order in *Slaughter v. Trump*, No. 25A264, 2025 WL 2692050 (U.S. Sept. 22, 2025), which involves the removal of Federal Trade Commission member, that asks the parties to brief whether *Humphrey's Executor* should be overruled and whether a federal court can prevent the removal of an official.

Though the Government and perhaps others may interpret these developments in the Supreme Court as a death knell for the future of the *Humphrey's Executor* exception, this Court's role is to interpret current authority, not anticipate future authority. *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) ("As this Court has explained: If a precedent of this Court has direct application in a case, . . . a lower court should follow the case which directly controls, leaving to this Court the prerogative of overruling its own precedents.") (cleaned up). And the Supreme

Court's interim order in *Wilcox* provides no guidance as to what and what is not considerable or substantial executive authority. Under the current state of the law, the FLRA removal provision is constitutional. The FLRA has the structure of a traditional independent agency that falls under the *Humphrey's Executor* exception, a point that the Government does not appear to dispute. As to the Authority's functions, the government fails to show how they individually and collectively comprise substantial executive authority. Moreover, enabling the President to remove members at-will would undermine Congress's intent to have an independent body adjudicate matters where the executive branch is a party. As to remedy, this Circuit has made clear that injunctive relief is available in officer removal cases and the district court was well within its discretion to find that injunctive relief is available here.

For these reasons, and as discussed in more detail below, the district court should be affirmed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction of this matter under 28 U.S.C. § 1331. The district court granted Plaintiff summary judgment and issued declaratory and injunctive relief on March 12, 2025. JA 33-34. Defendants filed a notice of appeal on May 8, 2025. JA70. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether 5 U.S.C. § 7104(b), which states that members of the Federal Labor Relations Authority "may be removed by the President only upon notice and hearing and only for inefficiency, neglect of duty, or malfeasance in office," is constitutional.

2.      Whether the district court acted within its discretion when it enjoined Appellant-Defendant Kiko from removing Ms. Grundmann from her office or in any way treating Ms. Grundmann as having been removed and required Appellant-Defendant Kiko to provide Grundmann with access to the necessary government facilities and equipment so that she may carry out her duties during her term as a Member of the Federal Labor Relations Authority.

## STATEMENT OF THE CASE

### A. STATUTORY BACKGROUND

In 1978, as part of the Civil Service Reform Act (CSRA), Pub. L. No. 95-454, 92 Stat. 1111 (1978), Congress enacted the Statute, 5 U.S.C. §§ 7101–35. The Statute "comprehensively reorganized the structure of labor-management relations in the federal government.  Congress intended the new statutory system to serve the twin goals of protecting the right of public employees to organize and bargain collectively, while simultaneously strengthening the authority of federal management to hire and fire employees in the interest of a more effective public service." *Library of Cong. v. FLRA*, 699 F.2d 1280, 1283 (D.C. Cir. 1983).

6

Regarding the former goal, Congress stated in its statutory findings: "The Congress finds that (1) experience in both private and public employment indicates that the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them (A) safeguards the public interest, (B) contributes to the effective conduct of public business, and (C) facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment." 5 U.S.C. § 7101(a) (cleaned up).

Congress created the Federal Labor Relations Authority to "carry out the purpose of the Statute." 5 U.S.C. § 7105(a)(1). The Supreme Court described the Authority's functions as primarily quasi-judicial in resolving labor-management disputes and quasi-legislative in its rule making function. The Authority:

> adjudicates negotiability disputes, unfair labor practice complaints, bargaining unit issues, arbitration exceptions, and conflicts over the conduct of representational elections. See [5 U.S.C.] §§ 7105(a)(2)(A)–(I). In addition to its adjudicatory functions, the Authority may engage in formal rulemaking, § 7134, and is specifically required to "provide leadership in establishing policies and guidance relating to matters" arising under the Act, § 7105(a)(1). The FLRA may seek enforcement of its adjudicatory orders in the United States courts of appeals, § 7123(b), and persons, including federal agencies, aggrieved by any final FLRA decision may also seek judicial review in those courts, § 7123(a).

*BATF v. FLRA*, 464 U.S. 89, 93 (1983).

The Authority is multimember and bipartisan and serve five-year staggered

terms. 5 U.S.C. § 7104(a), (c); Pub. L. 95-454, 92 Stat. 1196, tit. VII, § 7104. A member's term "shall not expire until the earlier of (1) the date on which the member's successor takes office, or (2) the last day of the Congress beginning after the date on which the member's term of office would (but for this paragraph) expire." 5 U.S.C. § 7104(c).

Members of the Authority (1) are appointed by the President with the advice and consent of the Senate and (2) may only be "removed after notice and a hearing and only for inefficiency, neglect of duty, or malfeasance in office." *Id.* § 7104(b). The President designates a Chairman: "The President shall designate one member to serve as Chairman of the Authority. The Chairman is the chief executive and administrative officer of the Authority." *Id.* § 7104(b).

In addition, the Statute also provides for a General Counsel that is independent from the Authority members and that the President can remove at any time:

> The Act also provides for a General Counsel who is appointed by the President, with Senate approval, independent of the Authority members, and serves at the pleasure of the President. 5 U.S.C. § 7104(f)(1) (Supp. III 1979). The General Counsel has separate authority to promulgate regulations in furtherance of his statutory duties. *Id.* § 7134. The principal duties of the General Counsel are to investigate unfair labor practice charges, and issue and prosecute unfair labor practice complaints before the Authority. *Id.* § 7104(f)(2). The General Counsel is the only person given authority to issue unfair labor practice complaints.

*Turgeon v. FLRA*, 677 F.2d 937, 938 n.4 (D.C. Cir. 1982). Reflecting the General Counsel's independence from the Authority members, this Court has held that the

8

Statute "affords the Authority no opportunity to review a decision of the General Counsel declining to issue an unfair labor practice complaint—it is only upon the issuance of a complaint by the General Counsel that the Authority is empowered to exercise its decision-making functions: conduct hearings, decide the merits of a complaint, and issue any appropriate remedial order." *Id.* at 938–39. Congress "intended to draw the line between the prosecutorial function of the General Counsel, and the adjudicatory function of the Authority." *Id.* at 939.

The legislative history reflects Congress's intentionality in how it structured the agency. The "independent and bipartisan" structure of the Authority was of paramount concern as it "replaced the Federal Labor Relations Council, which had been criticized as defective because its members come exclusively from the ranks of management." *Department of Defense v. FLRA*, 659 F.2d 1140, 1145 (D.C. Cir. 1981) (cleaned up). As Representative Clay, who chaired the subcommittee who worked on the Statute, stated:

> One of the central elements of a fair labor relations program is effective, impartial administration. Title VII provides for the creation of an independent and neutral Federal labor relations authority to administer the Federal labor management program. Currently the Federal labor-management program is administered by the Federal Labor Relations Council which is composed of three administration officials, none of whom can be considered neutral.

124 Cong. Rec. 25,721 (1978); *see also* S. Rep. No. 95-969 at 7–8 (1978) ("Consolidating responsibility in FLRA should eliminate what is perceived by

Federal employee unions and others as a conflict of interest in the existing Council . . . . S. 2640 will assure impartial adjudication of labor-management cases by providing for a new Board whose members are selected independently—nominated by the President and confirmed by the Senate.").

Congress viewed the limitations on the President's ability to remove members of the Authority as critical to the Authority's independence and impartiality: "Impartiality is guaranteed by protecting authority members from unwarranted 'Saturday night' removals." 124 Cong. Rec. 25,721–22 (1978).

### B. FACTUAL AND PROCEDURAL BACKGROUND

Ms. Grundmann was nominated by the President and confirmed by the Senate on May 12, 2022 to a position on the FLRA for a term set to expire on July 1, 2025. J.A.39. "Under the FSLMRS, she is permitted to continue serving until either her successor takes office or the last day of the Congress beginning after the original expiration date, which in her case would fall in January 2029." J.A.39–40 (cleaned up). The Government does not dispute this fact. Apps' Br. 23 n.4.

 On February 10, 2025, Ms. Grundmann received a two-sentence email from Trent Morse of the White House informing her that President Trump was removing her: "On behalf of Donald J. Trump, I am writing to inform you that your position on the Federal Labor Relations Authority is terminated, effective immediately. Thank you for your service." J.A.40. "She did not receive notice or a hearing, nor

was any 'inefficiency, neglect of duty, or malfeasance in office' identified." *Id.* Ms. Grundmann was unable to perform her duties thereafter. *Id.*

Ms. Grundmann filed a Complaint against President Trump and Colleen Duffy Kiko regarding her removal and moved for summary judgment. J.A.41. The defendants cross-moved for summary judgment. *Id.* Defendants conceded that Ms. Grundmann's removal violated the FSLMRS, J.A.42, but claimed that the removal provision of the statute for FLRA members is unconstitutional and that the President has the at-will authority to remove Ms. Grundmann under Article II of the Constitution. J.A.36–37. Defendants did not dispute any of the material statements of fact submitted by Ms. Grundmann. J.A.39.

Following briefing and oral argument, the district court granted Ms. Grundmann's Motion for Summary Judgment and denied Defendants' Cross-Motion in an Order, J.A.33–34, and accompanying Memorandum Opinion, J.A.35–69, both issued on March 12, 2025.

After stating that Ms. Grundmann's removal violated the Statute, J.A.42, the Court proceeded to analyze the constitutionality of the Statute's removal provision. The Court noted that the Necessary and Proper Clause grants Congress broad authority to enact federal legislation, and that this includes the power to provide removal protections for multimember independent agency bodies with quasi-judicial or quasi-legislative functions. J.A.42. The Court further noted that "'Article II of the

11

Constitution provides that the executive Power shall be vested in a President who must take Care that the laws by faithfully executed,'" J.A.44 (quoting *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020)), and that as part of that authority, the general rule is that the President can remove executive officials, J.A.44.The district court stated that the one of the exceptions recognized by the Supreme Court to the general rule is an exception that applies to "'multimember agencies that do not exercise substantial executive authority,'" J.A.44 (quoting *Seila Law*, 591 U.S. at 218), which the Supreme Court recognized in *Humphrey's Executor*.

Based on *Seila Law's* articulation of the *Humphrey Executor's* exception, the district court broke the test into two parts: structure (whether the FLRA is a traditional multimember agency), J.A.46–47, and powers (whether the FLRA exercises substantial executive authority). J.A.47–50.  The district court also examined "[o]ther *Seila Law* factors." J.A.50–51.

First, the district court found that FLRA's membership structure falls within the *Humphrey Executor's* exception because it contains three structural components: (1) it is bipartisan and thus designed to be nonpartisan and impartial; (2) it is a trained body of experts; and (3) its terms are staggered. J.A.46–47.

Second, the district court held "none of the FLRA's powers identified by the Government qualifies as a substantial executive power."  J.A.47. The district court then proceeded to analyze each power identified by the government. The court

12

started by analyzing the FLRA's authority to "conduct hearings and resolve complaints," including issuing decisions awarding equitable relief. J.A.47. The district court cited to the Supreme Court's decision in *Wiener v. United States*, 357 U.S. 349, 354–55 (1958), where the Court found that the President's removal of a Commissioner fell into the *Humphrey Executor's* exception and those Commissioners adjudicated cases that could not be appealed. J.A.47–48.

The district court then addressed three arguments the Government made regarding the FLRA authority to litigate and enforce its decisions in federal court. It stated that the FLRA's authority to require an agency or labor organization to cease and desist and to take appropriate remedial action was akin to the FTC's cease-and-desist authority in *Humphrey Executor*. It found that the FLRA's authority to petition to enforce one of its orders in federal court was an authority the FTC had in *Humphrey's Executor*. J.A.48–49. It also found that the Government failed to show how the FLRA's independent litigation authority was an exercise of substantial executive authority. J.A.48–49.

The final set of arguments regarding power that the district court rejected as reflecting substantial executive authority was the agency's rulemaking function. The district court found that FLRA's "narrow, largely administrative regulatory assignments pale in comparison to what was feared in *Seila Law*." J.A.49.

Next, the district court also found that the "other" *Seila Law* factors favored

Ms. Grundmann. It stated that the unlike the CFPB, where Congress created an "unprecedented" organizational structure that the Supreme Court found unconstitutional in *Seila Law*, the structure of the FLRA was "part of the fabric of our federal government" and that agencies with similar structures had been in existence for nearly 150 years. J.A.50. The Court also found that the "FLRA has levels of Presidential accountability" that did not exist with the CFPB. J.A.51. The FLRA has staggered five-year terms which enables a President to wield influence through appointments; the FLRA receives funding through the appropriations process; the President has appointment power and full removal power over the General Counsel, enabling the President to "immediately influence the FLRA's investigative and prosecutorial power;" and the President designates the Chairman, who serves as the chief executive of the agency.  J.A.51.

Based on this analysis, the district court found that the "FLRA triggers and satisfies the "*Humphrey's Executor* exception," and ruled for Ms. Grundmann on liability. J.A.52.

As to remedies, the district court found that it had discretion to award declaratory relief against the defendants and elected to exercise that discretion because "the case before the Court involves legal relations that need to be clarified." J.A.55. It issued declaratory relief stating that Ms. Grundmann's removal was unlawful, that she remained a member of the FLRA, and would continue to do until

expiration of her term or if the President removed her consistent with the provisions of 5 U.S.C. § 7104(b). J.A.33.

With respect to injunctive relief, the district court found based on this Court's precedents in *Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996), and *Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023), de facto reinstatement was available as a remedy to a removed officer provided that Plaintiff satisfied the requirements of injunctive relief. J.A.59–64. Regarding those requirements, the district court found that there was no adequate remedy at law that would restore Ms. Grundmann to her position and that the deprivation of her statutory right to function in her office was a irreparable harm. J.A.65–67. The Court further found that the balancing of the equities and public interest favored Plaintiff. It noted that without Ms. Grundmann the remaining members could deadlock on cases causing cases to go into abeyance and that, given the widespread findings across the federal government, this was a "particularly bad time for deadlock." J.A.67–68. Conversely, the district court dismissed the Government's argument that an injunction would violate separation of powers, stating that "[p]roviding no injunctive relief would allow the President to flout not only Congress's Article I power to create multimember independent agencies, but also the Court's Article III power to maintain the rule of law." J.A.68. The district court further stated that the public interest favored Ms. Grundmann, citing Congress's several findings in the Statute about how the FLRA furthers the

15

public interest. J.A.68–69. Accordingly, the district court enjoined Defendant Kiko "from removing Ms. Grundmann from her office without cause or in any way treating Ms. Grundmann as having been removed, from impeding in any way her ability to fulfill her duties as a Member of the FLRA, and from denying or obstructing her authority or access to any benefits or resources of the office." J.A.34.

Ms. Grundmann resumed working on March 13, 2025. The government took its time to seek to have her removed. It waited fifty-seven days before filing their notice of appeal on May 8. 2025. ECF No. 24. It waited seventy-six days before moving for a stay in the district court on May 27, 2025. ECF No. 26. On June 13, 2025, the District Court denied the motion to stay in an Order, ECF No. 30, and accompanying Memorandum Opinion. ECF No. 29. The court found that Defendants did not satisfy any of the stay factors.

The government moved this Court for an administrative stay and stay of the district court's injunction on June 13, 2025. This Court granted an administrative stay on June 18, 2025, and in a brief per curiam order, granted the motion for stay on July 3, 2025.

## SUMMARY OF ARGUMENT

The district court correctly determined that the removal provision of the Statute is constitutional under the consistently reaffirmed *Humphrey's Executor* exception based on the FLRA's structure and functions. First, the FLRA has all the

16

structural components of a traditional independent agency that falls within the *Humphrey's Executor* exception: it is multimember and bipartisan, and it is comprised of experts who serve staggered terms. Second, the FLRA does not exercise substantial executive authority. As provided in the Statute and as the Supreme Court has found, it is a primarily quasi-judicial agency that adjudicates labor-management issues in the federal workforce. It also exercises a quasi-legislative function in its limited use of regulations in support of its quasi-judicial function. The powers the Government asserts are substantial exercises of executive power were found not to be so by the Supreme Court in *Humphrey's Executor* as applied to the FTC or are outgrowths of those powers and thus do not comprise substantial executive authority.

The district court also did not abuse its discretion in awarding injunctive relief to enable Ms. Grundmann to perform her duties.[1] This Court has found that such injunctive relief is available in removal cases. Moreover, the district court properly found that Ms. Grundmann satisfied the requirements of injunctive relief as she is irreparably harmed by losing her statutory right to office and backpay (which she has not sought) is not an adequate remedy. Furthermore, the balance of harms and public interest favor the plaintiff, particularly when, in Ms. Grundmann's absence,

---

[1] The Government does not appear to contest that Ms. Grundmann is entitled to declaratory relief if the district court is affirmed on liability.

the FLRA is subject to deadlock with two members and the Government's radical transformation of the federal workplace makes the FLRA especially important in adjudicating labor-management disputes.

## STANDARD OF REVIEW

The Court reviews the grant of summary judgment de novo. *N.M. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 148 F.4th 755, 764 (D.C. Cir. 2025). The grant of permanent injunctive relief is reviewed for abuse of discretion. *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1361 (D.C. Cir. 2023); *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

## ARGUMENT

I.   **The district court correctly found that the provision restricting the removal of FLRA members to instances of inefficiency, neglect of duty, or malfeasance in office is constitutional.**

   A.   **Under the *Humphrey's Executor* exception, Congress has the authority to limit Presidential removal of principal officers of multimember expert agencies that do not wield substantial executive power.**

Because the government concedes that it has violated the removal provision, it must show that the provision is unconstitutional under Article II of the Constitution. Article II provides that [t]he executive Power shall be vested in a President of the United States of America." U.S. Const., art. II, § 1. Among the President's executive responsibilities is "to take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3. The Supreme Court has found that the Take Care

18

Clause generally includes the power to remove executive officers. *Seila Law*, 591 at 213.

But the Supreme Court has also recognized limits to the President's power to remove officers in certain circumstances. In *Humphrey's Executor v. United States,* 295 U.S. 602 (1935), the Supreme Court unanimously held that the President illegally removed a member of the Federal Trade Commission where the FTC statute limited removal to when the member engaged in inefficiency, neglect of duty, or malfeasance in office and the President did not remove Mr. Humphrey for any of those reasons. As this Court recently described *Humphrey's Executor* in an ongoing case involving removal of a FTC Commissioner, "the Supreme Court held that it is 'plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers' wielding power of what it then termed a 'quasi-judicial' or 'quasi-legislative' 'character.'" *Slaughter v. Trump*, No. 25-2561, 2025 WL 2551247, at *2 (D.C. Cir. Sept. 2, 2025) (quoting *Humphrey's Ex'r*, 295 U.S. at 624, 628–29).

In the ninety years since, the Supreme Court has consistently preserved the "*Humphrey's Executor* exception" to the President's authority to remove Executive Branch officials. In *Wiener v. United States*, 357 U.S. 349 (1958), the Supreme Court unanimously applied the reasoning in *Humphrey's Executor* to find that the President did not have at-will authority to remove a member of the War Claims Commission,

a multimember, quasi-judicial body. *See also Morrison v. Olson*, 487 U.S. 654, 688 & n.25 (1988) (recognizing that *Humphrey's Executor* is still good law); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010) (declining to "reexamine" *Humphrey's Executor*); *Seila Law LLC v. CFPB*, 591 U.S. 197, 204, 228 (2020) (expressly stating twice that it was not revisiting *Humphrey's Executor*); *Collins v. Yellen*, 594 U.S. 220, 251 (2021) (describing *Seila Law* as not revisiting decisions limiting the President's removal authority regarding multimember agencies).

When describing the *Humphrey's Executor* exception as one of two exceptions to the President's authority to remove officers in *Seila Law*, the Court characterized it as applying to "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 591 U.S. at 218.[2]

---

[2] The Government inconsistently describes the *Humphrey's Executor* exception, sometimes suggesting that it does not apply when the agency exercises "substantial" executive power, Appellants' Br. 8, 18–19, 22, and other times suggesting that it does not apply when the agency exercises "any" executive power or applies only when the agency exercises "no part of" executive power. *Id.* at 2, 8, 11–12, 15. A fair reading of the cases shows that the threshold is whether the agency exercises "substantial" or "considerable" executive power as opposed to "any" executive power. In deciding *Humphrey's Executor*, the Court found no basis for at-will removal where the duties involved were "predominantly quasi judicial and quasi legislative." 295 U.S. at 624. *Seila Law* uses different language in different parts of the opinion, sometimes discussing whether the agency in question wields "significant" executive power, 591 U.S. at 199, 220, other times "substantial" executive power, *id.* at 218, and other times "any" executive power, *id.* at 216. But, when the Court described the two exceptions for when Congress can limit the removal authority of the President, it

Regarding the "multimember expert agency" component of the test articulated in *Seila Law*, the Court referenced *Humphrey's Executor* in "identif[ying] several organizational features that helped explain its characterization of the FTC as non-executive" *Seila L*aw, 591 U.S. at 216 (citing *Free Enter. Fund*, 295 U.S. at 619–20, 624). The Court noted that the FTC was "[c]omposed of five members—no more than three from the same political party." *Seila L*aw, 591 U.S. at 216 (citing *Humphrey's Ex'r*, 295 U.S. at 624). This bipartisan requirement indicates that the FTC was "designed to be 'non-partisan' and to 'act with entire impartiality.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624). The FTC Commissioners' "staggered, seven-year terms enabled the agency to accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624). Additionally, the FTC's duties were "neither political nor

---

used the phrase "substantial executive power" for the *Humphrey's Executor* exception. *Id.* at 218. Moreover, the concurring and dissenting opinions categorize the majority's test as "substantial executive power." *Id.* at 239 (Thomas, J., concurring and dissenting) ("the Court takes a step in the right direction by limiting *Humphrey's Executor* to 'multimember expert agencies that *do not wield substantial executive power*'") (cleaned up) (emphasis in original); *id.* at 250 (Kagan, J., concurring and dissenting) ("the Court concludes that *Humphrey's Executor* must be limited to multimember expert agencies that *do not wield substantial executive power*") (emphasis in original). In *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), the Supreme Court stayed the lower court decision in part because "the Government [was] likely to show that both the NLRB and MSPB exercise considerable executive power." This brief uses the phrase "substantial executive power" for ease of reference, but the analysis and result would be no different if "considerable executive power" is the operative standard.

executive" because they "called for 'the trained judgment of a body of experts' 'informed by experience.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624). The Court characterized these features as characteristic of a "traditional independent agency headed by a multi-member board or commission," *id*. at 207, and contrasted them with the structure of the CFPB, which is headed by a single-Director. *Id.* at 218.

Regarding what constitutes substantial executive authority as opposed to quasi-judicial or quasi-judicial authority, the Supreme Court in *Humphrey's Executor*, recently re-examined by this Court in *Slaughter*, and in *Wiener* provides guidance as to what does not constitute executive authority. Conversely, the Supreme Court in *Seila Law* provided guidance as to what does constitute substantial exercising authority in the context of an independent agency led by a single member.

In *Slaughter*, this Court held that 'the present-day [Federal Trade] Commission exercises the same powers that the Court understood it to have in 1935 when *Humphrey's Executor* was decided." 2025 WL 2551247 at *3. This Court in *Slaughter* also described certain current day powers of the FTC as an "outgrowth of the Commission's original enforcement and remedial powers" such that these powers did not constitute the exercise of substantial executive authority. *Slaughter*, 2025 WL 2551247 at *4 (quoting *Slaughter v. Trump*, 2025 WL 1984396 at *12 (D.D.C. July 17, 2025)).

22

In *Wiener*, as part of the War Claims Act of 1948, Congress created the three-member War Claims Commission whose members were appointed by the President and confirmed by the Senate. 357 U.S. at 349–50. The Commission had "jurisdiction to receive and adjudicate according to law, claims for compensating internees, prisoners of war, and religious organizations, who suffered personal injury or property damage at the hands of the enemy in connection with World War II." *Id.* at 350 (cleaned up). The Commission's decisions were final and could not be appealed to a court or an official. Awards made by the Commission were paid out of a War Claims Fund administered by the Secretary of the Treasury. *Id.* at 354–55. President Eisenhower removed Commissioner Myron Wiener because he regarded it in "the national interest" for the work of the Commission to be completed with "personnel of [his] own selection." *Id.* at 350. The Supreme Court unanimously held "[t]he philosophy of *Humphrey's Executor*, in its explicit language as well as its implications, preclude[d]" the President from "remov[ing] a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission." *Id.* at 356.

*Seila Law* identified powers of a one-member independent agency head that are inconsistent with *Humphrey's Executor* but even there the Court said that Congress could cure the constitutional problem by converting the agency to a multimember agency, which suggests that the problem with the CFPB was less about

23

its functions and powers and more about its structure. *Seila Law*, 591 U.S. at 237 ("Our severability analysis does not foreclose Congress from pursuing alternative responses to the problem—for example, converting the CFPB into a multimember agency.").

The Government makes a series of arguments seeking to minimize the *Humphrey's Executor* exception that are perhaps best epitomized in its references to Judge Walker's concurring opinion in *Severino v. Biden*, which asserts that "'only a very narrow reading of' that case 'is still good law.'" Appellants' Br. 16 (quoting *Severino v. Biden*, 71 F.4th 1038, 1050 (D.C. Cir 2023) (Walker, J., concurring)). This view of *Humphrey's Executor* is not the law of the Circuit, as reflected in *Slaughter*. And, as discussed above, the Supreme Court has not only yet to overrule, or significantly limit *Humphrey's Executor* as applied to multimember expert agencies that do not exercise substantial executive power, but it has repeatedly affirmed *Humphrey's Executor*.

Each of the government's individual arguments seeking to undermine or minimize *Humphrey's Executor* is unavailing when applied to the present context. The Government cites Attorney General Robert Jackson's 1938 opinion regarding the President's authority to remove members of the Tennessee Valley Authority and a footnote in his concurring opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 n.4 (1952), as demonstrating that "[s]oon after *Humphrey's Executor*

was decided, its reach across the Executive Branch was understood to be limited."

Appellants' Br. 13. Notwithstanding that neither of these references are controlling

authority, they do not do the work the Government claims. In his opinion, Attorney

General Jackson did not seek to limit *Humphrey's Executor*. Instead, he

distinguished it:

> In the *Humphrey's* case the Court held the contrary in the case of a
> member of the Federal Trade Commission, but relied upon the
> distinguishable fact that the Federal Trade Commission exercises quasi-
> legislative and quasi-judicial functions and is not a part of the executive
> branch; and it also laid great stress upon the legislative history of the
> Federal Trade Commission Act as indicating a purpose of the Congress
> to secure the maximum independence of the Commission from
> Executive interference and control.
>
> These distinguishing factors are not present in the case of the Tennessee
> Valley Authority. It does not exercise quasi-legislative or quasi-judicial
> functions, and the legislative history of the Tennessee Valley Authority
> Act contains no such indications of purpose on the part of the Congress
> to restrict the President's ordinary power to remove executive officers
> appointed by him.

*Power of the President to Remove Members of the Tennessee Valley Authority from*

*Office*, 39 Op. Att'y Gen. 145, 146–47 (1938). The *Youngstown* footnote, far from

limiting *Humphrey's Executor*, acknowledges it: "President Roosevelt's effort to

remove a Federal Trade Commissioner was found to be contrary to the policy of

Congress and impinging upon an area of congressional control, and so his removal

power was cut down accordingly." *Youngstown Sheet & Tube*, 343 U.S. at 638 n.4

(Jackson, J., concurring) (citing *Humphrey's Ex'r*, 295 U.S. 602). It goes on to note that the President had exclusive power of removal in other contexts.

Next, the Government, citing *City of Arlington, Texas v. F.C.C.*, 569 U.S. 290, 304 n.4 (2013), claims that even when agencies like the FLRA engage in adjudicative and rulemaking activities that take legislative and judicial forms, they are exercising executive authority. Appellants' Br. 14. *City of Arlington* considered whether a ruling by the Federal Communications Commission (FCC) was entitled to *Chevron* deference and did not touch on the relevant issue here: Congress's power to limit the President's removal authority. *Id.* at 307. In *City of Arlington*, the Court explained that when federal agencies like the FCC "make rules" and "conduct adjudications," these activities "take 'legislative' and 'judicial' forms," but are exercises of "executive Power" "under our constitutional structure." 569 U.S. at 304 n.4. In other words, federal agencies exercise executive power because, under our constitutional structure, they are housed within the executive branch. Such a reading is incompatible with *Humphrey's Executor* because it would swallow up the *Humphrey's Executor* exception.

The Government then contends *Humphrey's Executor* should be "confined to the precise considerations before it" because that is "consistent with how the Supreme Court and courts of appeals have applied binding precedent whose underlying foundations have since been eroded." Appellants' Br. 16–17. The

Government provides three examples: limitations on taxpayer standing challenging the expenditure of federal funds under the Establishment class; the exemption of the sport of baseball to antitrust laws; and bringing damages actions under the Constitution against federal actors under *Bivens v. Six Unknown Named Agents of Federal Bureau of Investigation*, 403 U.S. 388 (1972). Appellants' Br. 17–18. These examples are inapt because in the examples the Government cites, the Supreme Court has repeatedly distinguished cases that did not fall within the narrow bounds of the original case. As discussed above, this is not what has happened with *Humphrey's Executor*. In *Wiener*, the Supreme Court applied the *Humphrey's Executor* exception to an entirely different agency. And in *Seila Law*, 591 U.S. at 207, 218, the Court's description of the *Humphrey's Executor* exception, "multimember expert agencies that do not wield substantial executive power," applies to a broad range of agencies that the Court characterized as "traditional independent agenc[ies] headed by multimember board[s] or commission[s]." *Humphrey's Executor* hardly qualifies as a precedent whose foundations have eroded.

The Government then cites *Collins v. Yellen*, 594 U.S. 220 (2021), for the proposition that "once the Court had determined that a federal agency exercised executive power, it presumptively fell within the President's control of at-will removal, and courts are not well suited to craft judicial exceptions to the

27

Constitution's structure for the chain-of-command in the Executive Branch." Appellants' Br. 19. But *Collins* makes clear that the Court was not disturbing *Humphrey's Executor* or addressing removal of a member of a multimember executive agency but instead predicating its decision on the fact that the agency has issue was led by a single Director. *Collins*, 594 U.S. at 250–51.

### B. The FLRA has the structure of a multimember independent agency of experts that falls within the Humphrey's Executor exception.

There can be no serious dispute that the FLRA has the structure of an agency that falls under the *Humphrey's Executor* exception as described in *Seila Law,* and the Government's brief does not appear to argue otherwise. In *Humphrey's Executor*, the Court "identified several organizational features that helped explain its characterization of the FTC as non-executive." *Seila L*aw, 591 U.S. at 216 (citing *Free Enter. Fund*, 295 U.S. at 619–20, 624). The Court noted that the FTC was "[c]omposed of five members—no more than three from the same political party." *Seila L*aw, 591 U.S. at 216 (citing *Humphrey's Ex'r*, 295 U.S. at 624). This bipartisan requirement indicates that the FTC was "designed to be 'non-partisan' and to 'act with entire impartiality.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624). The FTC Commissioners' "staggered, seven-year terms enabled the agency to accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624). Additionally, the FTC's duties were "neither political nor executive" because they "called for 'the trained

judgment of a body of experts' 'informed by experience.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624). The Court characterized these features as ones characteristic of a "traditional independent agency headed by a multi-member board or commission," *id.* at 207, and contrasted them with the structure of the CFPB, which is headed by a single Director, *id.* at 218.

The FLRA contains all of these features of a multimember board of experts. The FLRA is composed of three members, not more than two of whom shall be members of the same political party. 5 U.S.C. § 7104(a). In addition, FLRA members serve staggered five-year terms, *id.* § 7104(c) (establishing five- year terms); Pub. L. No. 95-454, § 7104(c)(1), 92 Stat. 1196 (1978) (staggering terms), which "prevent(s) complete turnovers in leadership and guarantee(s) that there would always be some Commissioners who had accrued significant experience." *Seila Law*, 591 U.S. at 218. That significant experience enables the Authority members to act as a "body of experts." *See AFGE v. Trump*, 929 F.3d 748, 760 (D.C. Cir. 2019) (noting the "FLRA's 'specialized expertise in the field of federal labor relations'") (quoting *AFGE Council of Locals v. FLRA*, 798 F.2d 1525, 1528 (D.C. 1986)). The FLRA's structure therefore falls within the *Humphrey's Executor* exception.

29

C.    **The FLRA does not exercise significant executive authority and thus falls within the *Humphrey's Executor* exception.**

Contrary to the Government's insistence, the FLRA does not exercise "significant executive authority" to fall outside the *Humphrey's Executor* exception. Appellants' Br. 20. The FLRA—like the FTC in *Humphrey's Executor* and more recently in *Slaughter*—performs quasi-legislative and quasi-judicial duties. Indeed, the three-Member Authority is primarily quasi-judicial because the Members, as a board, predominantly act as an adjudicative appellate body, resolving legal disputes after factfinding has already occurred by administrative law judges or in arbitration. 5 U.S.C. § 7105(a)(2)(G), (H). This appellate function—the primary function of the multimember body of the FLRA—is exclusively adjudicative in nature.

On appeal, the government argues the district court erred by concluding that the FLRA does not "wield[] substantial executive power." *See* Appellants' Br. 22–23 (concluding that the FLRA falls outside of the *Humphrey's Executor* exception because it exercises substantial executive power). In so arguing, the government points to the FLRA's authority to "conduct[] hearings and resolve[] complaints of unfair labor practices . . . in which it 'unilaterally issue[s] final decisions awarding legal and equitable relief.'" Appellants' Br. 20 (citing 5 U.S.C. § 7105(a)(2)(G) and *Seila Law*, 591 U.S. at 219).

*Seila Law* characterized these functions as adjudicative. 591 U.S. at 207. There, however, the Supreme Court was concerned that the Consumer Financial

30

Protection Bureau Director could "*unilaterally*" take various actions, including adjudicate. *Id.* at 225 (emphasis in original). In contrast, the Members of the Authority act as a *body* when they carry out their functions—more like an appellate body than a single executive officer.

Regardless, and as the district court noted, the mere ability to issue decisions, even if executive in nature, does not strip the FLRA of its removal protections. *See* J.A.48 (citing *Wiener*, 357 U.S. at 354–55, to demonstrate that "the ability to issue final judgments is not a death knell for removal protections"). In *Slaughter*, this Court agreed, finding that "the present-day [FTC] exercises the same powers that the Court understood it to have in 1935 when *Humphrey's Executor* was decided." *Slaughter*, 2025 WL 2551247, at *3. For example, this Court noted that the 1935 FTC was authorized to "gather and compile information . . . and to investigate corporate practices; to demand both annual and special[ ] reports or answers from corporations; and to issue subpoenas and enforce them in federal court"—powers shared by the current FTC. *Id.* (internal quotation marks omitted).

The government similarly points to the Authority's ability to "'require [an agency or labor organization] to take any remedial action it considers appropriate to carry out the policies' of the Statute, 5 U.S.C. § 7105(g)(3), and petition to enforce such an order in federal court, *id.* § 7123(b)." Appellants' Br. 20. The government highlights the FLRA's authority to send its own attorneys to litigate civil actions. *Id.*

at 20–21 (citing 5 U.S.C. § 7105(h). While *Seila Law* characterized the "power to seek civil 'monetary penalties' as a 'quintessentially executive power not considered in *Humphrey's Executor*,'" here, the FLRA's "authority to seek such penalties is far less 'daunting' than the [CFPB's]." *Slaughter*, 2025 WL 2551247, at *4 (quoting *Seila Law*, 591 U.S. at 219). Unlike the CFPB, the FLRA does not go to court to bring new enforcement actions through litigation. *Cf. id.* at *4 ("Unlike the [CFPB], which—when *Seila Law* was decided—could impose monetary penalties of its own accord in administrative proceedings as well as seek them in court actions, the [FTC] can seek such penalties only in court."). This Court characterized the FTC's powers to seek monetary penalties as an "outgrowth" of the FTC's "original enforcement and remedial powers, not a 'dramatic transformation of the character of the office.'" *Id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 632) (cleaned up).

Finally, *Slaughter* also rejected the government's contention, Appellants' Br. 21, that rulemaking is enough executive authority to remove an agency from the *Humphrey's Executor* exception. *Id.* In *Slaughter*, this Court recognized that, "in 1935, as now, the [FTC] could promulgate rules and regulations, as well as issue reports." *Id.* (citing, among others, *Humphrey's Ex'r*, 295 U.S. at 624, 628).

Simply stated, if the government's characterizations of the FLRA's powers were correct, then virtually any function of the government could be recharacterized as "executive" simply by virtue of an agency having any discretion over any

decisions, contrary to the well-established holding of *Humphrey's Executor* and its progeny, which *Seila Law* declined to call into question. *See, e.g.*, *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993) (Federal Election Commission, "patterned on the classic independent regulatory agency," can make both rules and other retrospective remedies).

In contrast, the executive functions of the agency are carried out by officers who are removable at will by the President. The President designates one of the members of the Authority as the Chairman, who serves as "the chief executive and administrative officer of the Authority," 5 U.S.C. § 7104(b). The General Counsel exercises the executive functions of investigating, filing, and prosecuting complaints. *Id.* § 7104(f)(2). The General Counsel is appointed by the President with the advice and consent of the Senate and the "General Counsel may be removed at any time by the President." *Id.* § 7104(f)(1); *see also Turgeon*, 677 F.2d at 939 (Congress "intended to draw the line between the prosecutorial function of the General Counsel, and the adjudicatory function of the Authority").

In sum, Congress did not grant the members of the Authority with "substantial" or "considerable" executive authority. Accordingly, the district court correctly concluded that the FLRA falls squarely within the *Humphrey's Executor* exceptions. As such, the Statute's removal protections are constitutional, and the district court's decision should be affirmed.

## II.   The District Court properly awarded injunctive relief.

### A.   The district court correctly determined that when the President has no authority to remove a principal officer, courts have the power to order de facto reinstatement.

The district court ruled that it could permissibly enjoin Defendant Kiko, a subordinate official, to reinstate Grundmann as a de facto member of the FLRA. This relief is well-supported by and entirely consistent with this Court's decisions in *Swan v. Clinton*, 100 F.3d at 979–80, and *Severino v. Biden*, 71 F.4th at 1043, which held that subordinate officials could be enjoined to reinstate government officials who had been terminated by the President, without determining the thornier issue of whether a federal court could order the President to reinstate an official that he had terminated. *See* J.A.59–64 (discussing the appropriateness of de facto reinstatement in the instant action and rejecting largely the same arguments that the government asserts here).

In *Swan*, this Court addressed whether the plaintiff, who had been removed by the president as a board member of the National Credit Union Board, could obtain injunctive relief against officials other than the president. 100 F.3d at 979. There, this Court explained, "the question was not whether subordinate officials have the legal power to remove or reinstate NCUA Board members," but "rather whether injunctive relief against such officials alone could provide Swan with an adequate remedy, despite the fact that only the president has the power to officially remove . . .

Swan." *Id.* This Court found that the subordinate officials could "accomplish these deeds de facto by treating Swan as a member of the NCUA Board and allowing him to exercise the privileges of that office," *id.* at 980, such as by including Swan in Board meetings, giving him access to his former office, recording his votes as official, and allowing him to draw a salary of a Board member, *id.* Thus, it concluded that being permitted to resume his seat on the Board in a "de facto fashion" was an "adequate remedy." *Id.* at 979–80.

In *Severino*, this Court ruled that the plaintiff there, a presidential appointee to the Council of the Administrative Conference of the United States later removed, could seek an injunction against a subordinate agency official. 71 F.4th at 1043. Relying on *Swan*, this Court made clear "[o]ur power to enjoin the Conference's Chairperson is undisputed, and, at least in principle, the Chairperson may 'includ[e] [Severino] in Board meetings,' 'giv[e] him access to his former office,' and permit him to cast votes as if he were a Council member, just the same forms of relief we held sufficient in *Swan*." *Id.* (quoting *Swan*, 100 F.3d at 980).

Indeed, this Court, sitting *en banc* in *Harris v. Bessent*, has already agreed that the government is unlikely to succeed on its arguments that de facto reinstatement is not an available remedy. *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *2 (D.C. Cir. Apr. 7, 2025); *see also Slaughter*, 2025 WL 2551247, at *6, n.1 ("This court sitting *en banc* has already found the government unlikely to succeed on that

very same argument.") (citing *Harris v. Bessent*, 2025 WL 1021435, at *2); *see also Aviel v. Gor*, No. 25-5105, 2025 WL 1600446, at *2 (D.C. Cir. June 5, 2025) (Pillard & Katsas, JJ., concurring) ("[I]t seems appropriate to defer to the views expressed by our *en banc* Court in denying a stay pending appeal in *Harris*, which found the government unlikely to succeed in its contention that reinstatement is rarely if ever an available remedy for unlawfully removed officials."). Because the district court's decision is well-supported by this Court's existing precedent in *Swan* and *Severino*, it is correct and should be affirmed. Each of the government's three issues with the district court's opinion lacks merit.

Appellants first argue that the district court erred in determining that plaintiff "remains a Member of the [FLRA]" because it is beyond the equitable power of the court and impinges upon the President's "power of removal in executive agencies." Appellants' Br. 23–24 (citing *Trump v. United States*, 603 U.S. 593, 607 (2024)). This position is predicated, however, upon the incorrect determination that the FLRA *does not* satisfy the *Humphrey's Executor* exception.  *See* J.A.52 ("The FLRA triggers and satisfies the *Humphrey's Executor* exception, making the FSLMRS removal provision *a valid exercise of Congress's constitutional authority*.") (emphasis added). Stated differently, because the President does not have the power to terminate Ms. Grundmann without cause, Ms. Grundmann's reinstatement order can hardly be said to infringe upon the executive's "power of removal." Instead, the

President infringed upon Congress's authority in terminating Grundmann without cause in the first place. The primary case relied on by the government, *Trump v. United States*, which considered Presidential immunity for alleged crimes committed while in office, is inapposite.

While the government argues that *Mississippi v. Johnson* supports its position because the "court has no jurisdiction of a bill to enjoin the President in the performance of his official duties," Appellants Br. 24, that case, like *Trump*, stands only for the elementary proposition that the Court should not enjoin the President where the President has the authority to act. 71 U.S. (4 Wall.) 475, 501 (1867); *see also, e.g.*, *Youngstown Sheet & Tube*, 343 U.S. at 635–37 (Jackson, J., concurring) ("grouping of practical situations" of the extent of a President's powers). Here, however, the President's termination of Ms. Grundmann is wrongful pursuant to *Humphrey's Executor*, and therefore that termination could hardly be said to be the "performance of [the President's] official duties." *See, e.g.*, J.A.52 ("But it has been clear for almost a century that *Article II does not give the President an 'illimitable power of removal'* over all federal officers.") (quoting *Humphrey's Ex'r*, 295 U.S. at 629) (emphasis added). Further, unlike in *Mississippi v. Johnson*, the injunction in the instant case has been issued against a subordinate officer and not the President.

To that end, the government's contention that Ms. Grundmann can only seek backpay seems to be a legal requirement invented out of whole cloth. While the

government argues that in other cases, such as *Humphrey's Executor*, where the terminated employee had died before the case was decided, only backpay was sought, the contention that backpay is the only available remedy is belied by cases the government cites in the very same paragraph. *See* Appellants' Br. 24–25 (citing *Swan,* 100 F.3d at 979) (holding that injunctive relief could substantially redress the injury of a member of the National Credit Union Administration who had been fired by the president). As the district court correctly held, backpay is insufficient because, "[b]ackpay does not get Ms. Grundmann back into her role as a Member of the FLRA—a role that the President appointed her to, that the Senate confirmed her for, in an agency that both Congress and the President in their considered judgment created *to be independent* and free from political meddling." J.A.66 (emphasis in original).

The government next argues that injunctions issued against subordinates do not comport with remedies "traditionally accorded by courts of equity." *See Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). This argument misses the mark for at least two reasons.

First, even considering *arguendo* that the government's narrow reading of permissible equitable relief was correct, it completely disregards the holdings of *Swan* and *Severino*, which were decided by this Court after *Grupo* and allowed the de facto reinstatement that Grundmann seeks here. As explained by the district court,

38

any historic evidence offered by the government "does not clearly extend to de facto reinstatement; nor does the Government offer a theory for how it could. The Court is particularly hesitant to second-guess its authority to order de facto reinstatement now that the D.C. Circuit has reaffirmed the remedy's availability even after *Grupo*." J.A.64. The government has done nothing to explain why the cases it cites extend to the de facto reinstatement that the district court granted.

The district court's remedy falls well within the scope of Article II and is consistent with Supreme Court precedent addressing the proper remedy for when a President violates federal law. Unsurprisingly, courts rarely order relief against the President to avoid having to "delv[e] into complicated and exceptionally difficult questions regarding the constitutional relationship between the judiciary and the executive branch." *Swan,* 100 F.3d at 981; *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992). But that constraint has not stopped courts from "fashioning relief" against defendants other than the President who have the power "to treat plaintiffs [removed pursuant to the President's removal powers] as full members of the board." *Severino v. Biden*, 581 F. Supp. 3d 110, 116 (D.D.C. 2022), *aff'd*, 714 F.4th 1038, 1043 (D.C. Cir. 2023). Therefore, a proper remedy is to issue declaratory but not injunctive relief against the President and issue declaratory and injunctive relief against subordinate federal officials. *See Youngstown Sheet & Tube*, 343 U.S. at 585–

89; *Franklin*, 505 U.S. at 802–03; *Clinton v. City of New York*, 524 U.S. 417, 421 (1998). That is exactly what the district court did here.

Second, the Court in *Grupo Mexicano* did not hold as a categorical matter that equitable remedies are confined to their 18th century forms but expressly acknowledged that "equity is flexible." *Id.* at 322. The government's invocation of 19th-century cases, *White v. Berry*, 171 U.S. 366 (1898), and *In re Sawyer*, 124 U.S. 200 (1888), to support its position that a court may not enjoin the removal of an executive officer is similarly unconvincing. The Court in *White* and *In re Sawyer*, while acknowledging the limits on the availability of relief at *equity*, also made clear that equivalent remedies were available at *law*. *White*, 171 U.S. at 377; *In re Sawyer*, 124 U.S. at 212 (expressly acknowledging availability of mandamus remedy at law). This understanding was well established in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), where the Court, considering a case involving a Senate-confirmed official whose commission was wrongfully withheld, found the scenario presented "a plain case for a mandamus." *Id.* at 173. Further, the writ of mandamus has been used to restore executive officials since at least the King's Bench decision in *Bagg's Case* in 1615, where the court granted a "writ of restitution" against the mayor and city council for removing Bagg from his residence in Plymouth with no legal basis. *James Bagg's Case,* 77 Eng. Rep. 1271, 1272 (K.B. 1615) (Coke, C.J.).

In 1938, Federal Rule of Civil Procedure 81(b) essentially merged actions in law and equity, explaining that the "[r]elief previously available through them may be obtained by appropriate action or motion." Fed. R. Civ. P. 81(b). Although Rule 81(b) and a later change to the U.S. Code support the continued issuance of relief in the nature of mandamus, *see* 28 U.S.C. § 1361, Rule 81(b)'s contemplation of using any "appropriate action or motion" to obtain relief formally available under mandamus also readily explains the reliance on injunctions in the mid-to-late-twentieth-century decisions chronicled above. *See In re Cheney,* 406 F.3d 723, 728-29 (D.C. Cir. 2005) (explaining that because Rule 81(b) abolished the formal writ of mandamus, what were formerly mandamus principles "now govern attempts to secure similar relief, such as a mandatory injunction ordering a government employee or agency to perform a duty owed to the plaintiff") (internal citation omitted); *Mical Commc'ns, Inc. v. Sprint Telemedia, Inc.,* 1 F.3d 1031, 1036 n.2 (10th Cir. 1993) ("Fed. R. Civ. P. 81(b) abolished writs of mandamus, and provided that relief formerly available by mandamus may now be obtained by appropriate motion' such as a motion for injunctive relief."); *Marshall v. Whirlpool Corp.,* 593 F.2d 715, 720 n.7 (6th Cir. 1979) ("Since the writ of mandamus has been abolished in federal practice [by Rule 81(b),] the [Occupational Health and Safety] Act presumably contemplates injunctive relief against the Secretary [of Labor].").

Hence, with the merging of the federal courts' power in law and equity in 1938, the relevant consideration in the instant case is whether the remedy was historically available, not whether it was provided by a court of law or a court of equity, a now archaic distinction. To that end, there can be no real doubt that the *de facto* reinstatement ordered by the district court was historically available. As the district court correctly noted, "issuing no relief at all would undermine 'the bedrock principle that our system of government is founded on the rule of law.'" J.A.64 (citing *Swan*, 100 F.3d at 978).

The government's final argument as to why an injunction is not available is simply to argue that the district court overly relied on *Swan* and *Severino* because those cases determined standing to seek an injunction and not the issuances of an injunction itself. However, the fact that the remedial questions arose in the context of standing and that neither case was decided on the merits is beside the point, since the relevant question this Circuit addressed was whether it could provide an equitable remedy for wrongful removal. As the district court explained, "[t]he redressability analysis [necessary to establish standing] asks whether it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.' [citation omitted]. So a remedy cannot establish redressability if it is beyond the authority of the court." J.A.61.

42

Therefore, that *Swan* and *Severino* determined standing rather than a merits ruling is a distinction without a difference. The relevant question in each was whether a subordinate officer could be enjoined to reinstate a federal employee wrongfully terminated by the president. The answer to that question in *Swan* and *Severino*, as it is here, is a resounding yes.

### B.    The injunction factors weigh in favor of Appellee.

The government also argues that, even if Grundmann is correct on the merits, the district court nevertheless abused its discretion by ordering permanent injunctive relief. Appellants' Br. 30 (citing *eBay,* 547 U.S. at 391). This is wrong for a whole host of reasons, notably that most of the arguments the government makes seem to assume that Grundmann was incorrect on the merits. *See, e.g.*, *id.* at 31 (arguing that reinstating Grundmann infringes upon the President's power). The district court did not abuse its discretion.

"[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay*, 547 U.S. at 391. "[T]he balance of equities and public interest

factors merge if the government is the opposing party." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *eBay*, 547 U.S. at 391.

The district court considered the first two factors together and found that Ms. Grundmann's removal deprived her of her "statutory right to function in office" of a "presidentially appointed and congressionally confirmed position of high importance." J.A.66 (cleaned up). The district court rejected the Government's argument that back pay served as an adequate remedy and noted that the case the Government cited, *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974), recognized that there where extraordinary situations where loss of a position could constitute irreparable injury. The district court then explained why this case is extraordinary:

> Far from a mere claim of lost employment, this is a case of constitutional significance. Backpay does not get Ms. Grundmann back into her role as a Member of the FLRA—a role that the President appointed her to, that the Senate confirmed her for, in an agency that both Congress and the President in their considered judgment created *to be independent* and free from political meddling. A check in the mail does not address the gravamen of this lawsuit. Perhaps that is why Ms. Grundmann has not even asked for one.

J.A.66 (emphasis in original) (cleaned up).

Regarding the latter two factors, the district court notes that FLRA would retain only two of its members, and would run the risk of deadlock, which results in a case being in abeyance until the third member is in place. J.A.67. The district court

further noted that "[d]uring the eighteen-month period that Plaintiff Grundmann served as part of a two-member Authority, approximately one-third of the Authority's cases deadlocked, leading to duplicative disputes and resource waste" and that "deadlock would come at a particularly bad time considering the widespread firings across the federal workforce in recent months." J.A.67.[3] The district found that this outweighed the separation of powers raised by the Government. It also correctly pointed out, not reinstating Grundmann "ignores the separation-of-powers risks posed by non-intervention. If the Government had its way, it would place unchecked power in the hands of the President, which is antithetical to our system of government." J.A.68. The district court also found the public interest would be better served by having a fully functional FLRA. It cited to the numerous Congressional findings as to how the FLRA serves the public interest. J.A.68–69.

The Government's primary argument is grounded in the Supreme Court's statement in *Wilcox* that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." Appellants' Br. 31 (quoting *Wilcox*, 145 S. Ct. 1415). But *Wilcox*, in evaluating a

---

[3] In this respect the FLRA differs from the MSPB. For the MSPB, "[w]hen there are at least two Board members and, due to a vacancy, recusal or other reasons, the Board members are unable to decide any case by majority vote, the decision, recommendation, or other order under review may be deemed the final decision or order of the Board." 5 C.F.R. § 1200.3(b).

petition, was in a different posture than here. In *Wilcox*, the Supreme Court was weighing the equitable factors without a merits ruling as to whether the agencies exercise substantial executive power. This Court would only address the equitable factors if it first finds that the FLRA does not exercise substantial executive power. And in those circumstances, the Government's risk of harm is reduced as this Court will have found that the Government has violated the statute and the statute is constitutional. Additionally, under these circumstances, the related risk that the Government identifies—challenges to actions the FLRA takes in the event Ms. Grundmann resumes office, Appellants' Br. 32–33—is also reduced.[4]

---

[4] The only other argument the Government makes as to the equitable factors is that "forgoing reinstatement would not harm plaintiff" because "the traditional remedy . . . has been an award of backpay, not reinstatement." Appellants' Br. 32. This argument is nothing more than a rehash than the Government's argument that de facto reinstatement is not available that is addressed above at Section II.A.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellee Susan Tsui Grundmann respectfully requests that the Court affirm.


Dated: October 3, 2025                    Respectfully submitted,

                                          /s/ Jon Greenbaum
                                          Norman L. Eisen, D.C. Bar #435051
                                          Tianna J. Mays, D.C. Bar #90005882
                                          Pooja Chaudhuri, D.C. Bar #888314523
                                          DEMOCRACY DEFENDERS FUND
                                          600 Pennsylvania Avenue SE #15180
                                          Washington, DC 20003

                                          Jon Greenbaum, D.C. Bar #489887
                                          JUSTICE LEGAL STRATEGIES, PLLC
                                          P.O. Box 27015
                                          Washington, D.C. 20038
                                          Tel: (202) 601-8678

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 11,182 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Times New Roman, a proportionally spaced typeface.

*/s/ Jon M. Greenbaum*
Jon M. Greenbaum